# Exhibit Z

## Inmate Request 5301953

"Sworn Declaration Under Penalty of Perjury"
in accordance with Federal Statute 28 U.S.C 1746.

Jose Luis Reyna, (hereinafter 'Declarant') makes the following statements based on declarant own first hand knowledge, information, and belief, unless otherwise stated.
I Jose Luis Reyna, hereby depose and Declare:

"That the attached documents are a true copy of the papers I received from the PBSO in regards to inmate request # 5301953 on May 11, 2021."

I, Jose Luis Reyna, Declare in accordance with Federal Statute 28 U.S.C. 1746 under Penalty of Perjury by this sworn declaration that the information and facts provided herein are within the best of my knowledge and belief, True in accordance with the Constitution and the Laws of the United States.

X _____     Date: _5/11/21_

Jose Luis Reyna           # 0252767

Exhibit List

| A | DHS Forms I-200, I-862, I-286 |
|---|---|
| B | Bond Order 50-2015-CF-004073-AXXX-MB |
| C | 2000 Case 00CF-13843 |
| K | 2015 Appeal and 4th DCA Opinion |
| M | 4th DCA Mandate |
| R | Santa Rosa County Jail Invoice |
| S | Florida Supreme Court Decision |
| X | Immigration Status, E-Verify |
| P | 3.850 motion for 2000 Case 00CF-13843 |
| Y | Inmate request # 5214298 |
| Z | Inmate request # 5301953 |
| V | Newspaper article May 12, 2021 |

Exhibit-A

## U.S. DEPARTMENT OF HOMELAND SECURITY    Warrant for Arrest of Alien

File No.   041 074 228

Date:   08/08/2019

**To:**   **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____ REYNA, JOSE _____ is removable from the United States.  This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

**Damian Weston SDDO (acting)**
(Printed Name and Title of Authorized Immigration Officer)

---

### Certificate of Service

I hereby certify that the Warrant for Arrest of Alien was served by me at _MIAMI, FL_
(Location)

on _REYNA, JOSE_   on _11·19·20_ , and the contents of this
(Name of Alien)          (Date of Service)

notice were read to him or her in the _SPANISH_ language.
(Language)

FRANCO DE MIRANDA
SDDO-KROME
Name and Signature of Officer                    N/A
                                        Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

EXHIBIT-A

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 10/17/1969

Event No: WPD1912000103

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: 363450929

FINS: 1268964654

File No: 041 074 228

In the Matter of:

Respondent: JOSE LUIS REYNA AKA: RAZURI, JOSE

_____ currently residing at:

414 26TH STREET WEST PALM BEACH,FLORIDA, 33407

(Number, street, city, state and ZIP code)                              (Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States.

2. You are a native of Peru and a citizen of Peru.

3. You were admitted to the United States at or near New York, New York on or about April 3, 1987 as a lawful permanent resident.

4. You were, on May 25, 2001, convicted in the Circuit Court of the Fifteenth   See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:      [ ] 8CFR 208.30      [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

18201 S.W. 12TH ST BLDG 1 STE C Miami FL 33194. EOIR SPC Miami, FL

(Complete Address of Immigration Court, including Room Number, if any)

on December 18, 2020 at      8:30 AM      to show why you should not be removed from the United States based on the
_____(Date)_____            ___(Time)___

charge(s) set forth above.

Samuel Torres Digitally signed by Samuel Torres
Date: 2020.11.19 13:06:03 -05'00'

S 8153 TORRES - Acting SDDO

(Signature and Title of Issuing Officer) (Sign in ink)

Date: November 19, 2020

Stuart, Florida

(City and State)

---

Exhibit-A

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent) (Sign in ink)*

Date: _____

_____
*(Signature and Title of Immigration Officer) (Sign in ink)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on **11·19·20**, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ~~Spanish~~ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

FRANCO DE MIRANDA
SDDO - KROME

**REFUSED TO SIGN**
_____          _____
*(Signature of Respondent if Personally Served) (Sign in ink)*          *(Signature and Title of Officer) (Sign in ink)*

DHS Form I-862 (2/20)                                                                                        Page 2 of 4

*Exhibit-A*

## Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

Exhibit-A

U.S. Department of Homeland Security                    Continuation Page for Form ___I-862___

| Alien's Name<br>REYNA, JOSE LUIS | File Number<br>041 074 228<br>Event No: WPD1912000103 | Date<br>11/19/2020 |
|---|---|---|

THE SERVICE ALLEGES THAT YOU:
--------------------------------
Judicial Circuit of Florida in and for Palm Beach County of the offense of Count 1-
Possession of Cocaine, in violation of Florida Statute 893.13(6)(a), for which you were
sentenced to five days of imprisonment, followed by eighteen months on probation. Case
number 00CF13843.


ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED
STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
---------------------------------------------------------------------------------
---------------------------------------------------------------------------------
Section 237(a)(2)(B)(i) of the Immigration and Nationality Act, as amended, in that, at any
time after admission, you have been convicted of a violation of (or a conspiracy or attempt
to violate) any law or regulation of a State, the United States, or a foreign country
relating to a controlled substance (as defined in Section 102 of the Controlled Substances
Act, 21 U.S.C. 802), other than a single offense involving possession for one's own use of
30 grams or less of marijuana.

| Signature | Samuel Torres<br>Digitally signed by Samuel Torres<br>Date: 2020.11.19 13:06:22 -05'00'<br>S 8153 TORRES | Title<br><br>Acting SDDO |
|---|---|---|

Form I-831 Continuation Page (Rev. 08/01/07)

Exhibit A

DEPARTMENT OF HOMELAND SECURITY
**NOTICE OF CUSTODY DETERMINATION**

Alien's Name: REYNA, JOSE LUIS

A-File Number: 041 074 228

Date: 08/08/2019

Event ID: WPD1912000103

Subject ID: 363450929

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

[x] Detained by the Department of Homeland Security.

[ ] Released (check all that apply):

[ ] Under bond in the amount of $ _____

[ ] On your own recognizance.

[ ] Under other conditions. [Additional document(s) will be provided.]

Damian Weston
Name and Signature of Authorized Officer

08/08/2019 08:42 AM
Date and Time of Custody Determination

SDDO (acting)
Title

West Palm Beach, Florida
Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

[✓] I acknowledge receipt of this notification, and

[✓] I **do** request an immigration judge review of this custody determination.

[ ] I **do not** request an immigration judge review of this custody determination.

Signature of Alien

11·19·20
Date

---

The contents of this notice were read to REYNA, JOSE LUIS in the SPANISH language.
(Name of Alien)          (Name of Language)

FRANCO DE MIRANDA
SDDO- KROME
Name and Signature of Officer

N/A
Name or Number of Interpreter (if applicable)

SDDO
Title

---

DHS Form I-286 (1/14)

Page 1 of 1

**IN THE COUNTY COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA - CRIMINAL DIVISION**
**CIRCUIT/COUNTY COURT**
**Court Event Form**

DEFENDANT: JOSE LUIS REYNA
CASE NO: 50-2015-CF-004073-AXXX-MB

| | |
|---|---|
| STATE OF FLORIDA | **DATE:** 11/17/2020 |
| vs. | |
| **DEFENDANT: JOSE LUIS REYNA** | **JACKET #:** 0252767 |
| **CASE NO: 50-2015-CF-004073-AXXX-MB** | **BOOKING #:** 2015016696 |
| **DIVISION: Z: Felony - Z (Circuit)** | |

| | |
|---|---|
| **PRESIDING JUDGE: CARACUZZO, JUDGECHERYL** | **START TIME:** 10:51 AM |
| **ASA: COAKLEY, BRIANNA C** | **END TIME:** 10:51 AM |
| **ATTORNEY:** | |
| **PUBLIC DEFENDER:** | |
| **CO-COUNSEL:** | **COURT REPORTER** Centrally Recorded |
| **DEPUTY CLERK: BM** | **COURT TYPE: BOND - BOND HEARING** |
| **COURT ROOM: 11H (Main Branch)** | |

**Reset For**
**Court Date Scheduled - JT - JURY TRIAL - 2/16/2021 9:00 AM - 11H (Main Branch) MB, 205 N. Dixie Highway West Palm Beach FL 33401**
**Court Date Cancelled - STCK - STATUS CHECK - 11/18/2020 9:30 AM - 11H (Main Branch) MB**

**Motion - Granted   - FOR PRE TRIAL RELEASE**
**Other: CASE ADDED PER COURT**
**Other: HEARING HELD IN 10B**
**Other: HEARING HELD VIA ZOOM**
**Other: DFT NOT TRANSPORTED**
**Other: DEFENDANT NOT PRESENT IN CUSTODY**
**Other: B COAKLEY ASA PRESENT VIA ZOOM**
**Other: T KAWASS ESQ PRESENT VIA ZOOM- ATTORNEY OF RECORD (NAME NOT IN SHOWCASE AT THIS TIME)**

**New Bond - Count 1 - Crt Order Plus SOR IV ($50,000.00)**
**New Bond - Count 2 - Crt Order Plus SOR IV ($10.00)**
**New Bond - Count 3 - Crt Order Plus SOR IV ($10.00)**

**Bond Condition - NO CONTACT WITH VICTIM**
**Bond Condition - NO WEAPONS**

**Count 1 - FS SEXUAL BATTERY (NO PHYSICAL FORCE) 794.011(5B)**

**Count 2 - FS SEXUAL BATTERY (NO PHYSICAL FORCE) 794.011(5B)**

**Count 3 - FS SEXUAL BATTERY (NO PHYSICAL FORCE) 794.011(5B)**

FILED: PALM BEACH COUNTY, FL SHARON R BOCK, CLERK 11/17/2020 10:51:52 AM

EXHIBIT-C

A041-074-228

**95**

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR PALM BEACH COUNTY

CASE NO. OOCF 13843    A#2    DIV. S

STATE OF FLORIDA

Jun-14-2001 02:24pm 01-252119
ORB 12644 Pg 183
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

v. Jose Reyna
Jose Luis Reyna

[ ] COMMUNITY
CONTROL
VIOLATOR

[ ] PROBATION
VIOLATOR

DEFENDANT

I hereby certify that the foregoing is a true copy of the record in my office with redactions, if any as required by law.
THIS 28 DAY OF December, 20 18
SHARON R. BOCK
CLERK & COMPTROLLER

DEPUTY CLERK

H/M   10-17-69   060-73-

## JUDGMENT

The above Defendant, being personally before this Court represented by _Alan S. Fishman, Esq._, (attorney)

| [ ] Having been tried and found guilty of the following crime(s): | [X] Having entered a plea of guilty to the following crime(s): | [ ] Having entered a plea of nolo contendere to the following crime(s): |
|---|---|---|

| COUNT | CRIME | OFFENSE STATUTE NUMBER(S) | DEGREE | CASE NUMBER | OBTS NUMBER |
|---|---|---|---|---|---|
| 1 | Poss. Cocaine | 893.13(6)(a) | 3°F | | |

[ ]   and no cause having been shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s).

[ ]   and having been convicted or found guilty of, or having entered a plea of nolo contendere or guilty, regardless of adjudication, to attempts or offenses relating to sexual battery (ch. 794), lewd and lascivious conduct (ch. 800), or murder (s. 782.04), aggravated battery (s. 784.045), carjacking (s. 812.133), or home invasion robbery (s. 812.135), or any other offense specified in section 943.325, the defendant shall be required to submit blood specimens.

[X]   and good cause being shown:  IT IS ORDERED THAT ADJUDICATION OF GUILT BE WITHHELD.

SENTENCE
STAYED

[ ] The Court hereby stays and withholds imposition of sentence as to count(s) and places the Defendant on   [ ] Probation and/or [ ] Community Control under the supervision of the Dept. of Corrections (conditions of probation set forth in separate order).

SENTENCE
DEFERRED

[ ] The Court hereby defers imposition of sentence until _____

The Defendant in Open Court was advised of his right to appeal from the Judgment by filing notice of appeal with the Clerk of Court within thirty days following the date sentence is imposed or probation is ordered pursuant to this adjudication. The defendant was also advised of his right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigency.

DONE AND ORDERED in Open Court at West Palm Beach, Palm Beach County, Florida, this 25 day of May 2001, 199_

FILED

(rev. 1/97)

MAY 25 2001

DOROTHY H. WILKEN, CLERK
CIRCUIT & COUNTY COURTS

CIRCUIT COURT JUDGE

Exhibit-C

**PLEA IN THE CIRCUIT COURT**   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

**THE FOLLOWING IS TO REFLECT ALL TERMS OF THE NEGOTIATED SETTLEMENT**

Name: Jose Luis Reyna   H/m   10-17-69

Plea: Guilty ✗  Guilty/Best Interest __   Nolo Contendere __

~~Case No:~~   Charge

| | | Count | Lesser | Degree |
|---|---|---|---|---|
| 00CF 13843 AOL | Poss. Cocaine | 1 | NO | 3of |

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the foregoing is a
true copy of the record in my office with
redactions, if any as required by law.
THIS 28 DAY OF December, 20 18
SHARON R. BOCK
CLERK & COMPTROLLER
By _____ DEPUTY CLERK

State to Nolle Prosse the following at sentencing: _____

**PSI:** Waived/Not Required ✗  Required/Requested __

**ADJUDICATION:**   Adjudicate [ ]   Withhold [✗] Court's Discretion [ ]

If the Defendant is convicted of possession, sale, trafficking or conspiracy to possess, sell or traffic in any controlled substance, the court directs the Department of Motor Vehicles and Highway Safety to revoke the Defendant's driver's license for two (2) years. If the Defendant is convicted of grand theft of a motor vehicle; theft of motor vehicle parts; or, any felony in the commission of which a motor vehicle was used, the Court directs the Department of Motor Vehicles and Highway Safety to revoke the Defendant's driver's license as mandated by law. The Clerk is directed to make the proper notifications.

**SENTENCE:**

$ _____ Fine   $ _____ Court Costs   $ _____ Drug Trust Fund

$ _____ Cost of Prosecution   $ _____ Public Defender Fees/Costs

Incarceration: _____ Days _____ Months _____ Years

with credit for time served; which is _____ days.

**PROBATION:**   18   (Months) Years - Drug Offender if checked [ ]

ALL CONDITIONS OF PROBATION MUST BE SUCCESSFULLY COMPLETED NO LESS THAN 30 DAYS BEFORE PROBATION IS SCHEDULED TO TERMINATE UNLESS STATED BELOW.

STANDARD CONDITIONS OF PROBATION HAVE BEEN EXPLAINED BY DEFENSE COUNSEL.

**SPECIAL CONDITIONS OF PROBATION:**

A) Restitution as per the accompanying order. [ ] (check if ordered)

B) Fine: $ _____   Court Costs: $ 261⁰⁰   Drug Trust Fund: $ 50⁰⁰

C) Cost of Prosecution $ 50⁰⁰   Public Defender Fees/Costs $ _____

D) Substance abuse evaluation and successful completion of recommended treatment [ ✓ ] (check if ordered) (enroll within 30 days) If in custody, release only to _____

E) Random Drug Testing at Defendant's expense [ ✓ ] (check if ordered)

F) _____ hours of community service at a rate of no less than _____ hours per month

Incarceration: _____ Days _____ Months _____ Year

with credit for time served; which is _____ days.

**OTHER COMMENTS OR CONDITIONS:**

COS $20 A0

SENTENCING IS DEFERRED UNTIL _____ IN COURT ROOM _____

THE DEFENDANT UNDERSTANDS IF S/HE FAILS TO APPEAR OR IS ARRESTED ON NEW CHARGES, A CAPIAS WILL BE ISSUED AND THE COURT WILL IMPOSE ANY LAWFUL SENTENCE.

FILED

MAY 25 2001

DOROTHY H. WILKEN
CIRCUIT & COUNTY COURTS
(CRIM DIV)

_____   Attorney for the Defendant
Assistant State Attorney

5-25-01

Date of Plea   Defendant

Form Circuit 2 (rev 8/2000)

2

Filing # 100687582 E-Filed 12/20/2019 08:36:58 PM  *Exhibit K*  74

IN THE DISTRICT COURT OF APPEAL OF FLORIDA

FOURTH DISTRICT

CASE NO. 4D19-2306

**JOSE REYNA,**
Appellant,

vs.

**THE STATE OF FLORIDA,**
Appellee.

APPEAL FROM THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT OF THE STATE OF FLORIDA, IN AND FOR PALM BEACH
COUNTY
L. T. Case Number 2015-CF-4073-AXXXMB

**INITIAL BRIEF OF APPELLANT**

KRISTEN A. KAWASS, ESQ.
Florida Bar No. 84383

LAW OFFICES OF KAWASS, P.A.
780 Tamiami Canal Road
Miami, Florida 33144
Phone: 305-521-0490 x701
Email: Kristen@kawasslaw.com

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................ iii

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE AND FACTS ........................................1

SUMMARY OF THE ARGUMENTS ...................................................32

**ARGUMENTS**

I.    **THE TRIAL COURT REVERSIBLY ERRED IN ADMITTING COLLATERAL CRIME EVIDENCE OF A PRIOR SEXUAL OFFENSE WHERE: (1) THE OFFENSES WERE DISSIMILAR; (2) THE TRIAL COURT FAILED TO MAKE REQUISITE DETERMINATIONS MANDATED BY LAW; AND (3) THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO ALLOW FOR ITS ADMISSIBILITY.**.......33**

    **A.**    **Standard of Review** ....................................................33

    **B.**    **Merits**.........................................................................33

II.    **IT WAS AN ABUSE OF DISCRETION TO DENY THE DEFENSE'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF MR. REYNA'S PRIOR CONVICTIONS, WHERE THE CONVICTONS WERE TOO REMOTE IN TIME AND THE NATURE OF THE PRIOR FELONY CONVICTION WAS HIGHLY PREJUDICIAL.** ............................45

    **A.**    **Standard of Review** ....................................................45

    **B.**    **Merits**.........................................................................46

CONCLUSION.....................................................................................48

CERTIFICATE OF SERVICE ..................................................................49

CERTIFICATE OF COMPLIANCE.....................................................49

# TABLE OF CITATIONS

## FLORIDA CASES

*Alsfield v. State*, 22 So. 3d 619 (Fla. 4th DCA 2009)................................36

*Audano v. State*, 641 So. 2d 1356 (Fla. 2d DCA 1994)............................36

*Bruce v. State*, 44 So. 3d 1225 (Fla. 5th DCA 2010) ..............................33

*Ciccarelli v. State,* 531 So. 2d 129 (Fla. 1988)....................................45

*Farr v. State*, 230 So. 3d 30 (Fla. 4th DCA 2017) ..................................45

*Fike v. State*, 4 So. 3d 734 (Fla. 5th DCA 2009)....................................40

*Fiore v. State*, 967 So. 2d 995 (Fla. 5th DCA 2007)................................42

*Harrelson v. State*, 146 So.3d 171 (Fla. 1st DCA 2014)............................35

*Mann v. State*, 281 So. 3d 503  (Fla. 4th DCA 2019)................................37

*McLean v. State*, 934 So 2d 1248 (Fla. 2006)...................... 35, 38, 41, 42, 43, 44

*Pitts v. State*, 263 So. 3d 834 (Fla. 1st DCA 2019) ................................37

*Pryor v. State*, 855 So.2d 134 (Fla. 1st DCA 2003) ..............................46, 47

*Pulcini v. State*, 41 So. 3d 338 (Fla. 4th DCA 2010) ..............................33

*Riechmann v. State*, 581 So. 2d 133 (Fla. 1991)....................................46

*Robertson v. State,* 829 So. 2d 901 (Fla. 2002) ......................4, 34, 39, 44

*State v. DiGuilio,* 491 So.2d 1129 (Fla.1986) ......................................44

*State v. Lee*, 531 So. 2d 133 (Fla. 1988)............................................44

*State v. Lincoln*, 279 So. 3d 854 (Fla. 2d DCA 2019)................................37

-iii-

*State v. Page*, 449 So. 2d 813 (Fla. 1984) ................................................46

*Strohm v. State*, 985 So. 2d 640 (Fla. 4th DCA 2008) ...........................40

*Taylor v. State*, 256 So. 3d 950 (Fla. 5th DCA 2018) ............................33

*Trowell v. J.C. Penney Co., Inc.*, 813 So.2d 1042 (Fla. 4th DCA 2002) ...............47

*Whisby v. State*, 262 So. 3d 228 (Fla. 1st DCA 2018)...............................37

*Williams v. State,* 621 So. 2d 413 (Fla. 1993) ........................................5

*Williams v. State,* 110 So. 2d 654 (Fla. 1959) ........................................4

*Wood v. State*, 238 So. 3d 924 (Fla. 1st DCA 2018) ...............................35

## FLORIDA STATUTES

§ 90.404(2), Florida Statutes (2019)........................... 1, 4, 34, 35, 36, 37, 39, 40, 41

§ 90.601(1), Fla.  Stat. (2019)....................................................46

§ 794.011(5)(b), Florida Statutes (2019) .......................................1, 34, 37

## OTHER SOURCES

C. Ehrhardt, *Florida Evidence* § 610.5 (2015) .....................................48

Fla. Std. Jury Instr. (Crim.) 2.4 ...................................................25

U.S. Const. Amends. V, XIV ......................................................33

Art. I, § 9, Fla. Const...............................................................33

# INTRODUCTION

This is an appeal from judgments of convictions and sentences entered following a jury trial before the Honorable Cheryl Caracuzzo, Circuit Court Judge for the Fifteenth Judicial Circuit.  The symbol "R" designates the record on appeal.  The symbol "T" designates the transcripts of the trial proceedings.

## STATEMENT OF THE CASE AND FACTS

Jose Reyna was charged by Information with three counts of sexual battery pursuant to section 794.011(5)(b), Florida Statutes (2019). [R. 333-34].  The case at trial boiled down to a credibility battle between Mr. Reyna and the victim, which was unduly influenced by not only collateral evidence of a prior sexual offense allegedly committed by Mr. Reyna years before., but also evidence of Mr. Reyna's prior convictions.

Prior to trial, the State filed a notice of intent to offer Williams Rule evidence pursuant to section 90.404(2)(c), Florida Statutes, seeking to introduce evidence concerning an alleged prior act of sexual misconduct by Mr. Reyna. [R. 183-84].  Mr. Reyna filed an objection to the State's notice, arguing the dissimilarity between the nature of the alleged sexual act and the charged offenses; the lack of clear and convincing evidence that Mr. Reyna committed the alleged act; and the prejudicial effect of admitting the collateral crime evidence at trial. [R. 192-205].  On November 17, 2017, an evidentiary hearing was conducted by the

1

Honorable Charles E. Burton, during which the testimony of the alleged victim of the collateral crime, J.M., was offered:

### *Williams* **Rule Hearing: Testimony of J.M.**

In October of 2010, the time frame of the alleged incident, J.M. was a detective with the Special Investigations Unit of the Palm Beach County Sheriff's Office, which specifically handled with sex crimes. [R. 660-61]. J.M. was introduced to Mr. Reyna and his wife through a mutual friend, Christie Johnson. [R. 661]. J.M. began hanging out socially with Ms. Reyna at gatherings at the Reyna residence and an occasional dinner. [R. 662].

Around the time of Halloween, J.M. had plans to go to a festival called "Moonfest" on Clematis Street with the Reynas and another person. [R. 663]. J.M. first met at the Reynas' home to eat and drink before driving to the festival. [R. 664]. Once at the festival, they danced, talked, and continued drinking at several bars to the point of impairment. [R. 664].

J.M. testified to going to a bar named "Off the Hookah," where they had gotten a table and were drinking and dancing. [R. 666]. J.M. testified that nothing happened inside of the bar in terms of any physical contact with Mr. Reyna. [R. 666]. It was not until she and Mr. Reyna were outside of the bar that the encounter allegedly occurred. [R. 666].

According to J.M., she had gone to the bathroom located towards the back of the bar. [R. 666]. Mr. Reyna was in that back area and the two of them were hanging out and talking. [R. 666]. She and Mr. Reyna somehow got pushed out of an open door in the back area and the security yelled at them to stay in or out. [R. 666]. The door closed, and she and Mr. Reyna ended up in an alley unable to open the door to get back in. [R. 667].

J.M. and Mr. Reyna walked down the alley towards a bench. J.M testified that she was trying to figure out how to contact Ms. Reyna, but she did not have her cellphone on her. [R. 667-68]. Once they sat on the bench in public [R. 674], J.M. testified that Mr. Reyna attempted to kiss her. [R. 668]. He "kind of leaned over" and put his arm around her. [R. 670]. He told her that she was beautiful. [R. 668]. J.M. testified that she told Mr. Reyna, "No, No, you're married," and pushed him off before he could kiss her. [R. 668, 670].

J.M. further testified that at another point, Mr. Reyna leaned over on top of her, shoved his hand really quickly up her skirt and touched her vagina. [R. 668, 670]. That night, she was wearing a "dark angel" costume consisting of a skirt, fishnet stockings, boots, a tank top and wings. [R. 669]. According to J.M., Mr. Reyna ended up ripping the fishnet pantyhose that she was wearing. [R. 670-71]. J.M. then pushed Mr. Reyna off of her and took off running. [R. 671].

3

J.M. ran to a convenience store, called her mother and eventually met up with her mother. [R. 671]. Rather than calling the police, J.M. told an officer working at the bar what had happened. [R. 671]. She later filed a police report, but was informed by the State Attorney's Office that they were electing not to file charges. [R. 672].

The State argued that the collateral crime evidence was relevant to prove absence of mistake [R. 679-80] and also to establish Mr. Reyna's motive, plan and intent as to "how he functions." [R. 670]. Mr. Reyna argued that the evidence was strikingly dissimilar to the charged crimes and maintained that the State was improperly offering the collateral crime evidence to establish propensity. [R. 684-85, 691].

On December 5, 2017, the trial court issued a written order and made the following findings:

> The State seeks to admit the testimony of [J.M.] to establish lack of mistake. In his response, the Defendant argues that the acts are too dissimilar to have any probative value.
> Generally, evidence of other collateral crimes is admissible "when relevant to prove a material fact in issue, including, but not limited to . . . plan . . . or absence of mistake or accident." § 90.404(2)(a). Such evidence, however, is inadmissible when it is "relevant solely to prove bad character or propensity." *Id.* This type of evidence is frequently referred to as *Williams* Rule evidence. *See generally Williams v. State*, 110 So. 2d 654 (Fla. 1959). "[S]ubstantial similarity of crimes is a requirement when the evidence is sought to be admitted for the specific purpose of establishing absence of mistake or accident." *Robertson v. State*, 829 So. 2d 901, 909 (Fla. 2002).

4

Furthermore, "[a]lthough similarity is not a requirement for admission of other crime evidence, when the fact to be proven is, for example . . . common plan or scheme it is generally the similarity between the charged offense and the other crime or act that gives the evidence probative value." *Williams v. State,* 621 So. 2d 413, 414 (Fla. 1993).

Here, the Defendant points out the dissimilarities from the instant offense. The 2010 incident occurred in a public place on a bench. There was no allegation of penetration by the Defendant's finger, penis, or mouth. However, the similarities in both incidents is what makes the evidence relevant. Both incidents involve a single woman who had planned to go out socially with the Defendant and his wife. Both incidents involve the Defendant, wife, and victim going out for the evening on Clematis Street and consuming alcohol to the point of impairment. Both incidents involve the Defendant making sexual advances when his wife was not present.

Accordingly, it is:

**ORDERED AND ADJUDGED** that the testimony of [J.M.] shall be admissible during the trial of this cause in the State's case in chief as the testimony is relevant to show the absence of a mistake by the Defendant and to rebut his statement during the controlled telephone call that he thought it was his wife.

[R. 217-19].

Mr. Reyna's motion for reconsideration of the trial court's order [R. 232-42] was summarily denied thereafter by the Honorable Cheryl Caracuzzo. [R. 376; T. 322].

**Motion in Limine**

Prior to trial, Mr. Reyna moved in limine to preclude the State from introducing evidence of his prior felony conviction for cocaine possession in 2003. During arguments on the motion, Mr. Reyna also challenged the admissibility of his misdemeanor conviction for filing a false report to a police officer. [T. 364-67;

5

1024-27]. Mr. Reyna argued that the remoteness of the fifteen-year old convictions was more prejudicial than probative to be used for impeachment. [R. 323-26]. The trial court denied Mr. Reyna's motion and determined that the prior convictions were more probative in value because the case hinged on the credibility of Mr. Reyna and the victim. [T. 1026-27].

**Trial Proceedings**

### I. **The State's Case**

The evidence presented at trial established that the victim was a coworker of Mr. Reyna's wife, Jennifer Reyna (hereinafter "Jennifer"), and good friends with both Jennifer and Mr. Reyna. [T. 380, 381]. The victim spent time with the Reynas hanging out at their home and taking trips together. [T. 381].[1] On nights that they would go out together, the victim would stay in the spare bedroom at the Reyna home. [T. 381-2]. The victim testified that prior to the last time that they spent time together, nothing inappropriate had ever occurred between herself and Mr. Reyna. [T. 382].

---

[1] The victim testified to taking a trip to "JazzFest" in New Orleans with the Reynas. [T. 381, 482]. She stayed in a room with Jennifer and Mr. Reyna during that trip. [T. 482-83]. At no time during the trip did Mr. Reyna make an advance towards her. [T. 517]. The victim's testimony was corroborated by Jennifer and Mr. Reyna at trial. [T. 895-99, 1130-33]. Jennifer also testified that they had made plans to return to JazzFest in April of 2015. [T. 899].

6

The victim had made plans with Jennifer to hang out on January 18, 2015, after having gone through a bad break up over the holidays. [T. 383].[2] The plan for that night was to hang out and have fun so as to take her mind off of the breakup. [T. 384]. The victim went to the Reyna home that evening [T. 385] with a packed bag because she was planning on staying over that night. [T. 387].

When they left the house, the victim drove herself, Mr. Reyna and Jennifer to the Clematis Street area. [T. 388]. The first stop they made was at a wine bar named "Wine Dive." [T. 389]. They ordered food and drinks and spent time eating, talking and catching up. [T. 389]. The victim and Jennifer shared a bottle of wine and Mr. Reyna had two drinks. [T. 388-89].

They left the wine bar and went to a Mexican restaurant named "Roxy's." [T. 392]. There, the victim and Jennifer had three rounds of vodka and tonic while Mr. Reyna had gin and tonic. They spent their time dancing and having a good time. [T. 394-95]. By the time they left there, the victim testified that she was "buzzed" and enjoying herself. [T. 396]. Nothing unusual or suspicious occurred with the victim and Mr. Reyna while there. [T. 395-96].

---

[2] The victim was upset about the breakup – she had been speaking to a therapist about it and testified that it was not a good time in her life because it was a very painful breakup. [T. 518].

7

The next stop was a place called "Rocco's" to have another drink. [T. 397]. They chose this place because the Reynas knew the owner and a bartender named Reese [T. 397, 398, 399], whom the victim had actually been introduced to by the Reynas before. [T. 501]. The victim testified to having more drinks while there, this time a margarita and a shot. [T. 397-98].

The three of them went back to the Reyna home when they left Rocco's. [T. 399]. The Reyna home at that time was under renovations. [T. 401, 899]. During the defense case, Jennifer explained that 90% of the house had been gutted. [T. 900]. There were no interior walls [T. 900] and the house was wide open. [T. 916]. Mr. Reyna explained that everything in the house was exposed; that the house was "pretty much open." [T. 1057].

The house originally had two bedrooms – the main one belonging to Jennifer and Mr. Reyna which was under construction, and the other, located in the front, which the victim would sleep in on the nights she slept over. [T. 402, 599, 1170]. Due to the construction, Jennifer and Mr. Reyna were staying in the front bedroom, which was the only room in the house with a bed in it. [T. 401, 403, 483].

The front room was located within 20 to 25 feet from the living room. [T. 1172]. Although the front room was one of the only rooms with walls [T. 403], there was no drywall at the bottom of the walls and there were giant holes in the top. [T. 916, 996]. One of the large holes was directly in line with the couch in the

8

living room. [T. 916]. Because Jennifer and Mr. Reyna had been living in the front bedroom of the house at the time, the victim had to sleep on the couch in the living room that night. [T. 402-03].

The couch in the living room was an L-shaped sectional couch [T. 402; R. 837-39, 842, 845] that was located in front of the front bedroom. [T. 496-97]. Pictures depicted the distance between the couch and the front room. [T. 498; R. 840, 843]. The victim testified that on that night, she slept on the part of the couch that was flat like a bed while Mr. Reyna was positioned on the corner with the armrest. [T. 496].

Once they had returned to the house that night, the victim changed into a t-shirt, cotton shorts and cotton briefs. [T. 400, 404]. She poured herself a glass of red wine from a bottle in the kitchen and sat on the couch in the living room. [T. 400]. One of the dogs jumped on her and spilled the wine on her t-shirt, causing her to change into a pullover fleece. [T. 400-01]. After the wine had spilled, the victim testified to having a sip of tequila from a bottle that Mr. Reyna had in the house. [T. 405-06]. The victim acknowledged throughout the trial that she had consumed a lot of alcohol that night. [T. 552, 593].

The plan was then to watch the movie "Gone Girl." [T. 405]. Jennifer placed sheets, a blanket and a pillow on the couch for the victim. [T. 405]. The victim remembers laying down because she was sleepy. [T. 405]. At this point,

9

Jennifer was in the front room getting ready for bed and Mr. Reyna was sitting on the other end of the couch. [T. 406, 407]. The movie had started but the victim fell asleep before the opening credits. [T. 407].

The victim testified that she was then awoken by someone kissing her on the mouth. [T. 408]. She was very disoriented and once she opened her eyes, she described it as dark, *i.e.*, dark hair and dark skin. [T. 408]. The victim realized that it was Mr. Reyna and believes she tried to swat him way and said to him, "What are you doing?" and "You need to go to your bed." [T. 408, 556-57, 559].

The victim repeatedly described the entire event as a series of "flashes." [T. 409, 410, 412, 558]. She would keep falling back asleep and be awoken again by some form of touching. [T. 409, 412, 558]. It was a repeated occurrence of flashes and fading to black. [T. 410, 592].

The next flash occurred when the victim woke up to Mr. Reyna unzipping her fleece and kissing her chest and breast. [T. 409, 561]. She testified that she kept trying to swat him off and repeatedly asked, "What are you doing?" and told him, "Go to bed with your wife." [T. 409-10, 557].

The flash occurred again. The victim testified that Mr. Reyna now put his hands down her shorts and stuck at least two fingers inside of her. [T. 410]. She described it as forceful, painful and uncomfortable. [T. 410, 411]. The victim testified that she probably said once again, "What are you doing? Go to bed with

10

your wife." [T. 411]. According to the victim, Mr. Reyna's non-responsive answer at one point may have been "she's passed out." [T. 411, 416, 586-87].

The victim testified that at another point, Mr. Reyna said, "Let me at least lick your pussy." [T. 411]. Another flash again. This time, according to the victim, she was awoken by Mr. Reyna performing oral sex on her. [T. 411-12]. The victim then testified that at some point, Mr. Reyna was in between her legs in front of her and she felt him put his penis inside of her. [T. 412, 564, 595]. The last thing she remembered was Mr. Reyna going back over to the edge of the couch and falling forward. [T. 414]. He did not touch her again [T. 414] and the victim fell back asleep. [T. 415].

Admittedly, the only reaction that the victim had to Mr. Reyna during the course of events was the repeated statements that she made to him in a low voice [T. 579], until he ended up having sex with her. It was at that point that she pushed him away and said "no." [T. 413]. Although the victim testified that she "probably actually tried to swat him away" before [T. 415], she did not yell or scream at any point. [T. 413]. The victim testified that she felt humiliated that Mr. Reyna's wife was her really good friend and she did not want Jennifer to know. [T. 414]. She also testified that she felt as if she had no power to actually push him away [T. 415], and that the alcohol was impacting her decisions. [T. 594].

11

The victim woke up the next morning and remembered that she had to be at an appointment with her counselor at 11:00 a.m. [T. 416, 421]. She engaged in small talk with Jennifer [T. 584], grabbed a bottle of water, poured herself a cup of coffee, and decided to take a quick shower. [T. 417]. When she took off her clothes to shower,[3] she noticed that there was abnormal discharge on her underwear and on her leg. [T. 418]. She also felt cramping in her abdomen while showering. [T. 418]. The victim testified that she immediately knew that something was wrong; she knew that something had happened to her sexually, but she did not remember any details of the night before. [T. 417-18, 555-56]. She quickly finished her shower, threw on some clothes, told the Reynas that she had to go, and quickly left the house to head to her appointment. [T. 420, 582]. She did not discuss the incident with her counselor at the appointment. [T. 421].

The victim also did not discuss the incident with anyone the following day [T. 422], including her ex-boyfriend and two other people that she had spoken to for over an hour. [T. 550-51]. That day, which was a holiday, the victim picked up food, went home, watched some movies, and "pretty much laid on the couch all day." [T. 422].

---

[3] The victim testified that she rolled up the shorts and underwear that she had been wearing and threw them in her overnight bag. [T. 420].

On January 20, 2015, the victim returned to work. [T. 422].  When she went to the bathroom that morning, she noticed more abnormal discharge. [T. 423].  It is at that point that the victim testified to having clear memories of that night. [T. 423].  She testified to going through the events of that night in her mind and remembering more of what had happened. [T. 426].  At approximately 3:00 p.m., the victim remembered that Mr. Reyna had raped her. [T. 426].  She did not tell anyone at work about what she remembered. [T. 424].  Jennifer came to her office at the end of the day and the two engaged in small talk (as opposed to their usual lengthy conversations), but the victim said nothing to her. [T. 424-25].

When the victim left work that day, she called her older sister, Andrea Hammer, distraught and hysterical. [T. 426-27, 603-04].  They both agreed that it would be best to go to the hospital, so the victim went to the emergency room at Delray Hospital. [T. 427-28].  A nurse conducted a rape kit by taking swabs from the victim's vagina. [T. 429].[4]  During the exam, the victim told the nurse that she was unsure if there had been penile penetration [T. 681] and that due to her alcohol consumption, she experienced periods of losing her memory. [T. 682].  According

---

[4] The victim was examined by Kyle Rowlands-Perez, a sexual assault nurse examiner employed with Palm Beach Victim's Services at the time. [T. 664-65, 668-69].  Ms. Perez took oral, vaginal and anal swabs from the victim. [T. 677, 678].  Ms. Perez testified that she neither saw any bruises that were the result of a sexual assault [T. 675], nor any trauma associated with the vaginal exam that was conducted, which was not uncommon. [T. 675-76].

to the victim, she did not have sex with anyone either between the night of the incident and when the rape kit was conducted, or a month prior to the incident. [T. 432]. Officer Brent Treu then responded to the hospital with another officer and took the victim's statement. [T. 430, 610-12].

After the victim was discharged from the hospital, Officer Treu and the accompanying officer followed the victim to her house to collect the clothing that she had been wearing that night. [T. 430-31, 616-17]. The victim handed over her cotton underwear and cotton shorts. [T. 431, 617]. Once the items were collected, the victim was contacted by Detective Mark Vertefeuille, who had been assigned to her case. [T. 434, 628].

The victim met with Det. Vertefeuille at the police department on January 22, 2015. [T. 434, 629]. She provided him with a seven-page word document memorializing her memory of the incident. The document was drafted over a span of several hours beginning on January 20th. [T. 433-34, 571-72, 629]. One of the reasons for doing so was to later report it to the police. [T. 574]. The victim also gave a recorded statement of her recollection of the incident. [T. 434, 630].

Det. Vertefeuille asked the victim to conduct a "controlled call" with Mr. Reyna – a "one party consent call" to discuss the incident without Mr. Reyna's knowledge that it was being recorded. [T. 435, 630]. Prior to the call, Det. Vertefeuille and the victim discussed tactics or strategies to use to get Mr. Reyna to

14

talk about the incident. [T. 438, 460-61, 632].   During the call, Det. Vertefeuille provided suggestions of things to ask by writing down questions. [T. 513-14, 633]. Two controlled calls were conducted within the same hour that day. [T. 437, 633]. Both phone calls were played for the jury [T. 438-60, 461-76], and both the victim and Mr. Reyna testified at trial in relation thereto. [*See infra* at 23-25].

On cross-examination, the victim testified that it was possible that her memory was beginning to fade by the time she had left Roxy's because she had had a lot to drink. [T. 552-53].  There were admittedly other things that occurred at Roxy's that she did not remember, such as taking a photograph of a gentleman kissing her on her cheek. [T. 554].  The victim also testified that her memory was probably better when she had spoken to detectives on January 22, 2015 [T. 565], at which time she said that she did not exactly remember whether she felt Mr. Reyna put his penis inside of her. [T. 564].   She later testified at her deposition on November 7, 2016 [T. 553], that she was unsure whether she felt Mr. Reyna put his penis inside of her. [T. 567, 573].

The victim did not recall having a heated conversation with Jennifer on the evening in question regarding her job performance, including that the person the victim was hiring was probably going to replace her. [T. 578].  She did not recall having that conversation at any point in time. [T. 579].

## II. **DNA Evidence**

Alyse Yacovone-Margetts, a senior forensic scientist at the Palm Beach County Sheriff's Office [T. 684-85], conducted a serological analysis of the rape kit, the victim's underwear, as well as an oral standard. [T. 694, 697]. Included in the rape kit were six vaginal swabs [T. 698] which were tested for semen. [T. 700]. Ms. Margetts explained to the jury that semen consists of both sperm cells (cellular component) and seminal fluid (liquid component). [T. 695, 703]. Sperm cells, which is described as "the more heartier cells" [T. 691], can survive in the vaginal cavity for three to seven days. [T. 717]. Seminal fluid proteins, on the other hand, typically survive in the vaginal canal for about 12 to 24 hours. [T. 719, 722, 723].

Different tests were conducted on the swabs for the presence of semen, namely a presumptive test and two confirmatory tests. The presumptive test utilizes acid phosphatase, a highly concentrated protein found in seminal fluid, to determine its presence. [T. 700-01]. The test revealed a "weak positive" on four of the swabs and negative on the remaining two. [T. 701]. The first of the confirmatory tests – a microscopic analysis – came back negative for sperm cells. [T. 702-03]. The second test, however, which utilizes "prostate specific antigen," a highly concentrated protein found in seminal fluid, returned a positive result. [T. 702-03]. Ms. Margetts was able to confirm the presence of seminal fluid on the vaginal swabs. [T. 703].

16

Ms. Margetts testified that both the oral and rectal swabs tested negative for the presence of semen. [T. 704-06]. It was further determined that there was no blood detected on any of the swabs. [T. 699, 705, 706]. In regard to the victim's underwear, Ms. Margetts noted a yellowish discoloration on the interior crotch region, which tested positive on both the presumptive test and the "prostate specific antigen" test for seminal fluid, but not semen. [T. 710]. Ms. Margetts also swabbed the inside and outside of the underwear, but did not conduct additional testing on those items. [T. 712].

DNA analyst Celynda Sowards received the vaginal swabs, three areas from the underwear, and two oral standards of the victim and Mr. Reyna for further DNA testing. [T. 712-13, 736]. The results of the items were as follows:

(1) The first area of the underwear resulted in a single contributor that belonged to the victim. [T. 743].

(2) The second area was taken from inside of the underwear and contained a mixture with a major and minor component, indicating at least two individuals. [T. 743-44]. The major component belonged to the victim and the results of the minor component were inconclusive. Ms. Sowards testified that she could see that there was DNA from another person present, but that there was not enough to be able to reach a conclusion as to who it belonged to. [T. 745].

17

(3) The third area was taken from outside of the underwear and also indicated a mixture of at least two individuals. [T. 745]. The major component likewise belonged to the victim, but the minor component contained a mixture of at least two people, possibly a third. [T. 746]. Ms. Sowards again testified that she could not make a determination as to who the DNA belonged to. [T. 746]. She further testified that there was no male chromosome that was present in any of the minor components of the samples taken from the underwear. [T. 748].

(4) The vaginal swabs resulted in a single contributor that was female in nature. [T. 748]. There was no DNA belonging to anyone else on these swabs. [T. 754-55].

## III.   **The Defense Case**

Jennifer met Mr. Reyna in 2005 and had been married to him since 2009. [T. 885, 1047]. She met the victim in 2012 though work [T. 886] and became close to her over time. [T. 888]. Much like the victim's testimony, Jennifer explained that she and Mr. Reyna spent time with the victim having dinners and taking vacations together. [T. 893-94].

There is not much dispute in the evidence regarding the events leading up to falling asleep at the Reyna home that night. Both Jennifer and Mr. Reyna testified to making plans with the victim for January 18, 2015. [T. 902, 1126]. Their first

stop was a wine bar where Jennifer and the victim shared a bottle of wine and Mr. Reyna had two drinks. [T. 906-08, 1140-41].

In contrast to the victim's testimony, both Jennifer and Mr. Reyna testified to having conversations with the victim throughout the night about her job performance, starting at the wine bar. [T. 908, 1141]. Jennifer testified that it was a key point of the evening. [T. 962]. The gist of the conversations was to alert the victim that her job was in jeopardy. The victim did not take it very well. [T. 1135-36]. She got defensive and was very upset about the conversation. [T. 962].

The night continued at Roxy's [T. 909, 1144] where they ordered rounds of drinks. [T. 910, 1147]. Jennifer and Mr. Reyna testified that the victim was dancing with other men and disappeared a few times for 15 to 20 minutes. [T. 911, 1149-50]. While there, Jennifer spoke to the victim about her job performance and told her that she was about to get fired or demoted from the project that she was working on. [T. 912].

The conversation continued on the way to their next stop, Rocco's [T. 913, 1141], where the bartender, Reese, worked. [T. 913, 1152]. Jennifer testified that as they were walking in, the victim was asking for Reese and yelling out his name, which nearly got them kicked out. [T. 913]. According to Jennifer, all three of them were impaired at that point. [T. 914].

They all returned to the Reyna home after leaving Rocco's. [T. 914, 1152]. They ended up sitting on the L-shaped couch in the living room to watch "Gone Girl." Mr. Reyna was laying in the corner of the couch leaning on the armrest, fully clothed from that night with his shoes on. [T. 919-20, 1173, 1181]. The victim was laying across the other end of the couch. [T. 923, 1183]. Jennifer testified that she was sitting in the middle of the two when the movie started. She eventually got up off the couch to go to bed [T. 923-24] and left the bedroom door open because their dogs would constantly scratch on the door if it was kept closed. [T. 917].

Both Jennifer and Mr. Reyna testified that Mr. Reyna had taken prescribed medication prior to falling asleep that night. [T. 924, 1177]. Mr. Reyna suffered from a herniated disc [T. 1142] and was prescribed "Flexeril" for his back pain. [T. 924, 1128]. Earlier that day, Jennifer and Mr. Reyna had worked on the renovations which involved heavy lifting. [T. 902, 1126-27]. As a result, his back was bothering him [T. 924, 1127] and Jennifer gave him one Flexeril and a sleeping aid to help him sleep that night. [T. 924, 1178]. Mr. Reyna testified to subsequently taking one more Flexeril and three more sleeping aids, which he would usually do when he was in a lot of pain. [T. 1178]. He also testified that it was not unusual for him to fall asleep on the couch when he was experiencing back pains. [T. 1003, 1142]. He explained that sleeping sideways with his elbow on the

20

armrest alleviated the pain from his lower disc and allowed him to fall asleep. [T. 1142, 1175-76].

At approximately 1:30 a.m., Jennifer woke up because her dog needed to use the bathroom. [T. 928]. She walked out of the bedroom and passed the couch to let the dogs out. She saw the victim and Mr. Reyna asleep in the exact same position where she had left them, with their clothing completely undisturbed. The victim was lightly snoring underneath a blanket. [T. 928-30].

When Jennifer woke back up between 5:00 and 5:30 a.m., she testified that the victim and Mr. Reyna were still in the same positions undisturbed. [T. 930-32]. Mr. Reyna was still fully clothed. [T. 932, 1185]. She brought Mr. Reyna to bed and they engaged in a brief sexual encounter. [T. 931, 1142, 1185-86].[5]  Jennifer got dressed and ready for the morning. The victim was still sound asleep. [T. 934-35]. Mr. Reyna woke up shortly thereafter at 9:00 a.m. [T. 936, 1187].

Jennifer woke the victim up and the two sat on the couch talking and laughing about the night before over a cup of coffee. [T. 937-38]. Mr. Reyna had showered and returned to the couch while the ladies chitchatted. [T. 937-39, 1188-91]. Jennifer tried to get the victim out of the house in time for her appointment.

---

[5] Jennifer testified that Mr. Reyna could not get a full erection because he was still medicated. They were kissing and playing around and the encounter lasted a few minutes. [T. 933].

The victim told Jennifer that she still felt drunk from the night before and declined Jennifer's offer to reschedule the appointment. The victim then apologized for not staying for breakfast as she usually would and waved goodbye to the Reynas as she left the house. [T. 940, 1195-96].

Jennifer testified that there was nothing unusual about the victim and Mr. Reyna's interaction that morning; it was normal. [T. 939-40]. They were all laughing as they sat on the couch discussing the night before. [T. 1192]. There was nothing about the victim's conduct to indicate that she was uncomfortable or that something inappropriate had occurred the night before. [T. 941, 1197]. Jennifer testified to the same in regard to seeing the victim at work on January 20, 2015. [T. 942].

Mr. Reyna testified to his prior convictions on direct examination. He testified that he had two convictions from 2003 for: (1) providing false information to a police officer about a crash (which was a misdemeanor); and (2) possession of personal cocaine, which consisted of less than .005 grams of cocaine found in the backseat of his car. [T. 1197-98].[6]

---

[6] Both the State and Mr. Reyna also presented expert testimony regarding the effects of alcohol on memory. [T. 1289-1414, 1420-59].

## IV. __Controlled Calls__

The victim reached out to Mr. Reyna via Facebook to get his phone number to conduct the controlled calls. [T. 436-37, 631, 1212]. Mr. Reyna assumed that they were going to discuss plans for JazzFest [T. 1214] because they were in the process of planning it. [T. 1133].

During the first call, the victim told Mr. Reyna that she wanted to discuss the other night. [T. 441]. Without any further details, Mr. Reyna stated, "I thought we apologized," and mentioned the rough time they had each been going through. [R. 345].[7] Mr. Reyna testified that he was referring to the discussions about her job performance that night and their apology for being stern with her. [T. 1222].

The victim began detailing the physical interactions between the two of them that night. [R. 345-47, 349, 351, 355, 358]. Mr. Reyna apologized multiple times throughout the phone call [R. 345-46, 349-50, 352-53, 356, 359] and repeatedly stated that he did not recall those specific events of that night. Each time that the victim questioned him about a particular interaction they had, Mr. Reyna stated that he did not remember. [R. 347-52, 355-57]. Mr. Reyna stated more than once that all he remembered doing was driving home, going to the couch, having a shot

---

[7] Mr. Reyna explained to the jury that the renovations had put a strain on his and Jennifer's relationship, and that the victim was dealing with the issues of her breakup and her job performance. [T. 1221-24]. Jennifer testified to the same. [T. 1009].

of tequila, and then Jennifer waking him up to go to bed. [R. 351-52]. He did not remember any details between having the drink and being woken up. [R. 358-59].

Mr. Reyna explained to the jury that he was surprised by the victims' questions and shocked at the allegations that she was making. [T. 1218]. He repeatedly testified that it did not happen. [T. 1225, 1229-30]. If something had happened – which Mr. Reyna maintains did not – then he would have taken responsibility for his actions. [T. 1231].

The second phone call took a different turn. Whereas the victim was calm and civil during the first call [T. 1219-20], her tone became more aggressive during the second call. She began cursing and was suddenly adamant that Mr. Reyna had raped her. [T. 478, 1232]. This was admittedly done at the direction of Det. Vertefeuille. [T. 656-57].

Throughout the second call, Mr. Reyna continued to be apologetic, yet still unceasingly maintained that he did not remember the details of that night. [R. 365-74]. He once again stated that all he remembered was sitting on the couch and Jennifer getting him up. [R. 369]. In the midst of his uncertainty, he told the victim more than once that maybe he thought that the victim was Jennifer. [R. 368-69, 370].

Towards the end of the second call, as the victim became more adamant that Mr. Reyna had admitted to having sex with her and had apologized for doing so in

the prior call, Mr. Reyna was adamant that he did not.  He stated that the truth is what he had told her, and that he knew that he had had sex that night, but it was not with her. [R. 372-73].[8]

Mr. Reyna explained why he had been so apologetic and why he did not insist that the victim was wrong during either call.  He testified that the victim was a close friend in a fragile state of mind from the breakup over the holidays and had been seeing a therapist.  He did not know what was going on, he did not want to derail her in any way, and he wanted to calm both her and the situation down. [T. 1219, 1225, 1227, 1228-29, 1234].

## V.   *Williams* **Rule Evidence**

At the outset of J.M.'s testimony, the jury was instructed pursuant to Florida Standard Jury Instruction 2.4:

> The evidence you are about to receive concerning other crimes, wrongs, or acts allegedly committed by the defendant will be considered for you -- or by you for the limited purpose of proving absence of mistake.  And that is as it relates to only – that testimony relates that that issue.
> The defendant is not on trial for a crime, wrong, or act that is not included in the Information.

[T. 773].

---

[8] In the first phone call, Mr. Reyna intimated at one point that "maybe [he] thought it was Jen or something, [he] doesn't know." [R. 358].

J.M.'s trial testimony was consistent with her testimony at the *Williams* rule hearing in terms of the backdrop of the night and the progression of events. At trial though, her testimony was more detailed. For example, the jury learned that she was engaged to a man named Brian at the time, and the original plan that night was to meet him and his cousins, Nick and Susie, at their house to head to Moonfest. J.M. left the Reyna house that evening to do so, but Brian and his cousins had already left their house, so J.M. went back to the Reynas and headed to Moonfest with them. [T. 799-800]. The jury also learned that J.M. was so impaired at the end of the evening that she used the bathroom in the bushes. [T. 805-06].

The specifics of her trial testimony, however, were also contradictory and markedly different in certain respects than her previous testimony. At trial, J.M. testified to feeling uncomfortable while dancing with Mr. Reyna at Off the Hookah because he would comment on how beautiful she was and that he thought he was in love with her. There were points where Mr. Reyna would touch her waist and try to kiss her. [T. 781]. She responded by saying, "No. You're married. Don't do this." [T. 781-82].

J.M. further testified that when she had gone to the bathroom a few times and Mr. Reyna would follow her, he continued to try to kiss and touch her and continued making passes at her. [T. 782]. This happened more than once. [T. 815].

26

At one point of going to the bathroom, Mr. Reyna was leaning up against her and pushing her. [T. 782-83].

J.M. previously testified at the *Williams* rule hearing that there was no physical contact with Mr. Reyna until they were *outside* of the bar. She also previously testified that when she had gone to the bathroom, the two of them were just hanging out and talking. [R. 666].

J.M. testified at trial that Mr. Reyna was leaning up against her when they got pushed out of the back door. [T. 784]. When they ended up in the alley, J.M. testified that she had her phone on her. She tried to use it but it was dead. She also tried to reboot it while sitting on the bench. [T. 786-87]. At the hearing, however, J.M testified that she was trying to figure out how to contact Ms. Reyna, but she did not have her cellphone on her. [R. 667-68].

J.M. further testified at trial that while on the bench outside of the bar, Mr. Reyna shoved his hand up her skirt and shoved his fingers in her vagina. J.M. now detailed that he moved her underwear and touched her in between the lips of her vagina. He was also pinching and touching her butt. [T. 788-89]. J.M. also detailed that Mr. Reyna grabbed her hand and placed it on her crotch. [T. 790].

At the prior hearing, J.M. testified that Mr. Reyna shoved his hand really quickly up her skirt and touched her vagina. [R. 668, 670]. J.M. then pushed Mr. Reyna off of her and took off running. [R. 671].

27

J.M.'s testimony at trial was followed by that of her mother, Sally Antosek, who was called to corroborate J.M.'s testimony regarding the events that occurred after she took off running from Mr. Reyna. [T. 833-36]. J.M. and her mother were the last two witnesses to testify before the State rested its case. [T. 840].

Both Jennifer and Mr. Reyna were questioned about the alleged events from 2010. Their testimony was fairly consistent with J.M.'s regarding the events leading up to arriving at Off the Hookah. [T. 967-72; 1059-74]. Jennifer noted that J.M.'s "dark angel" costume was old and used and that the fishnet stockings were ripped in several places. [T. 978].

Once at Off the Hookah, Jennifer testified that she had gotten separated from Mr. Reyna at some point. She noticed that Mr. Reyna had not returned from the bathroom, so she sent their friend, Cesar, to find Mr. Reyna and J.M. [T. 974-75]. When Cesar was unable to find them, Jennifer tried to call them, but the phones were having problems connecting (there was only one area in the back of the club that had cellphone reception). Jennifer and Cesar went outside to attempt to call again, but Clematis Street was very loud. Cesar decided that they should head home. [T. 975-76, 1016]. Jennifer testified that Mr. Reyna called Cesar and reached home around ten minutes later. [T. 977, 1017].

Mr. Reyna confirmed that the only area with cellphone reception inside of Off the Hookah was by the bathrooms. [T. 1079]. He ended up going to that area

28

four to five time to make calls. [T. 1081].  One of those times, he saw J.M. and she asked him to wait for her.  He ended up having to pull her away from an altercation with another girl. [T. 1081-82].  At another point, he encountered J.M. as he was trying to make a call.  Mr. Reyna testified that J.M. hugged and kissed him, congratulated him on the wedding, and thanked him for inviting her.  Mr. Reyna also testified that he was eventually pushed out of the back alley door by J.M [T. 1083], which was in fact confirmed by video surveillance footage played for the jury. [T. 1110-13].

According to Mr. Reyna, he and J.M. were unable to get back in through the backdoor. [T. 1085-86].  They decided to see if they could get back in through the front door, so they walked around the block towards the front entrance. [T. 1087-88].  Mr. Reyna noticed that J.M. was upset about something at that point and also that the street and entrance were very crowded. [T. 1088-89].  He tried to call Jennifer and Cesar unsuccessfully, so he and J.M. decided to walk to a central area in the hopes that they would spot Jennifer and Cesar when they were leaving. [T. 1090, 1092].  J.M. was also attempting to get in touch with her boyfriend's cousin. [T. 1092].

Mr. Reyna testified that he and J.M. were sitting on a bench when he finally connected with Cesar on the phone and was told that they had reached home. [T. 1093, 1095].   Mr. Reyna laid down on his back on the bench with his head on

J.M.'s leg because his back was in pain.  Once the call connected, he tried to convince J.M. to go with him to the house, but she did not want to because she wanted to stay to find her friends and family.  Mr. Reyna left J.M. there because he knew that she had friends there and that she was a police officer. [T. 1095-96].  Mr. Reyna testified that as he was leaving to get into the cab, J.M. was upset and "flipped [him] the bird." [T. 1097].

Mr. Reyna testified that he did not tell J.M. that he loved her and he did not try to kiss her inside of the club. [T. 1091].  He testified that he did not make any sexual advances to her against her will. [T. 1097].  Mr. Reyna testified that nothing that J.M. testified to about the alleged sexual acts on the bench actually happened. [T. 1097-98].

On cross-examination, Mr. Reyna testified that he had exchanged a friendly hug and mutual kiss with J.M. in the alleyway regarding her engagement. [T. 1266-68].  The State also impeached Mr. Reyna was his statement to the police regarding another kiss on the bench. [T. 1271-75].  The State then detailed the graphic interaction of Mr. Reyna sniffing his fingers in the video statement to detectives in the 2010 case. [T. 1276-80].

During the State's closing arguments, after discussing the evidence of the crimes charged, the State argued: "But even if all of that is not enough for you, even consider everything that supports what [the victim] said happened, the law

30

*Exhibit 1C*                                                                *Page 36 ½*  74

says that you can look to the testimony of someone else," and then discussed J.M.'s testimony. [T. 1523-24]. The State also commented: "it's not the first time a friend has made accusations against him" [T. 1512], "this is what he does" [T. 1530], as well as:

> What we're saying is we know that Jose Reyna, when presented with the opportunity of a woman who is intoxicated, who a woman is maybe a little disoriented, when is alone with her away from his wife, he will take the opportunity to do something to her without her consent. And it's a sexual act.

[T. 1525]. The State further discussed J.M.'s testimony and the events surrounding the 2010 allegations. [T. 1525-27]. In rebuttal, the State, relying on the collateral crime evidence, argued that Mr. Reyna "has excuses for everything." [T. 1594]. The State specifically pointed to the "sniffing the finger" incident as direct evidence of his guilt. [T. 1594].

Mr. Reyna was found guilty as charged following his jury trial. [R. 51]. Mr. Reyna was subsequently sentenced to a term of 17.9 years imprisonment on each count, to run concurrently. [R. 605-09]. Following a timely notice of appeal [R. 618], this brief follows.

31

## SUMMARY OF THE ARGUMENTS

I.  The trial court improperly allowed the introduction of evidence that Mr. Reyna allegedly committed a sexual offense upon another female five years prior to the charged offense. First, the trial court failed to employ the requisite standards for admission under either statutory law or well-established precedent. Second, the evidence was insufficient to satisfy admissibility standards where there was no clear and convincing evidence that Mr. Reyna committed the prior act; the prior act and charged crime were substantially dissimilar to be relevant; and the probative value of the evidence was substantially outweighed by its prejudicial effect, especially where the collateral act became a feature of the trial. The error in admitting evidence of the alleged prior sexual offense was undoubtedly harmful.

II. The trial court abused its discretion in allowing admission of Mr. Reyna's 2003 prior convictions for felony cocaine possession and a misdemeanor charge for providing false information to a police officer. The remoteness and nature of the prior convictions were far more prejudicial than probative in value and should have been excluded.

32

*Exhibit K*

## ARGUMENTS

I.   **THE TRIAL COURT REVERSIBLY ERRED IN ADMITTING COLLATERAL CRIME EVIDENCE OF A PRIOR SEXUAL OFFENSE WHERE: (1) THE OFFENSES WERE DISSIMILAR; (2) THE TRIAL COURT FAILED TO MAKE REQUISITE DETERMINATIONS MANDATED BY LAW; AND (3) THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO ALLOW FOR ITS ADMISSIBILITY.**

### a. Standard of Review

A trial court's decision to admit *Williams* rule evidence is reviewed for an abuse of discretion. *Pulcini v. State*, 41 So. 3d 338, 344 (Fla. 4th DCA 2010).

### b. Merits

One of the basic constitutional protections afforded to a criminal defendant is the right to a fair trial. U.S. Const. Amends. V, XIV; U.S. Const.; Art. I, § 9, Fla. Const.   A jury's determination as to one's guilt or innocence should be based solely upon admissible proof of the charged crimes, disencumbered of the improper admission of evidence that prejudices the outcome of the trial.   There is no doubt that evidence of a collateral crime can have such an effect. *See, e.g., Taylor v. State*, 256 So. 3d 950, 953 (Fla. 5th DCA 2018) (noting that collateral crime evidence is "inherently prejudicial").   As a result, trial courts are implored to use great caution and employ procedural safeguards when determining its admissibility, *Bruce v. State*, 44 So. 3d 1225, 1228 (Fla. 5th DCA 2010), including

33

*Exhibit K*

"a highly individualized, factually intensive" determination of whether the evidence may be properly admitted. *Robertson v. State*, 829 So. 2d 901, 908 (Fla. 2002).

Mr. Reyna was charged with three counts of sexual battery pursuant to section 794.011(5)(b), Florida Statutes (2019). Prior to trial, the State filed a "Notice of Intent to Admit Williams Rule Evidence," seeking to admit evidence at trial of an alleged sexual offense committed upon J.M. in 2010. [R. 183-84]. The State proposed that the evidence was relevant to the issues of "corroboration, motive, intent, to show absence of mistake, and to show the defendant's sexual interest in women he meets through his wife. [R. 183-84].

At the *Williams* rule hearing, the State argued that evidence of the alleged sexual offense committed upon J.M. was relevant to prove absence of mistake [R. 679-80] and also to establish Mr. Reyna's motive, plan and intent as to "how he functions." [R. 670]. The trial court agreed and issued an order allowing admission of the evidence on a single basis: that sufficient similarities existed between the collateral and charged offenses to justify its relevance under section 90.404(2)(a), Florida Statutes. [R. 216-19]. The jury was instructed in accordance therewith prior to J.M.'s testimony at trial. [T. 773].

The admissibility of collateral crime evidence is statutorily governed by section 90.404(2), Florida Statutes (2019). Regardless of the applicable subsection

34

*Exhibit K*

thereof, Florida jurisprudence requires multiple determinations to be made by the trial court as part of its admissibility analysis: (1) whether the collateral acts are proven by clear and convincing evidence; (2) the relevancy of the collateral evidence; and (3) whether the probative value of the evidence is substantially outweighed by prejudicial effect under section 90.403, Florida Statutes (2019). *See McLean v. State*, 934 So 2d 1248, 1262 (Fla. 2006).

**(1)   Proof of Prior Act by Clear and Convincing Evidence**

It is well established that evidence of a collateral act which is subject to admission under section 90.404(2) must be proved by clear and convincing evidence. *See, e.g., McLean v. State*, 934 So 2d 1248, 1262 (Fla. 2006) ("[o]f course, before even considering to allow evidence of prior acts to be presented to the jury, the trial court must find that the prior acts were proved by clear and convincing evidence.").   The trial court here failed to make this requisite finding, which was error warranting reversal. *See Wood v. State*, 238 So. 3d 924, 925 (Fla. 1st DCA 2018) (citing *Harrelson v. State*, 146 So.3d 171, 173 (Fla. 1st DCA 2014)) (reversing the judgment and sentence where the trial court failed to make the requisite finding that the collateral acts were proved, and declining to make such finding in the first instance)).

Even so, the record does not enable such a finding. J.M. testified at the evidentiary hearing that she was a sex crimes detective on the date of the alleged

incident. [R. 660-61].   Her testimony at the hearing and trial, however, were largely inconsistent, such as her contact with Mr. Reyna inside of the club [R. 666; T. 781-83], whether she had her cell phone with her while sitting on the bench [R. 667-68; T. 786-87], and the details regarding the sexual assault allegedly committed upon her by Mr. Reyna while sitting on the bench outside. [R. 668, 670; T. 788-90].   These inconsistencies are also evidenced in the State's "No File" packet, which contained multiple police reports with differing details. [R. 940-95]. Additionally, the State did not elect to file charges against Mr. Reyna based upon J.M.'s allegations.

In light of these facts, J.M.'s varying allegations of sexual battery failed to "yield the firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Alsfield v. State*, 22 So. 3d 619, 621 (Fla. 4th DCA 2009) (quoting *Audano v. State*, 641 So. 2d 1356 (Fla. 2d DCA 1994)). Accordingly, the collateral accusations were not established by clear and convincing evidence and should not have been admissible at trial.

Should this Court find otherwise, however, the evidence would still be inadmissible for the reasons set forth below.

## (2)      **Relevancy of Collateral Evidence**

Section 90.404(2)(a) establishes "the general rule that collateral crime evidence is admissible when relevant to prove a material fact in issue, but is

*Exhibit K*

inadmissible when the evidence is relevant solely to prove bad character or propensity." *Pitts v. State*, 263 So. 3d 834 (Fla. 1st DCA 2019) (internal quotations omitted). When the purported relevance of the collateral evidence is absence of mistake, "substantial similarity" between the collateral offense and the charged crime is required in order for the evidence to be admissible. *State v. Lincoln*, 279 So. 3d 854, 857 (Fla. 2d DCA 2019).

Although the trial court relied upon subsection (2)(a) for admission of the evidence, it was also concededly subject to admission under 90.404(2)(c), Florida Statutes, which is applicable when a defendant is charged with a "sexual offense" pursuant to section 794.011, Florida Statutes. *See Mann v. State*, 281 So. 3d 503 (Fla. 4th DCA 2019) (holding that collateral evidence of a prior sexual offense was properly admitted under section 90.404(2)(c), even though it may not have been admissible under section 90.404(2)(a)).

Akin to section 90.404(2)(b) (which addresses child molestation cases), evidence of other sexual offenses committed by the defendant is admissible under subsection (2)(c) "for its bearing on any matter to which it is relevant." § 90.404(2)(c)1, Florida Statutes. This is a markedly different standard than that of subsection (2)(a), *see Pitts*, 263 So. 3d at 838, as it allows for admission of the collateral sexual offense "even if offered to show propensity," *Whisby v. State*, 262

So. 3d 228, 232 (Fla. 1st DCA 2018), or to corroborate the victim's testimony. *See McLean*, 934 So. 2d at 1263.

Despite this relaxed standard of admissibility though, relevancy is still the threshold consideration. *See McLean*, 934 So. 2d at 1259. Similarity of the collateral and charged offenses, albeit not a striking similarity, is a factor that must be considered by the trial court. *See Stewart v. State*, 147 So. 3d 119, 124 (Fla. 1st DCA 2014) (recognizing that the relaxed standard of admissibility does not completely foreclose the similarity of the offenses from the trial court's analysis). As explained in *McLean*, "the less similar the prior acts, the less relevant they are to the charged crime, and therefore the less likely they will be admissible." *Id.*

The similarity standard was neither satisfied under subsection (2)(a) nor (2)(c) in this case. The only similarities delineated in the trial court's order are the following:

> Both incidents involve a single woman who had planned to go out socially with the Defendant and his wife. Both incidents involve the Defendant, wife, and victim going out for the evening on Clematis Street and consuming alcohol to the point of impairment. Both incidents involve the Defendant making sexual advances when his wife was not present.

[R. 218].

At the onset, it must be noted that the first two similarities are generic to common behavior amongst social friends. This is not a situation where Mr. Reyna

*Exhibit K*

was accused of purposely impairing the victims in order to take advantage of them. Both J.M. and the victim testified to socializing with Mr. Reyna on more than one occasion without incident. [R. 662; T. 381-82, 794-96].

There are far more substantial dissimilarities between the alleged prior act and the charged crime. J.M.'s social relationship with Mr. Reyna was not so close where she would sleep at his house, whereas the victim not only slept at the Reyna home on several occasions, but also vacationed with Mr. and Mrs. Reyna. [T. 38-82]. The alleged prior act occurred on a bench in a public street in the presence of passersby during a crowded Halloween Fest [R. 674], while the charged offense occurred at Mr. Reyna's home while he and the victim slept alone on the couch in the living room. [T. 405-08]. J.M. was awake and alert during the alleged prior act; the victim in this case was sleeping and experiencing blackouts. [T. 409, 410, 412, 558]. The alleged prior act, although subject to different versions, involved quickly touching J.M.'s vagina. [R. 668]. The charged offense involved kissing the victim's breasts, oral sex, followed by penile penetration. [T. 408-12].

These dissimilarities certainly did not allow for the evidence to be admitted to establish absence of mistake pursuant to section 90.404(2)(a). The charged and collateral offenses were neither "strikingly similar," nor did they "share some unique characteristic or combination of characteristics which sets them apart from other offenses." *Robertson v. State*, 829 So. 2d at 909..

*Exhibit R*

These dissimilarities also did not render the collateral evidence admissible under the relaxed admissibility standard. *See, e.g., Strohm v. State*, 985 So. 2d 640 (Fla. 4th DCA 2008) (holding that collateral crime evidence of a prior rape upon a twelve-year-old was substantially dissimilar to charged sexual battery upon an eight-year-old where the collateral crime victim did not know the defendant while the current victim was his daughter, and the collateral crime victim was vaginally penetrated while the crime in the instant case consisted of another form of sexual abuse); *Fike v. State*, 4 So. 3d 734 (Fla. 5th DCA 2009) (finding collateral crime dissimilar to the charged crime where the current victim was female and eleven years old while the collateral victim was male and between three and seven years old; the current victim was alone with the defendant in a hotel room while the collateral victim was at a house with other children when the abuse occurred; and the abuse in the charged case occurred in a hotel bed while the collateral offense occurred in the bathroom at the home).

Given the significant lack of similarities, evidence of the collateral crime evidence was not admissible either to show absence of mistake under the "substantial similarity" standard of section 90.404(2)(a), or, as further explained below, to show propensity under section 90.404(2)(c). The trial court abused its discretion in holding otherwise.

*Exhibit K*

### (3)     Section 90.403 Balancing Test

Lastly, the trial court was required to weigh the danger of unfair prejudice against the probative value of the evidence under section 90.403, Florida Statutes.[9] In *McLean v. State*, 934 So 2d 1248 (Fla. 2006), the Florida Supreme Court set forth a list of factors that a trial court should consider when conducting this balancing test:

> (1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances.

*Id.* at 1262.

Recognized as the trial court's "gatekeeping function," *id.* at 1261, the Court underscored the importance of this procedural step: "the trial court's gatekeeping function is critical. In every case, the trial court must conduct the weighing required by section 90.403." *Id.*

The trial court's order is devoid of any reference to section 90.403 or the *McLean* factors. Indeed, the trial court analyzed the similarities of the collateral and charged offenses, but did so only under the guidance of section 90.404(2)(a),

---

[9] The relevant portion of section 90.403 provides: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

*Exhibit K*

not as part of its gatekeeping function under section 90.403. No other determinations were made by the trial court. The trial court's failure to perform the critical gatekeeping function mandated by *McLean* constituted error in and of itself. *See, e.g., Fiore v. State*, 967 So. 2d 995, 999 (Fla. 5th DCA 2007) (recognizing that the trial judge is in the best position to determine whether this testimony is properly admitted in light of *McLean* and its progeny).

Even so, it cannot be concluded from the instant record that this omission did not prejudice Mr. Reyna. First, similarity of the collateral act and the charged offense must still be considered when determining the evidence's probative value. *See McLean*, 934 So 2d at 1259. According to the *McLean* Court, "[t]he similarity of the collateral act . . . and charged offense is a critical consideration for the trial court in conducting an appropriate weighing under section 90.403." *Id.* As previously discussed, the offenses were substantially dissimilar in several respects. *See supra* at 38-40.

Second, the collateral accusation and the charged were offenses were five years apart, one in 2010 and the other in 2015. Third, the collateral offense was alleged to have happened once and lasted only moments. Finally, there was no evidence of intervening circumstances.

The analysis does not end there, however. There are considerations other than the potential for unfair prejudice that are relevant to a section 90.403 analysis:

42

*Exhibit K*

(1) "whether the evidence of the prior acts will confuse or mislead jurors by distracting them from the central issues of the trial;" (2) "whether the evidence is needlessly cumulative of other evidence bearing on the victim's credibility, the purpose for which this evidence may be introduced;" and (3) "the trial court must guard against allowing the collateral-crime testimony to become a feature of the trial." *McLean*, 934 So. 2d at 1262. None of these determinations were made or even considered by the trial court.

In fact, the collateral crime evidence was allowed to become a feature of Mr. Reyna's trial. J.M. testified at length during trial regarding the alleged prior sexual assault; her testimony having become far more detailed than before. [T. 773-832]. The State also offered the testimony of J.M.'s mother to corroborate her testimony. [T. 833-39]. Jennifer Reyna and Mr. Reyna were left with no choice but to address J.M.'s allegations and testify to their accounts of the alleged incident, which amounted to approximately 100 pages of testimony. [T. 967-87, 1012-17, 1059-1121, 1261-1280]. During the cross-examination of Mr. Reyna, the State went as far as to elicit testimony regarding his recorded statement to police about J.M.'s allegations, including questioning Mr. Reyna about whether he had "sniffed his fingers" to police during the interview. [T. 1271-80].

In closing argument, the State highlighted the collateral crime testimony and argued that the allegations demonstrated Mr. Reyna's guilt by showing a pattern of

*Exhibit C*

misconduct: "it's not the first time a friend has made accusations against him" [T. 1512]; "this is what he does" [T. 1530]; and:

> What we're saying is we know that Jose Reyna, when presented with the opportunity of a woman who is intoxicated, who a woman is maybe a little disoriented, when is alone with her away from his wife, he will take the opportunity to do something to her without her consent. And it's a sexual act.

[T. 1525]. The State also highlighted the collateral crime evidence in rebuttal, arguing that Mr. Reyna "has excuses for everything." [T. 1594]. The State specifically pointed to the "sniffing the finger" incident as direct evidence of his guilt. [*Id.*].

Accordingly, because Mr. Reyna was not afforded the due process safeguards required under section 90.403 and *McLean*, and the evidence was insufficient to satisfy compliance therewith, the trial court abused its discretion in admitting the collateral crime evidence at issue.

The question then becomes whether the error was harmless. *State v. Lee*, 531 So. 2d 133, 136 (Fla. 1988). Since the erroneous admission of collateral crime evidence is presumptively harmful, *see Robertson*, 829 So. 2d at 913-14, the State has the burden of proving "that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So.2d 1129, 1135 (Fla.1986).

Here, the trial hinged on the credibility of the victim and Mr. Reyna. It was her word against his. There was no physical evidence implicating Mr. Reyna. The

*Exhibit R*

DNA evidence even suggested that the victim may have had sex with someone else in the time period between that night and going to the hospital,[10] despite the victim's testimony that she did not have sex with anyone from a month prior to the incident up to her hospital visit. [T. 432]. In fact, there was no evidence to corroborate the victim's testimony other than the collateral crime evidence elicited from J.M. It cannot be said "beyond a reasonable doubt that [the] verdict could not have been affected by" the improper admission of the prior alleged sexual offense. *Ciccarelli v. State*, 531 So. 2d 129, 132 (Fla. 1988).

## II.   IT WAS AN ABUSE OF DISCRETION TO DENY THE DEFENSE'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF MR. REYNA'S PRIOR CONVICTIONS, WHERE THE CONVICTONS WERE TOO REMOTE IN TIME AND THE NATURE OF THE PRIOR FELONY CONVICTION WAS HIGHLY PREJUDICIAL.

### a.  Standard of Review

Evidentiary rulings concerning a defendant's prior convictions are reviewed for an abuse of discretion. *Farr v. State*, 230 So. 3d 30, 33 (Fla. 4th DCA 2017).

---

[10] Ms. Margetts was able to confirm the presence of seminal fluid on both the vaginal swabs [T. 703] and swabs from the victim's underwear. [T. 710]. Seminal fluid proteins typically survive in the vaginal canal for about 12 to 24 hours. [T. 719, 722, 723]. The victim slept at the Reyna home on the night of January 18th [T. 383-84] and went to the hospital on the evening of January 20th. [T. 427-28].

**b. Merits**

Section 90.610, Florida Statutes, allows for a witness' credibility to be attacked by evidence of a prior felony conviction or any conviction for a crime of dishonesty. § 90.601(1), Fla. Stat. (2019). Subsection (1)(a) provides that in a civil trial, evidence of such conviction is inadmissible "if it is too remote in time as to have no bearing on the present character of the witness." The same rule applies to criminal trials as well. *Pryor v. State*, 855 So.2d 134, 137 (Fla. 1st DCA 2003).

Section 90.403 is applicable to convictions admitted under section 90.610, *State v. Page*, 449 So. 2d 813, 816 (Fla. 1984), and the remoteness and nature of the prior convictions are factors to be considered as part of the analysis. *See Riechmann v. State*, 581 So. 2d 133, 140 (Fla. 1991) ("under section 90.403, the nature and remoteness of prior convictions may create a danger of unfair prejudice substantially outweighing the probative value of the evidence").

Mr. Reyna moved in limine to preclude admission of his two prior convictions: (1) a 2003 felony conviction for cocaine possession; and (2) a 2003 misdemeanor conviction for providing false information to a police officer about an accident. [T. 364-67]. Mr. Reyna argued that the remoteness of the fifteen-year old convictions was more prejudicial than probative to be used for impeachment. [R. 323-26; T. 1024-25]. The trial court denied the motion and determined that the

*Exhibit R*

prior convictions were more probative in value because the case hinged on the credibility of Mr. Reyna and the victim. [T. 1026-27].

The prior convictions were too remote in time to have any bearing on Mr. Reyna's credibility. The convictions from 2003 occurred 12 years prior to the charged offenses and 15 years prior to the time of trial. Mr. Reyna did not continue on a pathway of misconduct. He did not continue to acquire criminal convictions after then. *Cf. Pryor*, 855 So. 2d at 137 (holding that witness' prior 25-year-old misdemeanor conviction was not so remote as to have no bearing on witness' character where witness continued to acquire felony convictions). The convictions simply did not have any bearing on Mr. Reyna's present character. *See, e.g., Trowell v. J.C. Penney Co., Inc.*, 813 So.2d 1042, 1044 (Fla. 4th DCA 2002) ("[e]vidence of theft and shoplifting convictions in the early 1980s with no subsequent convictions would tend to suggest that the witness no longer has a propensity toward dishonesty, and thus such convictions would have little or no bearing on his present character").

Furthermore, the nature of the prior felony conviction for cocaine possession was far more prejudicial that probative. The jury was faced with a decision as to whether to believe Mr. Reyna's version of what happened or the victim's version. As the trial court correctly noted, credibility was critical to the deliberations of the jury. [*See* T. 1027]. The jury may very well have inferred guilt for the charged

*Exhibit K*

offenses on the basis of evidence that Mr. Reyna was a drug user.  As noted by Ehrhardt, "[w]hen the witness who testifies is a criminal defendant, there is a danger that the jury will consider convictions which are admitted only to impeach as evidence that the defendant is a 'bad' person." C. Ehrhardt, *Florida Evidence* § 610.5, at 685 (2015).

Accordingly, the trial court abused its discretion in denying Mr. Reyna's motion in limine to preclude admission of his prior convictions for felony cocaine possession and a misdemeanor crime of providing false information to a police officer, as the probative value of the convictions was far outweighed by its prejudicial effect.

## CONCLUSION

Based on the foregoing arguments and authorities cited herein, Mr. Reyna respectfully requests that this Honorable Court reverse his convictions and sentences and remand the cause for a new trial..

*Exhib. 4 R*                                                          *page 5 of 74*

Respectfully Submitted,

**s/ *Kristen Kawass***

KRISTEN A. KAWASS, ESQ.
Florida Bar. No. 84383
Law Offices of Kawass P.A.
780 Tamiami Canal Road
Miami, Florida 33144
Phone: 305-521-0490 x701
Email: Kristen@kawasslaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this Brief was sent via the e-filing portal
system to the Office of the Attorney General, Criminal Appeals Division,
crimappwpb@myfloridalegal.com, 1515 N. Flagler Drive, Suite 900, West Palm
Beach, Florida 33401, on December 20, 2019.

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this Initial Brief complies with the form requirement of
Rule 9.210(a)(2) of the Florida Rules of Appellate Procedure. The Brief is written
in Times New Roman 14-point font.

*s/ Kristen Kawass*
Kristen Kawass, Esq.

49

*Exhibit K*

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOSE REYNA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-2306

[August 26, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cheryl Caracuzzo, Judge; L.T. Case No. 502015CF004073A.

Kristen A. Kawass of Law Offices of Kawass, P.A., Miami, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Paul Patti, III, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

We reverse convictions for three counts of sexual battery because the trial court abused its discretion in admitting evidence of a collateral crime. We remand for a new trial in which the collateral crime evidence is excluded.

The state charged Jose Reyna with three counts of sexual battery under section 794.011(5)(b), Florida Statutes (2015), by a person eighteen years of age or older upon a person over eighteen. All three counts arose from one encounter; count 1 alleged digital penetration of the victim's vagina, count 2 alleged oral penetration or union with the victim's vagina, and count 3 alleged penile penetration or union with the victim's vagina.

The state timely filed a notice of its intent to offer *Williams*[1] rule evidence pursuant to section 90.404(2)(c), Florida Statutes (2015). The state sought to introduce evidence of a separate incident that occurred in

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

*Exhibit K*

*page 56 of 4*

October 2010, described in more detail below.   After an evidentiary hearing, the circuit court ruled that the testimony was admissible.

### *The Evidence at Trial*

#### *The State's Case*

The victim testified that she met appellant through his wife, with whom she worked.  She vacationed with the couple and had stayed at their house in a spare bedroom numerous times after socializing with them.  Prior to the night of the incident, nothing inappropriate had occurred between her and appellant.

On January 18, 2015, the victim made plans with the wife to socialize. The game plan for the evening was to hang out, have fun, and help the victim forget an unhappy personal matter.  The victim went to the Reyna home the evening of the incident with a packed bag because she was planning on staying overnight.

Using her car, the victim drove the Reynas to the Clematis Street area of West Palm Beach.  Their first stop was a wine bar, where they ordered food, drinks, and a bottle of wine.

The trio next went to a different bar where they ordered three rounds of drinks, danced, and had a good time.  By the time they left, the victim testified that she was "buzzed."  Next, the three went to a restaurant, owned by an acquaintance of the Reynas, for more drinks.

After leaving the restaurant, the group returned to the Reyna home. Because the house was being renovated, one of the bedrooms was unavailable.  The Reynas took the other bedroom, and the victim prepared to sleep on the couch in the living room.  The couch was an L-shaped, sectional couch.  Once they arrived at the home, the victim poured herself a glass of red wine from a bottle in the kitchen and sat on the couch.  She spilled the wine on her t-shirt and changed into something else.  Then she had some tequila.

The victim fell asleep on the couch.   The victim was awakened by someone kissing her on the mouth.  She testified that

> it was kind of one of those like "What is happening?"  Once I opened my eyes, it was dark.  Like dark hair, dark skin.  It didn't feel familiar.  It didn't smell familiar.  I mean, if that even—it just felt very strange and very disorienting.  I

2

*Exhibit R*

*page 37 of 74*

remember thinking—and then once I realized what was happening, I was just like "What are you doing?" It was just such a strange, almost shocking "What are you doing?"

The victim realized that it was appellant. She swatted at him and asked, "What are you doing?" She told him he needed to go back to bed.

The victim described the rest of the night as a series of "flashes." She kept falling back asleep, only to be awakened by different types of touching.

The next time she awoke to appellant kissing her chest, after having unzipped her fleece pullover. She repeatedly swatted at him, asked him what he was doing, and told him, "Go to bed with your wife."

The next thing the victim remembered was that appellant "put his hands down my shorts and began to stick his fingers inside of me." It was uncomfortable and the victim pushed him away to make him stop. At another time, she was awakened by appellant performing oral sex upon her. Concerning the third form of assault, the victim testified that

> at some point, he was in front of me and in between my legs. And at some point, I did feel him—I felt him actually put his penis inside of me. . . . [When appellant was] on top of me and actually was having sex with me, I did finally get my feet up on his hips and push him away and say, "No."

The prosecutor asked the victim why she didn't yell or scream during the events on the couch. The victim explained:

> I mean, this is—this is my friend. This is somebody that I know. And also it was—I was completely humiliated that his wife was my really good friend. And I didn't want her to know. I didn't—it was just such a—it wasn't even that terribly what I would call violent. It was just so inappropriate and so shocking and so unexpected. I'm not really the type of person that would scream or get that terribly emotional, anyway. But I—I mean, I didn't want [the wife] to know what was going on. And I did not understand why he was doing it.

After the final assault, the victim fell asleep. She woke up the next morning and took a shower. While in the shower, the victim realized that something was wrong. She had abnormal discharge and cramping in her abdomen. She threw her clothes in her overnight bag and left the house.

3

*Exhibit R*

Page 38 of 74

For the rest of the day, the victim hung out at home and reported the incident to no one.

The victim testified that her memories about the incident returned at work the next day. She began panicking but continued working. When she encountered appellant's wife, she did not tell her what had happened and insisted that she was busy with work.

After the victim told her sister about the assault, the victim decided to go to the hospital, where a nurse performed a rape exam and the incident was reported to the police.

Later, the police contacted the victim to participate in recorded, controlled calls with appellant. On the calls, when confronted by the victim, appellant repeatedly said he was sorry, but he also said he had no memory of anything:

> . . . [T]o tell you the truth what I remember is . . . being told to go to bed by [my wife]. And then I—and then I went to bed and then I woke up and I had this massive headache.

At another point in the call he said "I don't remember. And I apologize because seriously, I don't understand. I have to now figure out what the hell's now going on in my head."

The *Williams* Rule Testimony

At the admissibility hearing, the *Williams* rule witness identified herself as a detective at a local law enforcement agency, assigned to a unit that focused on sex crimes. She said she had socialized occasionally with the Reynas.

In October 2010, the witness made plans to attend the "Moonfest" festival on Clematis Street with the Reynas and another person. They met at the Reynas' house for food and drinks before leaving for the festival. On Clematis Street, they danced, talked, and drank "to the point of impairment."

At one of the bars, the witness and appellant were in the back "just talking [and] hanging out." Somehow, they got pushed out the back door into the alley and then the door closed. The door was flush with the wall and there was no handle, so they could not get back into the bar from the alley.

*Exhibit K*                                                              *page 59 of 74*

The witness and appellant walked to a bench and sat down.  They tried to call appellant's wife.  Appellant started trying to kiss the witness and said she was beautiful.  She protested that appellant was married and pushed him off.  At one point, the witness testified that appellant

> leaned over on top of me and started shoving his hand up under my skirt and ended up like touching in my vagina . . . . He just kind of like got on top of me.  And then just shoved his hand—it was really quick.  He just shoved his hand up my skirt.

Appellant's sudden action ripped her pantyhose.  The witness pushed appellant to get out from underneath him and "took off running."  She ran to a convenience store and used the phone to call her mother, who came to pick her up.   At trial, the witness testified consistently with her testimony at the prior hearing, adding just a few details.

### The Defense Case

Appellant testified at trial.  He claimed he had no memory of assaulting the victim.  On the night of the incident, he fell asleep on the couch in the living room, which he often did when he had back problems.  The next thing he remembered was his wife waking him up and taking him to bed. He said he was completely clothed when his wife came to get him.

The wife testified that she never saw anything inappropriate occur between appellant and the victim.  Both Reynas testified that a key point of the evening was to discuss the victim's poor job performance and to alert her that her job was in jeopardy.  Both Reynas testified that appellant suffered from a herniated disc and that he took a prescribed medication, Flexeril, after he arrived back at home the evening of the incident

Appellant denied the *Williams* rule witness's allegations.  He stated that the witness kissed him once.  He said no other sexual contact occurred.

As to the controlled calls, appellant said he was in shock and disbelief. He testified that the victim was a close friend in a fragile state of mind from a breakup over the holidays.  He did not know what was going on and he wanted to calm both her and the situation down.

Appellant was convicted of all three crimes.  On appeal, he primarily raises the *Williams* rule issue.

***The trial court abused its discretion by admitting collateral crime evidence under section 90.404(2)(c) because, under the <u>McLean v. State</u> analytical framework, there were insufficient points of similarity between the charged crime and the collateral crime***

For years, the admissibility of other crimes, wrongs, or acts was evaluated under section 90.404(2)(a), Florida Statutes. The current version of section 90.404(2)(a) provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

§ 90.404(2)(a), Fla. Stat. (2020).

This section "restate[d] the Florida law as determined by *Williams v. State*," 110 So. 2d 654 (Fla. 1959). Charles W. Ehrhardt, *Florida Evidence* § 404.9 (2012 ed.). Applying this section of the evidence code, courts were cautious when asked to admit collateral crime evidence in sexual battery cases, so as not to run afoul of the statutory prohibition against admitting such evidence "solely to prove bad character or propensity." *See, e.g.*, *Feller v. State*, 637 So. 2d 911, 916 (Fla. 1994) (addressing *Williams* rule issue in order to offer guidance on retrial, explaining that sexual battery on an underage child is not uniformly admissible under section 90.404(2), and emphasizing that the acts at issue had only two things in common—they involved the same type of offense and both victims were young girls); *Williams v. State*, 621 So. 2d 413, 416 (Fla. 1993) (observing that "because consent is unique to the individual the mere fact that the victim of an unrelated assault did not consent cannot serve as evidence of nonconsent by the victim of the charged offense"); *Frieson v. State*, 512 So. 2d 1092, 1093 (Fla. 2d DCA 1987) (in a sexual battery prosecution, it was error to admit evidence that defendant had committed another sexual battery where only similarity between the two offenses was that both were sexual batteries).

In 2011, the Florida Legislature enacted section 90.404(2)(c), Florida Statutes, applicable when a defendant is charged with a "sexual offense." Ch. 2011-220, § 2, Laws of Fla. Section 90.404(2)(c) provides in relevant part:

> In a criminal case in which the defendant is charged with a
> sexual offense, evidence of the defendant's commission of
> other crimes, wrongs, or acts involving a sexual offense is
> admissible and may be considered for its bearing on any
> matter to which it is relevant.

§ 90.404(2)(c)1., Fla. Stat. (2018).  Subsection 90.404(2)(c)2. defines a
"sexual offense" as including the crimes charged in this case.

The wording of section 90.404(2)(c)1. is strikingly similar to that of the
previously enacted section 90.402(2)(b)1., which applies in "child
molestation" cases.  Because of this similarity, courts have applied the
admissibility framework of *McLean v. State*, 934 So. 2d 1248 (Fla. 2006),
to evidence introduced under 90.404(2)(c), even though *McLean* involved a
child molestation case falling under section 90.404(2)(b).  *See, e.g., Whisby
v. State*, 262 So. 3d 228, 232 (Fla. 1st DCA 2018); Charles W. Ehrhardt,
*Florida Evidence* § 404.18 (2012 ed.).

Like the statute at issue in *McLean*, the plain language of section
90.404(2)(c)1. is broad—collateral crime evidence is "admissible and may
be considered for its bearing on *any matter* to which it is relevant."  §
90.404(2)(c)1., Fla. Stat. (2018) (emphasis added).  In *McLean*, the Florida
Supreme Court narrowed the broad sweep of section 90.404(2)(b)1. by
reading the statute in conjunction with section 90.403, Florida Statutes
(2005), which requires that the probative value of relevant evidence be
weighed against its potential for unfair prejudice.  *McLean*, 934 So. 2d at
1251.  The supreme court resolved a due process challenge to section
90.404(2)(b) by applying section 90.403 considerations to ensure that the
door is not opened "to introduction of any and all propensity evidence in
sexual molestation cases." *Id.*

Central to the section 90.403 analysis mandated by *McLean* is the
notion of similarity between the collateral act and the charged offense.  In
upholding the constitutionality of the statute, the court noted that "[t]he
similarity of the collateral act . . . and charged offense is a critical
consideration for the trial court in conducting an appropriate weighing
under section 90.403." *Id.* at 1259.

The court explained that the similarity between the two acts is
important in determining admissibility in two ways:

> First, the less similar the prior acts, the less relevant they are
> to the charged crime, and therefore the less likely they will be
> admissible.  Second, the less similar the prior acts, the more

likely that the probable value of this evidence will be "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

*Id.* at 1259 (quoting § 90.403, Fla. Stat.).

*McLean* set forth a non-exclusive list of factors a trial court should consider when determining whether the probative value of previous sexual offenses is substantially outweighed by the danger of unfair prejudice:

> (1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances.

*Id.* at 1262.

Since section 90.404(2)(c) was enacted in 2011, several cases have interpreted the statute. For collateral sex crimes to be admissible, courts have applied section 90.404(2)(c) to require significant similarity between the collateral evidence and the charged crime, evidence so similar and specific that it resembles a clear pattern of conduct. This is in contrast to child molestation prosecutions where collateral crime evidence under section 90.404(2)(b) is a common prosecutorial tool. *See Pridemore v. State*, No. 4D19-1555, 2020 WL 4496072 (Fla. 4th DCA Aug. 5, 2020). The law requires greater similarity under 90.404(2)(c) than in child molestation cases because the adult cases can involve defenses—identification and consent—that are not present in crimes against children. Evidence can be more nuanced in adult cases and subject to different interpretations.

For example, in *Whisby*, the First District held that collateral crime evidence was admissible where it occurred less than twenty-four hours from the charged crime and in an "almost identical fashion." 262 So. 3d at 232. In both instances, the defendant forced the victim into his car at gunpoint, drove her to various locations while coercing her to engage in sexual acts, and concluded the incident by using a tissue or napkin to either clean himself or the victim. *Id.* Also, both incidents involved women who had previously had intimate relationships with the defendant. *Id.*

Courts find adequate similarity under 90.404(2)(c) when the defendant's conduct conforms to an identifiable pattern. *See, e.g., Bruce*

*v. State*, 44 So. 3d 1225, 1229 (Fla. 5th DCA 2010) ("The victim's and [witness's] testimony demonstrated a clear pattern of conduct."). In *Bruce*, the court pointed to the numerous and specific similarities present in both instances in holding that the collateral evidence was admissible. *See id.* The victims were both women of the same age, the defendant knew both women from church, and he knew both were single and lived alone. *Id.* The defendant befriended the women by performing handyman services and commiserating with each about the hardship of caring for a loved one with disabilities. *Id.* During the course of performing handyman services, he not only made sexual advances but fondled the breasts of each. *Id.* Afterwards, he called both women expressing his love, then anger when they rejected his advances. *Id.* The court noted that the only difference was that the defendant successfully completed the sexual battery against the victim but was unable to with the collateral act witness. *Id.*

Similarly, in *Wade v. State*, 265 So. 3d 677 (Fla. 1st DCA 2019), the court found two prior acts similar to the charged crime, where in all three instances the defendant approached the victims on a bicycle, threatened them with a knife, and forced them to have sex with him. In *Mann v. State*, 281 So. 3d 503 (Fla. 4th DCA 2019), the court found the prior act was sufficiently similar where both victims testified that the defendant kidnapped then raped them, and where the crimes took place within one month of each other. In *Pitts v. State*, 263 So. 3d 834, 840 (Fla. 1st DCA 2019), the court held that collateral crime evidence was admissible where in both acts, the defendant was accused of digitally penetrating a female victim while she was sleeping or passed out following a night of drinking.

Here, the charged crimes were similar to that in *Pitts*, but the collateral evidence involved a different criminal act. There is no clear pattern of conduct between the charged crimes and the collateral act. The attack on the *Williams* rule witness on a bench in a public place is only minimally probative of the charged crime—repeated sexual batteries against a passed-out woman on a couch in a residential living room. As the supreme court observed in *McLean*, the less similar the prior acts are to the charged crime, the less relevant they are to that crime. 934 So. 2d at 1259.

In this case, there are some similarities between the charged crimes and the collateral conduct; both cases involved the consumption of alcohol on Clematis Street and an accuser who socialized with the Reynas. However, these similarities are outweighed by the differences between the two crimes, so there is no clear pattern of sexual misconduct:

- The victim was a close friend of the Reynas who regularly slept over at their home; the *Williams* rule witness was a

casual acquaintance who socialized occasionally with the Reynas.

- The charged crimes occurred on a couch in a private living room; the collateral act occurred on a public bench in an alley.

- The victim had a work relationship with the Reynas; the *Williams* rule witness had no such work relationship.

- The charged crimes were three sexual batteries that occurred over an extended period of time, with the attack occurring as the victim hovered between consciousness and sleep; the *Williams* rule witness was very much awake during the collateral act, a sudden groping of her genital area.[2]

- There was a gap of over four years between the two incidents.

Because of the significant disparities between the charged crimes and the collateral act, that act is only weakly probative of the charged crimes.[3] As the supreme court observed in *McLean*, where a collateral crime is so minimally probative, it is "more likely that the probative value of this evidence will be 'substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence'" under section 90.403. 934 So. 2d at 1259. Moreover, in this case, the fact that the *Williams* rule witness was a detective in a sex crimes unit carried an additional risk of undue prejudice in a section 90.403 analysis, as juries often afford great weight to the testimony of police officers. *See, e.g., Salomon v. State*, 267 So. 3d 25, 32 (Fla. 4th DCA 2019) (explaining that police officers "bring with their testimony an air of authority and legitimacy," and that a jury "is inclined to give great weight" to such testimony).

---

[2] We do not blame the victim here. We are simply analyzing the manner in which the acts were committed, as the law requires us to do under *McLean*.

[3] The dissent dismisses significant differences between the charged acts and the collateral act as "immaterial." However, the dissent's view of similarity would open the door too wide under section 90.404(2)(c)—any collateral act of sexual battery would be admissible as *Williams* rule evidence in the prosecution of the charged act, so long as both acts involved alcohol and an opportunity that arose when the defendant was alone with the accuser.

Without the collateral evidence, the jury faced a difficult question in this case—what to make of testimony of the two primary actors who had consumed such large amounts of alcohol that their memories of the crucial night were dim?  In such a circumstance, evidence of the prior, dissimilar conduct smoothed over the difficulties in the state's case.  In applying section 90.404(2)(c), trial courts are gatekeepers in ensuring that evidence of prior acts of sexual misconduct do not unfairly prejudice a defendant or mislead the jury.  Here, the trial court abused its discretion in admitting the *Williams* rule witness's testimony.  Without adherence to the *McLean* requirement of significant similarity, trials of sexual offenses would too often descend into character assassination by the introduction of marginally similar bad acts.

The dissent uses a buffet approach to the law of evidence by combining distinct portions of the evidence code to buttress its case for admissibility.  The dissent suggests that the collateral crime evidence was admissible to prove the "absence of mistake," a consideration under subsection 90.404(2)(a).  However, mistake is not a defense to sexual battery—a defendant cannot avoid criminal responsibility for attacking the victim by saying that he thought he was having consensual sex with his wife.

Under subsection 90.404(2)(a), collateral crime evidence is admissible only "when relevant to prove a material fact in issue."  "State of mind is not a material fact in a sexual battery charge, nor is intent an issue."  *Coler v. State*, 418 So. 2d 238, 239 (Fla. 1982).  As the Florida Supreme Court has explained, "in rape prosecutions, it is clear that while a general intent is involved in the crime, no specific intent is requisite other than that evidenced by the doing of the acts constituting the offense."  *Askew v. State*, 118 So. 2d 219, 222 (Fla. 1960).  Whether appellant knew the identity of the victim he attacked was not a material fact in issue in this case, so the collateral crime evidence was not admissible to prove an absence of mistake or accident under subsection 90.404(2)(a).  *See Hebel v. State*, 765 So. 2d 143, 144 (Fla. 2d DCA 2000) (in case involving defendant's sexual battery of "his then spouse," evidence of other crimes held inadmissible to prove the defendant's state of mind); *Killian v. State*, 730 So. 2d 360, 362 (Fla. 2d DCA 1999) (in prosecution for sexual battery of a child, holding that the state's introduction of "dirty" books in the defendant's possession to show his state of mind and intent "was improper because state of mind is not a material fact in a sexual battery case and intent is not an issue"); *Williams v. State*, 619 So. 2d 487, 493 (Fla. 1st DCA 1993) (holding that where the state sought to admit evidence of other crimes to prove "absence of mistake or accident," such evidence was

inadmissible where "there was no material issue of fact relating to either of these facts").

Finally, the dissent underplays the impact of the collateral crime evidence by stating that the testimony "took up only ninety minutes" of witness testimony.   The prosecutor emphasized the collateral crime evidence in closing argument to argue that appellant had the propensity to commit the charged crimes.   For example, the prosecutor argued:

> What we're saying is we know that Jose Reyna, when presented with the opportunity of a woman who is intoxicated, who . . . is maybe a little disoriented, when is alone with her away from his wife, he will take the opportunity to do something to her without her consent.   And it's a sexual act.

> \*\*\*

> All of the evidence points to one conclusion.   There is the testimony of [the victim].   The defendant on the controlled call supports what she sa[id] happened.   The testimony of [the *Williams* rule witness].   This is not some mistake.   This is not some confusion.   This is what he does.

On the remaining issue, we hold that the trial judge did not abuse her discretion in allowing appellant's prior convictions to be used for impeachment.

*Reversed and remanded for a new trial.*

WARNER, J., concurs.
GERBER, J., concurs in part and dissents in part with opinion.

GERBER, J., concurring in part and dissenting in part.

I respectfully dissent from the majority's holding that the trial court abused its discretion by admitting evidence of appellant having committed a sexual battery upon the *Williams* rule witness.   My dissenting opinion will be presented in two sections:   (1) the state properly relied upon the *Williams* rule sexual battery to prove the instant sexual battery; and (2) the similarities between appellant's sexual battery of the instant victim and the *Williams* rule witness are not outweighed by the differences between the two crimes.

### 1. *The state properly relied upon the* Williams *rule*

*Exhibit K*   Page 67 of 74

### sexual battery to prove the instant sexual battery.

In the second controlled phone call between appellant and the victim in the instant case, the victim confronted appellant for having kissed her, licking her chest, putting his hands down her pants, performing oral sex on her, and raping her. Appellant responded:

> Honey, I am so sorry. Please, I'm so sorry. *I didn't -- I didn't mean to touch you. I was thinking maybe that you was [my wife] maybe, I don't know.* I'm so sorry. I apologize, I'm so sorry. Please. Please, I am so sorry. I'm trying to remember.

(emphasis added).

Based on appellant's statement, the state filed its notice of its intent to offer *Williams* rule evidence pursuant to section 90.404(2)(c)1., Florida Statutes (2015), to show that appellant's sexual battery of the victim was not an innocent mistake of thinking he was having consensual sexual relations with his wife. Specifically, the state alleged:

> According to [the *Williams* rule witness], she met the defendant through his wife. On the date of the sexual battery, [the *Williams* rule witness] was hanging out with the defendant and his wife. While at a club in downtown West Palm Beach, the Defendant pushed [the *Williams* rule witness] through a door. The Defendant became aggressive and ripped her stockings and penetrated her vagina with his fingers. *This evidence is relevant to issues of ... motive, intent, to show absence of mistake, and to show the defendant's sexual interest in women he meets through his wife.*

(emphasis added).

Although the state's *Williams* rule notice expressly referred to section 90.404(2)(c)1., which provides that evidence of the defendant's other sexual offenses are "admissible and may be considered for its bearing on *any matter* to which it is relevant" (emphasis added), the state went a step further by specifically identifying the material facts upon which the *Williams* rule evidence was relevant, that is, to prove appellant's motive, intent, and absence of mistake, as permitted under the narrower section 90.404(2)(a).

The probative value of this *Williams* rule evidence was not substantially outweighed by the danger of unfair prejudice to appellant, based on the

non-exclusive *McLean* factors.   The manner in which the acts were committed were extremely similar:

- Both the *Williams* rule witness and the instant victim were single adult females.  The instant victim was thirty-seven years old at the time of the act charged.  Although the *Williams* rule witness was never asked her age, other contextual clues in her testimony (years of work experience) suggest she was also in her thirties when the prior sexual battery occurred.

- Both the *Williams* rule witness and the instant victim had become friends with appellant's wife and had socialized with appellant and his wife at their home.

- Both the night of the prior sexual battery and the night of the instant sexual battery began with the *Williams* rule witness and the instant victim drinking at the Reynas' home.

- Both nights continued with the *Williams* rule witness and the instant victim going out with appellant and his wife for drinking and dancing at bars within the downtown West Palm Beach entertainment district.

- Both the *Williams* rule witness and the instant victim became very impaired while drinking at the downtown bars.

- Both the prior sexual battery and the instant sexual battery occurred in locations where no one else was present – the prior sexual battery occurred in a dark deserted alley, and the instant sexual battery occurred in appellant's living room after appellant's wife had gone to bed.

- Appellant's first physical contact with both the *Williams* rule witness and the instant victim was kissing them on the mouth.

- Both the *Williams* rule witness and the instant victim reminded appellant he was married and attempted to physically resist him (the *Williams* rule witness tried to push appellant away, and the instant victim "swatted" at appellant), but appellant continued his sexual battery.

- Appellant physically got on top of both the *Williams* rule witness and the instant victim.

- Appellant reached through the clothes of both the *Williams* rule witness and the instant victim to penetrate their vaginas with his fingers.

The state properly relied upon the foregoing similarities to prove appellant's sexual battery of the instant victim was, beyond a reasonable doubt, not an innocent mistake of thinking he was having consensual sexual relations with his wife. The foregoing similarities further proved, beyond a reasonable doubt, appellant's motive and intent of committing sexual battery upon his wife's very impaired friends if an opportunity arose when he was alone with the women long enough to commit the sexual battery.

This conclusion is consistent with other cases in which our sister courts have admitted *Williams* rule evidence to prove a defendant's modus operandi of taking advantage of a relationship to commit sexual battery. *See Pitts v. State*, 263 So. 3d 834, 837-39 (Fla. 1st DCA 2019) (evidence that defendant had years earlier penetrated a woman after she passed out following a night of drinking was admissible to prove the present sexual battery of another woman who was sleeping after a night of drinking); *Bruce v. State*, 44 So. 3d 1225, 1229 (Fla. 5th DCA 2010) ("The victim's and [the *Williams* rule witness's] testimony demonstrated a clear pattern of conduct. The women were the same age, Bruce knew both women from church, and he knew both were single and lived alone.  Bruce first befriended the women by performing handyman services and commiserating with each about the hardship of caring for a loved one with disabilities. During the course of performing handyman services, he not only made sexual advances but fondled the breasts of each. The only difference was that he successfully completed the sexual battery against the victim, but was unable to [complete the sexual battery with the *Williams* rule witness who fought him off].").

### 2. The similarities between appellant's sexual battery of the instant victim and the Williams *rule witness* *are not outweighed by the differences between the two crimes.*

The majority cites five differences between appellant's sexual battery of the instant victim and the *Williams* rule witness to justify its ultimate conclusions that the prior sexual battery was "only weakly probative of the charged crimes" and thus "the trial court abused its discretion in admitting the *Williams* rule witness's testimony." Maj. op. at 10.  As discussed below, each of those five differences are either factually or legally mistaken or immaterial.

- *"The victim was a close friend of the Reynas who regularly slept over at their home; the* Williams *rule witness was a casual acquaintance who socialized occasionally with the Reynas."*

In actuality, the *Williams* rule witness was more than a casual acquaintance. Although she had not slept over at the Reynas' home, she had been to the Reynas' home a few times and *was a guest at the Reynas' wedding*. Thus, like the instant victim, the *Williams* rule witness's relationship was close enough that she was invited to the Reynas' home to begin a night of drinking, and then accompanied them to downtown bars for a night of dancing and more drinking. When she became very impaired, and no one else was present in the dark deserted alley, appellant took advantage of the opportunity to commit a sexual battery upon her, just as he did with the instant victim, another close friend, at the Reynas' home. Thus, the *Williams* rule evidence corroborated appellant's motive, intent, and absence of mistake in committing the sexual battery upon the instant victim.

- *"The charged crimes occurred on a couch in a private living room; the collateral act occurred on a public bench in an alley."*

This difference is immaterial. Appellant's motive and intent was to commit sexual battery upon his wife's friends *when the opportunity presented itself*, that is, when his wife's friends became very impaired and no one else was present, *regardless of location*. Thus, appellant took advantage of the dark deserted alley to commit a sexual battery upon the impaired *Williams* rule witness, and later took advantage of the impaired instant victim in his living room with while his wife slept in their bedroom.

- *"The victim had a work relationship with appellant's wife; the* Williams *rule witness had no such work relationship."*

This difference is immaterial. As stated above, the *Williams* rule witness's relationship was close enough that she had been to the Reynas' home a few times, socialized with them, and had been a guest at the Reynas' wedding.

Also immaterial is the fact that the *Williams* rule witness was a detective in a sex crimes unit. The majority argues that fact carried an additional risk of undue prejudice in a section 90.403 analysis, as juries often afford great weight to the testimony of police officers. *See, e.g., Salomon v. State,* 267 So. 3d 25, 32 (Fla. 4th DCA 2019) (explaining that police officers "bring with their testimony an air of authority and legitimacy," and that a jury "is

inclined to give great weight" to such testimony).  However, detectives in sex crimes units can become sexual battery victims too, and should not be excluded as possible *Williams* rule witnesses on that basis.  Here, the *Williams* rule witness's only role was being another of appellant's wife's very impaired friends whom appellant sexually attacked when the opportunity presented itself, just as he did to the instant victim.

- *"The charged crimes were three sexual batteries that occurred over an extended period of time, as the victim hovered between consciousness and sleep; the* Williams *rule witness was very much awake during the collateral act, a sudden groping of her genital area."*

This difference is immaterial.  The only reason why "three sexual batteries … occurred over an extended period of time" to the instant victim as she "hovered between consciousness and sleep," is because she was so much more impaired than the *Williams* rule witness, who was able to fight back and get away.  *Cf. Bruce*, 44 So. 3d at 1229 (the fact that the defendant successfully completed the sexual battery against the victim, but was only able to fondle the *Williams* rule witness's breasts, was an insignificant difference, because the *Williams* rule witness was able to fight off the defendant before he could complete the sexual battery).

That is why the majority's attempt to distinguish the striking similarities between the instant case and *Pitts v. State,* 263 So. 3d 834 (Fla. 1st DCA 2019), is ill-conceived.  As stated above, in *Pitts,* our sister court held that *Williams* rule evidence from years earlier was admissible where in both acts, the defendant was accused of digitally penetrating a female victim while she was sleeping or passed out following a night of drinking.  *Id.* at 837-39.  Like the *Williams* rule notice in the instant case, the *Pitts* notice had stated this collateral crime evidence would be introduced "pursuant to Florida Statute 90.404(2) for purposes of proving a material fact in issue: specifically the requisite elements of intent (including absence of mistake or accident), modus operandi."  *Id.* at 837 (internal brackets and quotation marks omitted).

Despite those striking similarities to the instant case, the majority attempts to distinguish *Pitts* as follows:

Here, the charged crimes were similar to that in *Pitts,* but the collateral evidence involved a different criminal act.  There is no clear pattern of conduct between the charged crimes and the collateral act.  *Groping  a woman on a bench in a public place is only minimally probative of the charged crime—*

17

*Exhibit A*

(Page 72 of 4)

> *repeated sexual batteries against a passed-out woman on a*
> *couch in a residential living room.*

Maj. op. at 9 (emphasis added). The majority's reasoning is unfortunately misguided. The only reason why the *Williams* rule witness was not also the victim of "repeated sexual batteries" is because she was less impaired than the instant victim, and thus more able to fight back and get away. Thus, the majority ultimately understates the facts by claiming appellant was merely "groping a woman on a bench in a public place." In actuality, appellant was taking advantage of being with the impaired *Williams* rule witness in a dark deserted alley so he could attempt to rape her, just as he was later able to rape the more severely impaired instant victim in his living room when no one else was present.

- *"There was a gap of over four years between the two incidents."*

I recognize the *McLean* court identified "the closeness in time of the prior acts to the act charged" as one of the factors which a trial court should evaluate when determining whether the probative value of previous offenses is substantially outweighed by the danger of unfair prejudice. 934 So. 2d at 1262. However, I do not consider "a gap of over four years between the two incidents" to be material in this case, for three reasons.

First, as mentioned above, in *Pitts*, our sister court held that evidence that defendant had "years earlier" penetrated a woman after she passed out following a night of drinking was admissible to prove the present sexual battery of another woman who was sleeping after a night of drinking. 263 So. 3d at 837.

Second, permitting the state to have presented *Williams* rule evidence from "years earlier" is consistent with section 90.610(1), Florida Statutes (2015), which permits a witness's credibility to be impeached by prior convictions for felonies and crimes of dishonesty going back many years, if appropriate. *See Peoples v. State*, 576 So. 2d 783, 789 (Fla. 5th DCA 1991) (noting that, although section 90.610(1)(a), "precludes evidence in a civil trial of a conviction so remote in time as to have no bearing on the present character of a witness," section 90.610(1) does not otherwise prohibit such evidence in a criminal trial). As our sister court stated in *Nehring v. State*, 225 So. 3d 916 (Fla. 1st DCA 2017):

> The only test for the admissibility of a prior conviction is whether the conviction has any bearing on the witness's credibility. The remoteness of the conviction will most certainly be a factor in determining whether it bears on the

> witness's credibility, but *there is no bright-line rule for when a conviction becomes too remote to bear on the witness's credibility. The determination is within the trial court's discretion, and a trial court abuses its discretion only when its decision is arbitrary or fanciful.*

*Id.* at 918 (emphasis added; internal citation omitted).  Given that a trial court's section 90.404(2) determination has similar considerations to a section 90.610(1) determination, no reason exists here why "a gap of over four years between the two incidents" should be material in this case.

Third, and most importantly, the method by which appellant committed the sexual batteries against the *Williams* rule witness and the instant victim was partially based on factors beyond appellant's control and partially based on opportunity, the combination of which may have required years to develop before appellant could offend again.  Appellant's modus operandi required four events to occur:  (1) his wife would have to become friends with another woman, (2) that relationship would have to develop to the point when the woman would socialize often with the Reynas, (3) an occasion would have to occur when the woman would drink to the point of impairment, and (4) an opportunity would have to occur when the woman was with appellant in a location where no one else would be present for several minutes, if not more, so appellant could take advantage of the woman.  Given that this combination of factors may have required years to occur, the fact that at least two incidents occurred just over four years apart should not be surprising.  *Cf. LaValley v. State*, 30 So. 3d 513, 515-16 (Fla. 5th DCA 2009) (trial court did not abuse its discretion by allowing *Williams* rule evidence of another familial molestation occurring eleven years earlier; "[A]lthough the molestations occurred years apart, that appears more to be a function of opportunity than anything else.").

### **Conclusion**

Based on the foregoing, I respectfully dissent from the majority's holding that the trial court abused its discretion by admitting evidence of appellant having committed a sexual battery upon the *Williams* rule witness.  *See Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980) ("Discretion ... is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where *no reasonable [person] would take the view adopted by the trial court.*") (emphasis added).

19

*Exhibit K*

*Page 74 of 6*

I also note the trial court read the cautionary *Williams* rule instruction, that is, Florida Standard Jury Instruction (Criminal) 2.4, to the jury before the *Williams* rule witness's testimony.   Further, this evidence did not become a feature of the lengthy trial or overwhelm evidence of the charged crime.  The *Williams* rule witness and her mother were the last two out of ten state witnesses to testify, and their testimony took up only ninety minutes out of three full days' of witness testimony in the trial as a whole. During the state's one hour closing argument, the state discussed the *Williams* rule evidence for only three to four minutes.  *See Stubbs v. State*, 275 So. 3d 631, 636 (Fla. 4th DCA 2019) ("On this record, the collateral act evidence did not become a feature of the trial or overwhelm the evidence of the charged crime.").

Lastly, and without further discussion, I concur with the majority's holding that the trial court did not abuse its discretion in allowing appellant's prior convictions to be used for impeachment.

*       *       *

**Not final until disposition of timely filed motion for rehearing.**

*Exhibit M*

# M A N D A T E

## from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Spencer D. Levine, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

**DATE:**              **October 30, 2020**
**CASE NO.:**          **19-2306**
**COUNTY OF ORIGIN:**  **Palm Beach**
**T.C. CASE NO.:**     **502015CF004073A**

**STYLE:    JOSE REYNA**        **v.    STATE OF FLORIDA**



*Lonn Weissblum*

**LONN WEISSBLUM, Clerk**
**Fourth District Court of Appeal**

Served:

cc:  Attorney General-W.P.B.        Kristen Alana Kawass        Paul Patti
     State Attorney-P.B.            Clerk Palm Beach

kr

*Exhibit B*

PLEASE DETACH THIS STUB AND RETURN WITH PAYMENT

Santa Rosa Sheriffs Office
c/o Advent Financial Systems
PO Box 6333
Elizabethtown, KY 42702-6333

Certified Check
Or Money Order

| Payment Details | |
|---|---|
| CR Number: | 1198143 |
| Release Date: | 11/14/2020 |
| Inmate ID: | 20014089 |
| **AMOUNT DUE  $** (No Partial Payments) | **70.00** |

**MAKER:**   JOSE REYNA
414 26th St
West Palm Beach, FL 33407-5414

REMIT PAYMENT TO:
PO BOX 6333
ELIZABETHTOWN, KY 42702-6333

**PLEASE DO NOT MAIL PAYMENT TO THE JAIL.**



Dear JOSE REYNA,

December 01, 2020

As a result of your recent incarceration at the Santa Rosa Sheriffs Office, expenses totaling $70.00 were incurred, which includes a service charge fee.  You have been granted 30 days from the date of this letter to make payment.  The Santa Rosa Sheriffs Office has entered into a contract with Advent Financial Systems (Pay My Jailer) to provide several convenient options to pay the outstanding fees.

**You must pay the total due of $70.00 on or before 12/31/2020 using one of the following PAYMENT OPTIONS:**

| PAY ONLINE | MAIL full payment with the attached payment slip to: | PAY BY PHONE |
|---|---|---|
| **www.payafee.net** | Santa Rosa Sheriffs Office | Call: 1-866-494-8556 |
| PayID: **1-1198143-436** | c/o Advent Financial Systems | M-F 8:00 AM to 6:00 PM ET |
| Additional convenience fees apply | P.O. Box 6333 | **VISA** MasterCard DISCOVER |
| | Elizabethtown, KY 42702-6333 | Additional convenience fees apply. |
| | Allow 3 to 5 business days.  Money order or certified check only. | |

Sincerely,

Santa Rosa Sheriffs Office

*Paid online*
*2/1/21*
*personal visa*

*561 688 3000*

**PLEASE RETAIN THIS PORTION FOR YOUR RECORDS 1198143**

*Exhibit S*

# Supreme Court of Florida

### THURSDAY, APRIL 22, 2021

**CASE NO.: SC20-1666**
Lower Tribunal No(s).:
4D19-2306; 502015CF004073AXXXMB

STATE OF FLORIDA     vs.   JOSE REYNA

---

Petitioner(s)                Respondent(s)

      This cause having heretofore been submitted to the Court on jurisdictional briefs and portions of the record deemed necessary to reflect jurisdiction under Article V, Section 3(b), Florida Constitution, and the Court having determined that it should decline to accept jurisdiction, it is ordered that the petition for review is denied.

      No motion for rehearing will be entertained by the Court. *See* Fla. R. App. P. 9.330(d)(2).

POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

dl
Served:

KRISTEN A. KAWASS         CHRISTOPHER J. BAUM
AMIT AGARWAL              JEFFREY PAUL DESOUSA
HON. JOSEPH ABRUZZO, CLERK
HON. LONN WEISSBLUM, CLERK
HON. CHERYL A. CARACUZZO, JUDGE

# Exhibit X
## Immigration Status

'Sworn Declaration Under Penalty of Perjury'
In accordance with Federal Statute 28 U.S.C 1746.

Jose Luis Reyna (hereinafter "Declarant") makes the following statements base on the Declarant own First hand knowledge, information, and belief, unless otherwise stated.

I Jose Luis Reyna, hereby depose and declare:

On the issue of his immigration status, the Declarant takes issue with the I-200 Form, "Warrant for arrest of Alien", specifically where it states that:

"....There is Probable Cause to believe that 'Reyna, Jose' is Removable from the United States."

And for its determination it states that a

"Biometric Confirmation of the Subjects identity and a Records Check of Federal Databases that affirmatively indicate, by themselves or in addition to other reliable information, that the Subject either lacks immigration status or notwithstanding such status is removable under U.S Immigration Law."

It is well establish by a long line of cases, that the Databases ICE Agents utilize to conduct their Biometric assessment, have errors and/or are not complete. One example is: Greedle V. Miami-Dade County, 349 F. supp. 3d 1276
(In a Declaration made by ICE officer Dean Caputo, which states that: "Upon information and belief, ICE Enforcement and Removal Operations Database records state that the Plaintiff Garland Creedle, is a United States Citizen.".... "The Declaration fails to state what the ICE Ero Database Records are,

Exhibit X

Wether This is The only Database upon which The ICE officers rely on before issuing detainers, when The ICE ero Database was allegelly updated to reflect That Mr Creedle was a U.S. Citizen...).

In Creedle ICE admits That Their Database records were or are complete, otherwise, Mr Creedle would have been in The ero Database and There would not have been a need to update it.

Further in The same case, The opinion identifies additional errors in ICE databases: Quoting Roy v. Cty of Los Angeles, No. CV-1209012-AB-FFMX, 2018 WL 914773 at 19. (C.D. cal. Feb 7, 2018), reconsideration Denied, No. CV-1209012-AB-FFMX, 2018 WL 3439168 (C.D. cal. July 11, 2018), (Denying ICE's Motion For Summary Judgement as to The Plaintiff's Fourth Amendment Claims on The Ground That 'a Factual dispute Exists as to The reliability of The Databases That ICE uses ... to Establish Probable cause' because The Plaintiff Presented evidence That errors Exists in one of ICE's Database (Cis), in approximately Three out of ten cases.).

In Uroza v. Salt lake city, No 2: 11 CV 713 DAK, 2014 WL 4457300 at 5 (D Utah 2014) ("Between 2008 and 2012, ICE issued detainers against more Than 800 Citizens and 28,000 Legal Permanent Residents.")

Also in Orhorhaghe v. INS, 38 F. 3d. 488, 498-99 (9th cir) (concluding That reliance on The immigration index System Data-base, which did not Contain entry records Predating 1983 and Excluded "millions of People who are legitimately Present in The United States," did not Provide Sufficient Cause for immigration Agents To Seize individual For Suspected illegal Presence.), and many, many more cases.

With The fore Going in mind, The Declarant, never had To Prove That he was a citizen before, as he came to The U.S as a child of 11 Years of AGE, in 1982.

Exhibit X

Page 3 of 8

In fact, he was not require to prove he was a citizen before to anyone, other than Employment Verification, which was done via an I-9 form; Which results were only shown to his employers, and he never was questioned on his ability to work in the U.S nor his status as a Citizen or Legal Permanent alien; The Declarant even worked in Federal Data Sensitive Projects, without his status being questioned.

It was only thru this process, that the Declarant learned that he was perhaps a 'Legal Permanent Resident' alien;

However, this contradicts the DHS E-verify system, which has the Declarant as a U.S citizen. Two distinct reports, which were produced in 2015 and 2019 confirm this fact. (See attachment #1 and #2).

'E-verify' is a DHS, 'U.S Citizenship and Immigration Services' (USCIS), and 'Social Security Administration' (SSA) System, which is used to confirm Employment Authorization, residency, and Citizenship status for all federal and commercial employees seeking to work in the United States.

In Contrast, ICE Systems mainly focus on Criminal history, contracted databases, and manual Data Updates.

The Declarant is currently in the process of verifying this conflicting information with the U.S Citizenship & Immigration Services (USCIS); This process is complicated and could take several months to verify, after the USCIS receives the Declarant forms; Which is proving to be difficult to do while in Detention, as the USCIS requires original forms signed and a full set of finger prints. PBSO policy is to only provide legal material to inmates as copies, there are no exceptions, so as a collateral consequence,

Mr Reyna's Detention is also depriving him of the ability to prove whether or not he is a citizen.

Exhibit X                                    Page 4 of 8

Finally, Mr Reyna asserts That The attachments
E-Verify reports are True Copies of The output Produced by
DHS's E-Verify System.

Report #1: was conducted on December 09, 2015
and has a case Verification Number of 2015343120159JS.

Report #2: Was Conducted on February 25, 2019
and has a case Verification Number of 201905623175IJE.

I, Jose Luis Reyna, Declare, in accordance with
Federal Statute 28 U.S.C § 1746 under Penalty of Perjury by
This Declaration That The Information and Facts Provided
herein are, within The Best of My Knowledge and belief,
True in with the Constitution and The Laws of the
United States of America.

NAME: Jose Luis Reyna
DOB : October, 17 1969
Inmate # : 0252767

x _____

x _____ 5/1/21 _____
      Date.

*Exhibit X*



 

## SENSITIVE BUT UNCLASSIFIED

# Case Verification Number: 2015343120159JS

Report Prepared: 12/09/2015

### Company Information

Company ID: 929309

Company Name: Velolux

### Employee Information

Last Name: Reyna

First Name: Jose

Date of Birth: 10/17/1969

Social Security Number: *** ** 8447

Hire Date: 12/07/2015

Citizenship Status: A citizen of the United States

### Document Information

List B Document: Driver's license or ID card issued by a U.S. state or outlying possession

List C Document: Social Security Card

Document Name: Driver's license

Document State: New York

Driver's License or ID Card Number:

Document Expiration Date: 10/17/2019

### Case Status Information

Current Case Result: Employment Authorized

Employer Case ID:

Case Submitted On: 12/09/2015

Case Submitted By: JREY5574

## SENSITIVE BUT UNCLASSIFIED

Exhibit X

Page 6 of 8

2/25/2019                                         E-Verify Case Processing: View/Print Details

# E-Verify

## Case Verification Number: 2019056231751JE

Report prepared: 02/25/2019

### Company Information

Company ID: 929309                          Company Name: Velolux

Client Company ID: 929309                   Client Company Name: Velolux

### Employee Information

Name: Jose L. Reyna                         Date of Birth: 10/17/~~████~~

U.S. Social Security Number: ***-**-8447    Employee's First Day of Employment: 03/15/2019

Citizenship Status: U.S. Citizen

### Document Information

List B Document: Driver's license or ID card issued by a U.S. state or outlying possession

Document Subtype: Driver's License          Document Number: ****-***-**-*77-0

Expiration Date: 10/17/2022                 State: Florida

List C Document: Social Security Card

### Case Information

Current Case Result: Closed                 Case Submitted By: Jennifer Reyna

Case Status: Employment Authorized          Reason for Closure: Employment Authorized Auto Close

Exhibit X

Page 7 of 8



The Law Offices of
# Sandra Echevarria, P.A.

Miami
14221 SW 120th Street, Suite 221, Miami, FL 33186
Office: (305) 554-0601 Fax: (305) 554-0640
Website: miamiimmigrationattorneys.us
Email: miamiimmigrationattorneys@gmail.com

April 14, 2021

**Palm Beach County Main Detention Center**
3228 Gun Club Road
PO Box 24716,
West Palm Beach, FL 33406

Docs for Inmate Registered name as:     REYNA, JOSE LUIS,
REAL Name: REINA, JOSE LUIS
A-Number: 041-074-228, Inmate ID: 0252767

**Subject:     Request to Provide Inmate with Enclosed Forms to Have them Signed and Returned using the Return Address Envelope**

Dear Officer in Charge:

We were hired by the inmate to obtained and search for records on the inmate's case, both criminal and immigration cases. We are attaching the forms that we will need the inmate to sign. We will also need for the inmate to imprint his fingerprints on the FBI's FD-258 forms and have all signed and original forms mailed to us.

Enclosed you will find the FD-258 cards, ink tabs, and ink removal towelettes, along with the return address envelope for the inmate to send us all documents signed and imprinted.

Please contact us should you have any questions, and/or should we require to take any additional steps.

Sincerely,

Sandra Echevarria, Esq.

LEGAL MAIL

Electronic Rate Approved #038555749

9405 5036 9930 0351 1308 75



**USPS TRACKING #**

SHIP
TO:   FOR INMATE025276Z JOSE REYNA S88.052527Z7
      MDC
      PO BOX 247Z6
      WEST PALM BCH FL 33416-47Z6

**B099**

SANDRA ECHEVARRIA
LAW OFFICES OF SANDRA ECHEVARRIA,
P.A.
14221 SW 120TH ST STE 221
MIAMI FL 33186-4225

Expected Delivery Date: 04/17/21
Ref# REYNA,JOSE
**0021**

**PRIORITY MAIL 1-DAY™**

Mailed from 33186                    04/16/2021

┌─────────┐
│    **P**    │
│         │
└─────────┘

**U.S. POSTAGE PAID**
Click-N-Ship®
US POSTAGE
Flat Rate Env
$7.95
usps.com
9405 5036 9930 0351 1308 75 0079 5000 0023 3416

✈ **UNITED STATES**
**POSTAL SERVICE** ®

**Click-N-Ship®**

EP14F May 2020
OD: 12 1/2 x 9 1/2

Exhibit P

In The Circuit Court of The Fifteenth Judicial Circuit
in and for Palm Beach County, Florida

Felony Criminal Division: "R"
Case No: 2000-CF-013843-Axxx-MB

State of Florida, Plaintiff

vs.

Jose Luis Reyna, Defendant

Amended Motion for 3.850 Post Conviction
Relief To Vacate, Set aside, correct,
and/or Dismiss Plea, Judgement
and Sentence

Please Expedite
Currently being detained
in ICE Custody.

NOT A CERTIFIED COPY

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 6/30/2021 9:49:00 AM

*Exhibit P*

State of Florida, Plaintiff

v.

Jose Luis Reyna, Defendant

Criminal Division : 'R'

case no: 2000-CF-013843-Axxx-MB

## Amended Motion for 3.850 Postconviction Relief to Vacate, Set aside, Correct, and/or Dismiss Plea, Judgement and Sentence.

Here comes now, The Defendant 'Jose Luis Reyna' Proceeding in Proper Person, and Pursuant to Florida Rules of Criminal Procedure 3.850, and respectfully moves This Honorable court for This 3.850 Postconviction relief challenging The validity of his Judgement, and Sentence in The above styled Cause.

The Defendant would Like for This Honorable court to enter an order to vacate and set aside his Plea. The Defendant is seeking to Resolve This case in The above styled Cause, To Place This Matter on calender call for The Purposes of Mitigating, correcting, and/or Dismissing the charge. In Support Thereof he asserts The following:

The Defendant has a computer science Background, and no legal Expirence. Therefore, The Defendant ProSe is seeking to invoke Haines V. Kenner, 404 US 519, 520, 91 S. CT. 594, 30 L Ed 2d 652 (1972) Which holds, ProSe Litigants are to be Given Some margin for error and/or Leway in The Drafting of their motions Pleading to the Courts.

According to The Courts, ProSe Litigants are held to less Stringent standards Than More Formal Pleadings Drafted by any Professional Court Attorney's. Please see Estelle Us. Gamble, U.S 97 S.CT. 285, 50 L Ed. 2d. 251 (1976); and Haines Vs Kenner, 404 U.S. 519, 520, 92 S.CT 594, 30 L Ed. 2d. 652 (1972).

In addition, The Courts had been advised to Give Leway to Layman Litigants to allow for Development of Potential Meritorious claims. Please see Cruz V. Berto, 405 US 319 (1972) id.

## Factual and Procedural Background

The Defendant, Jose Luis Reyna' is the only defendant in this case, and on May 25, 2001, the defendant was convicted in the 15th Judicial Circuit Court, for the following offense: Possession of Cocaine in violation of Florida Statutes 893.13 (6)(a) 2001; Case number: 2000-CF-013843-AXXX-MB. The court which rendered the judgement is the same; and the sentence under attack herein, that the defendant seeks to challenge is the original judgement, and sentence in which the the defendant entered a plea of 'Guilty with adjudication withheld; which the trial court imposed on May 25, 2001, and no direct appeal was filed on behalf of the defendant on this case. (see exhibit C).

### Claim One

"The defendant contends that his counsel in trial court was ineffective for failing to advise him of potential immigration consequences of deportation before accepting a plea of guilt."

The defendant counsel was ineffective for failing to advise the defendant, that by accepting the plea he was subjected to the consequence of mandatory deportation. According to exhibit A, provided by 'ICE', at the time of the plea the defendant was an immigrant with 'legal permanent residence' status; who was represented by counsel of record, and the defendants same counsel failed to inform him of the potential or certain threat of deportation, and full consequences of his plea, in violation of U.S.C.A. Const. Amend.6.

### Claim Two

"The defendant contends that his counsel in trial court was ineffective for failure to inform the defendant of his option to apply for the pre-trial intervention program."

*Exhibit 1*

The Defense Counsels failure to inform The Defendant of his option to apply for The 'Pre-Trial Intervention Program' as an alternative to Pleading Guilty, Constitutes ineffective assistance of Counsel; Prejudice Suffered by The Defendant was The inability to make an informed decision as to wether to accept a Plea offer, in violation of U.S.C.A Const. Amend 6; and F.S.A Fl. R.P Rule 3.171 (c)(2)(B).

Now, as a result of The Defendants Counsel of Record in Trial Court ineffective assistance, The Defendant, Jose Luis Reyna is now being Detained in ICE Custody Since November 19, 2020. As Such, The Defendant is currently Going Through The immigration Proceeding for removal and Deportation.

The Defendant is a Native Citizen of Peru, who was admitted into The United States Legally via New York, New York on or about April 3, 1987 With 'Legal Permanent Status' (See Exhibit A). It is only the Conviction from May 25, 2001 That has caused The Defendant to be inadmissible, and removable without any relief Through "The Immigration Court For Possession of a Controlled Substance under immigration statutes 237 (a)(2)(b)(i)."

Therefore, The 'Immigration Custom Enforcement (ICE) of DHS has Filed an 'NTA' (See Exhibit A), Consisting of The charging document For The Confirmation of The Defendant being removable for The Conviction herein.

Page 4 of 23

*Exhibit*

## <u>Argument</u>

The Defendants Plea was not Knowing, and not Voluntary because it was obtained in Violation of his Fifth, Sixth, Fourteenth Amendments, Rights, and F.C.:R.P. Rule 3.171 (c)(2)(b), because, Counsel Failed to advise The Defendant of The option to Participate in The 'Pre-Trial intervention Program'; Which would have mitigated The Conviction, and Counsel Failed To advise the Defendant That he would be Subjected to Mandatory deportation as a result of his Plea. The Defendant Seeks to "Establish" The Following:

1).- That The Defendant was Present in The Country lawfully and legally at the time of The Plea,

2).- That The Plea at issue is The sole basis For The Defendants Deportation,

3).- That The Defendant was not accurately advised by the court of The mandatory immigration Consequences,

4).- That The Defendant had no Knowledge of The same,

5).- That The Law, as it existed at The time of The Plea, subjected The Defendant to Virtually automatic Deportation,

6).- That INS had Instituted deportation proceedings, and The Defendant is at risk of deportation,

7).- That The Presumptively Mandatory Consequence of Deportation is clear from The Face of The Immigration statute, That the Defendant is now currently in The Process of going Through immigration Proceedings.

8).- That Counsel Failed to accurately advise The Defendant about The Pre-Trial intervention Program,

9).- That The Counsel Failed to accurately advise The Defendant about The mandatory Deportation Consequences of taking a Plea,

10).- That The Defendant would not have Plead Guilty, if The Pre-Trial Intervention Program was made available,

11).- And would not have accepted The Plea and Gone to trial, had he Understood The mandatory deportation Consequences,

12).- That if The Defendant had been accurately advised he would not have entered The Plea,

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 8:40:00 AM

13).- and That had The Defendant declined The Plea offer, and enrolled in The 'Pre-trial Intervention Program', or negotiated a better Plea deal for a Lesser offense, The Conviction would have been avoided and Thus rendering The Immigration Consequence null.

The Defendant Seeks To Demonstrate. That his counsel of record deficiently Performed To Such an Extent That The Counsel's Performance was outside The wide range of Professionally being Competent to Provding The Defendant with Proper assistance, and The Defendant Seeks To Demonstrate, That The Deficiency, or omission by his counsel actually had/has Prejudiced The Defendant.

Whereas, If The Defendant Counsel did Provide the Defendant with Competent assistance to research The 'Pretrial Intervention Program', and The True Deportation Consequences, The Conviction Would have been avoided. Instead, as a result of his Lack of Due Diligence, and improper advise, or Lack Thereof, The defendant is Prejudice, and Subjected to be Detained by 'ICE' For Deportation. The defendant would not have entered The Plea, Instead would have Join the 'Pre-trial Intervention Program', or negotianed a Plea For a Lesser offense, or Gone to trial to Win.

Furthermore, The Defendant Seeks to Demonstrate That The The Conviction In the above styled Captioned Cause is The sole reason For Which The Defendant is now facing The mandatory Threats of Immigration Deportation. (See Exhibit A).

The Defendant hereby incorporates all The above foregoing statements, and arguments to assert That his Plea was entered without The Full, and required Knowledge of all available options, and Direct consequences of Such, and is Sufficient Good Cause To Withdraw his Plea, and The Defendant also asserts That it was due To his Counsels affirmative Misadvise That he entered The Plea.

The Defendant alleges That his Counsel of Record in trial court Did not inform him of (1) The 'Pretrial Intervention Program' (PTI), (2) and by accepting The Plea agreement in This case, it would trigger a mandatory Automatic Deportation. The Defendant would Further assert That had his trial Counsel Properly informed him of The Certain immigration consequences as well as The option of Participating in The 'Pretrial Intervention Program', he would have enrolled, or would have negotiated To a Lesser offense, or Gone to trial.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

*Exhibit P*

It is blatantly evident, and true that The Defendants Counsel of record in Trial Court rendered Ineffective assistance of Counsel, in violation of The 6th Amendment to The Constitution of The United States (U.S.C.A. Const Amend 6), and under Strickland V. Washington, 466 U.S 668 (1984), and for violating Rule 3.171 (c)(2)(b) by not informing The Defendant of The 'Pretrial Intervention Program' as a possible alternative to taking The Plea, or Going to trial.

The Defendant would assert, and further Demonstrate That The Facts on which The claim is Predicated were unknown to The Defendant, and his Counsel of Record in trial Court, and These Facts could not have been Ascertained by The Exercise of Due Diligence.

Whereas, The Defendant would inform This Honorable court That affirmative steps were taken in an attempt to discover what The effects of The Plea on his residency status would result to harsh Immigration consequences, and That it was not until The Defendant was informed by The 'Department of Corrections' via memo on Feb 20, 2020 (see Exhibit b), and later Physically taken into 'ICE' Custody on November 19, 2020, That he was made fully aware of The Pleas Immigration Consequence, calling for his removal from The United States.

The Defendant would assert a new, That had his Counsel of record informed him of The Immigration Consequence, and advised him of The 'Pre-Trial Intervention Program', he would have Joined The Program, or Negotiated for a Lesser offense, or Proceeded to trial, and won.

Whereas, The Defendant' Counsel failed to inform The defendant, That according to Immigration Laws, "It is The Policy of 'Immigration and Customs Enforcement ('ICE') to Deport any non-citizen who are convicted of any charges That are Consisting of felony offenses, unless a Strong, undisputed reasons of facts to do otherwise exists."

Therefore, The Defendants Plea was not entered voluntarily as The Counsel of record Failed to Properly advise The Defendant of The 'Pretrial Intervention Program' ('PTI), and The Direct Consequence of Mandatory Deportation as a result of entering a Plea of Guilt in This case.

Whats more, The Defendants Plea was also entered in Great Duress, Due to The fact That The Defendant was scared and his Counsel of record improperly advised The Defendant.

*Exhibit p.*

In Summary, The Defendants Guilty Plea was not voluntary, as The Counsel of record failed to Properly advise him, and thus the Defendant's negative response during The Plea colloquy to any Questions ask to weTher anything had been "Promised" to him is not controlling. Please see Renjoli V. State, 718 So. 2d. 1278, 1279-80 (Fla 3rd DCA 1998) ("Judge's questioning during colloquy regarding wether anything had been Promised to the Defendant, was insufficient to require The Defendant to disclose his Counsel's advise about The time The Defendant would Likely Spend in Jail; an attorney's estimate of The time to be served in Jail is not Properly viewed as a Promise, and a General Question about "Promises" does not reasonably call for disclosure of an attorney's advise about time Likely to be served in Prison"). According to State V. Leroux, 689 So. 2d 235 (Fla 1996).

Additionally, The Defendant asserts, that his claim is valid for ineffective assistance of Counsel. Even if the record shows that the Plea colloquy warned The Defendant of The Deportation Consequence. See Cooke V. State, 174 So. 3d 628 (Fla 4th DCA 2015) ("We also conclude That the Court's warning during The Plea colloquy, That The Plea 'Probably' would result in The Defendants Deportation, did not necessarily remove any Prejudice caused by counsel's alleged ineffective assistance, where The Plea's Deportation Consequences, at least on The face of The Defendants motion, may have been truly clear at the time of The Plea... ...However, Even the Theory That the courts warning during Plea colloquy removed any Prejudice caused by counsel's alleged ineffective assistance does not hold water. Put another way, The Court's Warning - That The Plea Probably would result in the defendants deportation - did not necessarily remove any Prejudice caused by counsel's alleged ineffective assistance").

Exh. b. 1 p

The Defendant is entitled to "Effective assistance of competent counsel", Please see Menann v. Richardson, 397 U.S. 759, 771, So. ct. 1441, 25 L. ed. 2d 763. The Defendant contends that during the plea process, his counsel of record did not advise him of the option to to enroll in the 'Pretrial Intervention Program' nor that by entering the plea for the charge in this case (see exhibit c), The Defendant is now subject to Deportation as a consequence, because such risk attached to the plea, is due to the fact that the Defendant is an immigrant.

The Defendant's plea was not knowing, and not voluntary, because he was not made aware of all options available, nor the true consequences of entering into the plea. Because deportation was a mandatory consequence of his plea, and these facts should have been made known to the Defendant by his counsel of record before entering the plea.

Because the Defendant was not advised by counsel of the 'Pretrial Intervention Program', nor of the Deportation consequences; therefore his plea cannot be knowingly and voluntarily made. Please see McArthy v. United States, 394 U.S 459, 466, 89 So. Ct. 1463, 25 L. Ed. 2d 747.

Additionally, The Supreme Court held that counsel's failure to advise an immigrant defendant of the consequence of Deportation satisfies the first prong of Strickland v. Washington, 466 U.S 688, 104 So. Ct. 1475. The Defendants claim that his counsel of record provided ineffective assistance during the plea process, for failure to advise him of the 'Pretrial Intervention Program', and that there was a mandatory Deportation, which render's counsel's performance deficient "below an objective standard of reasonableness", 466 U.S., at 688, 104 So. ct. 2052, 80 L. ed. 2d 674. The Defendant was prejudiced by counsel's error, because, had counsel advised him that he would risk deportation as a result of his plea, he would have instead enrolled in 'PTI', or gone to trial. Please see Hill v. Lockhart 474 U.S. 52, 58, 106 So. ct. 366, 88 L Ed 2d 203.

Moreover, The counsel of record failed to follow F. R. C. P 3.171(c)(2)(5) by failing to advise the defendant of all options available to him, specially the option to enroll in the 'Pretrial Intervention Program.'

*Exhibit P*

see Julien V. State, 917 So. 2d 213 (Fla 3rd DCA 2005) (Florida Rule of Criminal Procedure 3.171 (c)(2)(b) Places a responsibility upon The Defense Counsel to advise a defendant of all Pleaoffers "Pertinent matters bearing on The choice of Which Plea to enter, and The Particulars attendant upon each Plea, and The Likely results thereof, as well as any Possible option That may be open to the Defendant." As The Criminal Law Expert explained, The 'PTI' Program is a 'Possible alternative' available to a 'First Time offender.' For a First-time offender Facing immigration consequences, the Program is critical. A defendant derives a 'Tremendous' benefit by having his charge dismissed after completing The Program. Considering These factors we conclude That Defense counsels failure to inform appellant of This Possible alternative constituted a deficient Performance).

At The Time, The Defendant did not have a conviction for a Third Degree Felony, nor a violent misdemeanor to disqualify him from Joining The 'Pretrial Intervention Program'. Please see Batista V. State, 951 So 2d 1002, (Fla 4th DCA 2007) ('Section 948.08 Florida Statutes, Allows certain First Time offenders or Persons Convicted of not more Than one non-violent misdemeanor or Third degree Felony to be Placed on PTI').

Therefore, it is illogical, and unreasonable to Think That The Defendant — Given an option For The case to go away as if nothing ever Happened — would have not opted For The 'Pretrial Intervention Program', if he was Given The information of its Existance. The Defendant asserts That by withholding This option, The Counsel of record Failed to comply with F.R.C.P 3.171 (c)(2)(b), and Thus his Performance Fell "below an objective standard of reasonableness."

The Defendant contends That he is entitled To withdraw his his Plea, and his conviction must be vacated, because it was obtained as a result of his counsel of record ineffective representation in Trial Court.

Page 10 of 23

*Exhibit P*

Additionally, in the absence of Transcripts, and the motion being legally Sufficient, the Defendant asks This Honorable Court to, if warranted, hold an evidenciary hearing to discuss the validity of his claim. Please see <u>Blanco V. State</u>, 997 So. 2d 1179 (2008); Quoting <u>Forrest V. State</u>, 988 So. 2d 38, 40 (Fla 4ᵀᴴ DCA); (Finding that unless the State can conclusively demonstrate by record attachments, that the defendant is not entitled to relief on a claim of Failure to warn of deportation consequences of a Guilty Plea, an evidenciary hearing is required to address factual disputes Sorrounding wether, the movant was Properly advised, and to hear evidence regarding wether the Plea in this case alone Subjects the Movant to Deportation.); Please also see <u>State V. Dearmas</u>, 988 So. 2d 156, 158 (Fla 3ᵈ DCA 2008), (Finding that where the Defendant files a Facially Sufficient Postconviction Motion alleging that he was not warned of the Deportation consequences of his Plea, an evidenciary hearing is appropriate to test the defendants eligibility to withdraw his Plea.).

The Defendant claims, that he does not recall the trial Court Giving any Instructions on the Deportation Consequences, and Since the Plea hearing transcipts no longer exist, and efforts to obtain them were unsuccessful; The Defendant can only Speculate, that if any instruction was Given, the trial Court at the very least used the Instructions Codified in F.R.C.P. 3.172(c)(8) as it were in 2001.

The defendants Plea was entered on May 25, 2001, at this Point in time F.R.C.P 3.172(c)(8) was deficient to fully advice the Defendant of the Deportation Consequences. This fact is evident by the amendment made to the rule by the Florida Supreme Court In 2016, See "In Re Ammendments to Fla Rules of Criminal Procedure," 188 So. 3d 764, 770 (Fla 2015).

In the amendment, a clear Instruction is afforded to any Immigrant defendant as to the Deportation Consequences of entering a Plea. This is a warning That was denied to the defendant at the Time.

*Exhibit P*

See Opinion note <u>Goddard V. State</u>, 217 So.3d 1105 (2017) (We note That The change in Rule 3.172(c)(8) standard of advisements Between 2015 and 2016 demonstrates The Supreme Court's recognition of The importance of a Thorough advisement, and The inadequacy of The brief advisement. Prior to 2016, The rule instructed trial Courts to Simply advice a defendant That if "he or she is not a United States Citizen, a Guilty Plea may Subject him or her to deportation." In The 2016 Version of The rule 3.172(c)(8), Courts are now instructed to Give a much more Comprehensive advisement...).

The Defendant argues That F.R.C.P. 3.172(c)(8) (2001) was Deficient even if it was use by the trial court at The Time, because, if it was Given, it would not had Conveyed The Certain Deportation Consequence of entering the Plea.

The Facts on Which The claim is Predicated were Unknown to The Defendant, or defendant's Attorney, and could not be ascertained by the Excercise of due diligence, and the claim is made Within 2 Years of the time That These new Facts were or could have been discovered with The Excercise of Due Diligence.

Whereas, The Defendant would like to inform The Honorable Court, That affirmative steps were Taken in an attempt to discover What The effects of the Plea on his residency status would result To Concerning The Immigration Consequences. Therefore, The Lack of court to ascertain, and inform The Defendant in Open Court of the Possibility of Deportation is insufficient to Satisfy Rule 3.172(c)(8).

The defendant involuntarily accepted The Plea agreement Without The Proper Understanding of The Immigration Consequences, and This admonition is Given to all Defendants in all Cases. The Language of Rule 3.172 is very clear and mandatory; Please see <u>Perriello V. State</u>, 684 So.2d 258, 260 (Fla 4th DCA 1996) (Holding That The rule requires That The Trial Judge actually ascertain in Open Court That the Defendant Understands The Possible Consequences of a Conviction on his alien status.). Therefore, neither the Signing of The Waiver Form, nor The reading of the Written Plea agreement To The Defendant by the Counsel of record alone can Satisfy The rules

*Exhibit P*

requirement That The Judge actually ascertain in open court That The Defendant understands the Possible Consequence of a conviction on his immigration status.

The Defendant asserts That The Defense Counsel never mentioned That his Plea would Subject him to a "Virtually Automatic" Deportation, or "Presumptively Mandatory" Consequence of deportation to The immigration status. As a result for The improper advised failure caused The Defendant to have a detainer Placed on him on November 19, 2020 by the immigration officials Seeking Deportation. Trial counsel Proved ineffective, by taking advantage of the Defendants mental State and lack of understanding in the Consequences of Pleading Guilty to a Deportable offense by misadvicing The Defendant To Plea Guilty. Please see <u>Ghanavati V. State</u>, 820 So. 2d 989, 991 (Fla 4th DCA 2002) ("It is well settled That affirmative Misadvice Regarding even a collateral Consequence of a Plea form a bias for withdrawing a Plea").

However, had The defendant been Properly advised of The Consequences Though a Competent Counsel, that he would be Taken into ICE's custody to face The Threat of deportation. The defendant would not have accepted The Plea, but would have Persistently insisted on Joining The 'Pretrial Intervention Program', negotiated a Plea to a lesser Offense, or Gone to trial.

Given The effects, and Consequences of The Plea, This Honorable Court should Grant The instant Motion or any other relief This court Deems Just and Proper. Distinctively, The Defendant is seeking to have his Conviction Vacated Pursuant to Fla.R.crim.P 3.850, on The Basis That his Plea was involuntary, because The defendant received ineffective assistance of Counsel in violation of his "6th Amendment Rights".

Specially, The defendants counsel affirmatively misadviced The defendant regarding The affects of his Plea in Light of his immigration status; had Counsel rendered effective assistance, The Defendant would not have entered a Plea, and The result of The Proceeding would have been different; had The defendant ~~had~~ been Properly informed of all options and Consequences.

*Exhibit*

## MEMORANDUM OF LAW

A "Motion For 3.850 Post Conviction Relief to Vacate" is Properly brought in The same Court that originally Convicted, the Defendant who has not otherwise appealed the Conviction. Please see <u>State V. Woods</u>, 400 So. 2d 456 (Fla 1981).

Since the Defendant has not Previously appealed, therefore, this Postconviction Properly Lies with this Court. Whereas in a ruling the supreme Court of Florida, citing to <u>Wood V. State</u>, 750 So 2d 592 (Fla 1999), the Court held that a 3.850 Motion has been expanded to Provide a remedy to custodial and non-custodial Defendants wherein Previously a Petition for "Error Coram Nobis" was the Proper remedy for Postconviction relief in criminal cases when no other remedy exists.

Therefore, the defendant has only recently become fully aware of his Deportation Consequence, when he was held by 'PBSO' to await for 'ICE' to be taken into its Custody, this is when he became informed to have knowledge of his Deportation.

Moreover, the Florida Rule of Criminal Procedure 3.850(6) Provides in Pertinent Part:

"(b) Time Limitations. A motion to Vacate a Sentence that exceeds the limits Provided by law may be filed at any time. No other motion shall be filed or considered pursuant to this rule, if filed more than 2 years after the Judgement and Sentence became Final unless it alleges that

(i) The facts on which the claim is Predicated were unknown to the movant or movants attorney and could not have been ascertained by the exercise of Due Diligence and the claim is made within 2 years of the time that these new facts were or could have been Discovered with the exercise of due Dilligence."

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

*Exh, B-1 /*

Therefore, The defendant is seeking to reassert The Honorable Court That, The facts on which The claim is Predicated were completely unknown to the Defendant, and That affirmative steps were in fact taken in an attempt to discover what The effect of The Plea on his residency status would result to an Immigration Consequence, and according to the Rule of Criminal Procedure 3.850(E) for effective assistance of Counsel, The defendant has suffered Prejudice, in that his Plea has subjected him to Mandatory deportation.

The Plea would not have been accepted, had the Defendant been Properly advised by an effective Counsel, which is The Standard set forth by "the 6th Amendment to The Constitution of The United States of America."

Thus, the Defendant alleges that ~~this~~ matter could not have been ascertained by the excersise of Due Diligence, for The claim to be made within 2 years of the time of This Conviction. Whereas, These new facts were not, and could not have been discovered with The excersice of Due Diligence until The Defendant was actually taken into 'ICE' Custody to learn The Details of his Deportation, and specifically how the Plea enabled such a harsh and direct conseQuence.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

*Exhibit 1*

## Exercise of Due Diligence

Excercising the use of Due Diligence, the Defendant hired the trial attorney of record to represent him in this case, because the Defendant was counting on his attorney to fully advice him on all matters pertaining to his case, including all direct consequences, and collateral consequences, and all options available, so he can make a sound informed decision.

The defendant is not a lawyer now, and he was not for sure one back in 2001, which is why he hired an attorney, not knowing that perhaps he also ~~needed~~ needed to hire an Immigration Attorney as well; which neither the attorney of record nor the court recomended to do.

Nonetheless, the Defendant, to the best of his abilities, and know how, took the following affirmative steps - which should have been done by his attorney of record - to understand his situation:

In 2001, prior to signing the plea, while in the court room, the Defendant consulted with his trial attorney of record, with regards to the limitations, and consequences of accepting the plea, at which the trial attorney responded - as best as the defendant could remember - "The only effect is that, the defendant could not hold a seat in a publicly traded company as an officer, nor as a member of any 'Board of Directors', and 'that after sometime he could get the case expunge.", This news was particularly memorable, and troublesome, as the defendant held a seat as a Chief Technology Officer at a local Private Company; wanting to resolve this issue as quickly as possible, the Defendant signed the plea with the hope of later expunging the case from his record.

Several months after signing the plea, the defendant got a job offer for a position in a publicly traded company as a 'Director / VP of information technology', this event triggered the Defendant to reanalyze his plea, and to see

Page 16 of 28

*Exhibit*

WeTher The Conviction would indeed Prevent the Defendant from Accepting The Job offer. As it turned out it did not, as the offer was for a Leadership / managerial role, and not for an 'Officer', nor a 'Board Directorship'; and also because the adjudication was withheld.

Nonetheless, The defendants analysis spilled into The realm of immigration Law, where the defendant discovered a case decided on <u>May 19, 1995</u> - six years earlier from The Execution of The Plea- "In The matter of Flavio eduardo ManriQue", 21 I & N. Dec 58, BIA 1995, Interim Decision #3250, Which in reading, The Defendant took to mean That he was not deportable. (see exhibit M).

The Defendant Went Further, and asked an INS attorney, and he also came to The same conclusion in The interpretation of ManriQue; The INS attorney also recommended to have the case expunge as soon as possible, to be sure That it could not be use in any future Proceedings.

The defendant understood That, because of ManriQue , and the trial attorney not mentioning The deportation consequences, and The fact That Both The INS and trial attorneys mention The expungement Process, That The matter of Risk of Deportation will be resolve Thru The expungement Process, and That at This Time it was a non-issue, and Thus The defendant move Some What Forward with his life, based on That understanding, to later deal with how to expunge This case.

FurTher more, as indirect affirmative steps; on July 9, 2002 an affidavit of Violation of Probation was Filed, followed by an Amended affidavit of Violation of Probation on Nov 7, 2002, and on May 1st 2003, The Defendant admitted to The Violation of Probation and was adjudicated Guilty, and Sentenced to 5 days in county Jail with (5) days Time served.

All of The above hearings, status checks, and NON-court meetings effectuated with a new attorney of record, and occurred within the two year Spheroid, and none of these events yielded any indication of a certain Immigration Consequence by the new attorney of record, nor the Court.

As Stated in The foregoing, The defendant exercising The use of Due Diligence - In 2001 - the defendant Consulted with an INS attorney to understand his Plea as it relates to his employment Consequences, his motivation was employment related, but it nonetheless Gave him an overview of his deportation Consequence, and what he found - as it turns out - was a false reassurance to bad Legal advice.

Whereas, The Defendant has now learned about what The adverse immigration Consequences for his involuntary Plea Consisted of, That it is with This Same Plea agreement, The U.S Government "will" deport The defendant, instead of The could, might, may or Possibly as The Common Language of The courts that The Judge's were using before at the time That applied to 'ICE' using for Their decisions, when it comes to Placing The Defendant in active Deportation Proceedings.

On or about, November 19, 2020, The defendant Consulted with a Criminal attorney, and a INS attorney, regarding The 2001 Plea agreement, and its consequences, The defendant was advised That in order to have received effective assistance of Counsel from his Attorney of record in 2001, his Counsel Should have addressed The concerns of immigration Consequences for the state's Plea with the Defendant, because such was The Defendant's attorney's Duty as a Defense attorney, and also being That the Counsel of record knew That The defendant was not a U.S Citizen, The Counsel of record should have Properly advise him of Both The 'Pretrial Intervention Program' (PTI), and The fact That The Plea included a "mandatory Deportation" as one of its Consequences.

*Exhibit P*

In addition, The Defendant learned only Years later, after accepting The Plea to be convicted of a crime, and was convicted, under INA Law, alien Defendants That are not U.S. Citizens, and who accept Guilty Plea deals from a Criminal Court will automatically be subjected to deportation Proceedings. Please see F.P.C.P 3.172 (c)(8).

Moreover, under immigration Laws, it is now the Policy of 'ICE' to execute The Deportation Process of 'Immigration Proceeding' based on The Defendants conviction, which is considered to be an immigration charge of "felony" where it is Preventing The Defendant from acquiring any relief from deportation in The immigration Court Presiding over the Defendants case.

Thus, in 2001, by consulting with an INS attorney at The time, The Defendant asserts That These issues of fact, could not have been ascertained That the Defendant would be Facing deportation Proceedings at any time or During The 2 Years Period for Filing a '3.850 Post-conviction relief motion to Vacate', nor could have had The Knowledge of being Subjected to mandatory deportation, due to him being Unlearned in Criminal, and INA Law at That time.

Therefore, it was not until After The Defendant consulted with an Immigration Attorney on November, 2020, after being Taken into 'ICE' Custody to face the Threat of Deportation, who helped the Defendant discover the issues of how he became Subject to Deportation; she explained That 'Manrique' may apply to his case, but it does not take The risk of deportation away, and That the defendant will still Have To Go Thru the Deportation Process to argue his case with an immigration Judge, additionally she mentioned That an Expungement does not apply to INS Proceedings as expunged cases or convictions can be use in Deportation Proceedings.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

*Exhibit 1*

all of The above statements were Confirmed by The Defendant thru several immigration attorneys and by his own research.

The Criminal, and Immigration attorneys consulted in November 2020 also determined, as outlined in Previous Pages, how The Defendants Trial Counsel Back in 2001 Gave him ~~bad~~ affirmative Misadvice, where it was never determined That The defendant would be necessarily removable from The U.S aside his 'Legal Permanent Residency' status being affected as a result of his Conviction.

The defendant was not aware of The Skillset required to Sort This Conviction; as it turns out, he needed or required a Criminal, Immigration and a Post Conviction attorney along with himself being Versed on all Those diciplines, enough to challenge his attorneys to understand That Proper advice is Given. It is unfair to think That after Paying For Competent counsel, That the Defendant had to become Fully competent in Law as well.

The Defendant has demonstrated in These actions to to illustrate That The Florida Rule of Criminal Procedure 3.850 (b)(i) has been satisfied to show and assert That "The Facts on which The claim is Predicated were unknown to The Movants or Movant's Attorney of trial, and could not been ascertained by The exercise of due diligence, and the claim is made within 2 Years of The Time that these new Facts were or could have been discovered with The exercise of due diligence."

Accordingly, before These acquirements, The Defendant Did not Know, nor should have known these issues until Beyond The 2 year period old Following The Plea agreement, that The conviction Would have such harsh consequences. Being So, The Florida Supreme Court in State v. Green Extends That time Period to 2 years Following The date the defendant Knew or should have known That he or she could or will be Deported by The U.S. Government as a result of his Plea acceptance. Please see <u>State V. Green</u>, 944 So. 2d 208.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

*Exhibit /*

Therefore, in The defendants case certainly, it wasn't until After nearly 20 years later on November 19, 2020, That ICE / DHS had taken the defendant into Immigration Custody, Where he remains, and after The defendant Consulted with Attorneys who had Knowledge in Both INA, and Criminal Law, did the defendant Knew The reason, That it was because of The acceptance of his involuntary Plea of Guilty. That The defendant had been Placed in Immigration Proceedings.

The Defendant ascertains, That The Facts of The Immigration Consequences of The Plea agreement would have not been Known to him before ICE / DHS had taken him into Custody, and Served him with The attached "NTA", or That it was because of Pleading out to Charges That made him Deportable Under INA Section 237 (a)(2)(b)(i), and thus unable to adjust his status under Immigration Laws, Where the defendant will be removed from The United States.

There is no reason, The defendant could have Known of These Immigration Consequences any earlier since his Criminal Conviction: The defendant has availed himself to The Government in every way Possible after he entered The Plea, including filing taxes with The IRS, and being cleared to work by a 'DHS', and 'USCIS system' - e-verify- to work in Private, Public and Governmental Projects at 'Nasa', 'Accenture Federal Services', - which contracts extend to almost all aspects of Technology Projects across The Federal Government - and on May 2003, completing his Sentence, and not having an Immigration hold Placed on him; and even after being taken into ICE Custody, and finger Printed, he was still not Given any Indication of The mandatory removal his Conviction Presented.

Therefore, The defendant consulted with an Immigration attorney, and availed himself to The Government, and because none of These individuals, or agencies were able

Page 21 of 28

*Exhibit P*

to determine That the defendant would or will be necessarily removable, not withstanding his status as an 'Legal Permanent Resident', as a result of This Conviction, he has exercised due diligence in attempting to Determine Wether The Plea would render The defendant removable, and inadmissible without relief, and doing such, The Defendant did not Know, nor The Defendant would have Known, until beyond the two year Perrod following The Plea That the conviction would have such harsh Consequences.

Further, The defendant has maintained Gainful employment, and also The defendant work tirelessly to Take care of his whole family, which if the Defendant is Deported, his whole Family would suffer a Great Deal of Extreme hardship.

Lastly, The defendants Conviction is only based on The Affirmative Misadvice received from his trial attorney of record. Therefore, as awareness of the standards Test for a defendant's Proof of Prejudice, as Provided by The Florida Supreme Court, The U.S supreme Court's Provided Standards for claiming Ineffective assistance of Counsel, and the timeliness requirement for a 3.850 Post conviction relief motion, The defendant is aware That even if allegations made in a motion are sufficient to state a claim For relief, a motion may be Summarily Denied without an evidenciary hearing, If The record conclosely refutes The allegations and demonstrates That a defendant is not entitled to relief. Please See <u>Anderson V. State</u>, 627 SO. 2d 1170 (Fla 1993).

Further, The defendant is also aware That an evidenciary hearing would be required if The Motion is facially sufficient, and The record shows That The defendant is entitled To relief. However, The defendant does assert that The allegations made herein this motion are facially sufficient, and cannot be refuted by The record. Therefore, The Defendant request For a consideration for relief.

Page 22 of 23

Exhibit 1

Rule 3.170(k) of The Florida Rule of Criminal Procedure Provides: No Plea of Guilty or Nolo Contendere shall be accepted by a Court, without The Court first determining in Open Court, with means of recording The Proceedings steno Graphically or mechanically, That The Circumstances Sorrounding The Plea reflect a full understanding of The Significance of The Plea, and its Voluntariness, and There is actual Fact basis for The Plea of Guilt.

The standard for determining "The Voluntariness of The Plea is wether The Plea represents a Voluntary and intELLIGENT choice among the alternatives courses of action Open to the Defendant." Please see North Carolina V. Alford, 400 U.S 25 (1975). Therefore, in order for a choice to be an intelligent one, it must be based on correct information. Because a Defendants Plea is involuntary where The Defendant is not informed of a direct and not merely a collateral Consequence of The Plea. Please see Daniels V. State, 716 So. 2d 827 (1998).

Whereas, a direct consequence is one That has a "Definite, and immidiate, and Largely automatic impact on The Defendants Punishment" Zamburo V. State, 413 So. 2d 461 (Fla 4th DCA 1982). Therefore, a defendant is entitled to withdraw a Plea if the direct reasonable Consequences of the Plea are not understood. Please see Thorton V State, 747 So. 2d 439 (Fla 4th DCA 1999). The Potential Deportation of the defendant is Direct, reasonable consequences of The Plea is said to be Presently evident when The Plea is "infected by misapprehension, undue Persuasion, ignorance, or The Plea was not competent to know its consequences, or That it was otherwise involuntary, or That the ends of Justice would be served by withdrawal of Such Plea." Please See. Omestad V. State, 404 So 2d 403 405 (1981).

*Exhibit F*

Furthermore, the defendant `Jose Luis Reyna` is currently in the process of going through the immigration removal proceedings based on the acceptance of the Plea alone, and is ultimately facing imminent threats of deportation consequences for which the defendant was convicted of the following offense: `Simple Possession of Cocaine` for which he was sentenced to 18 months Probation, Drug treatment, and random Drug testing; which was imposed on May 25, 2001; for the charge in this case; and the defendant is now ultimately facing the imminent threat of deportation consequences based on the fact that the defendant was convicted, for which is the only conviction to fall under the immigration statutes as being "Felony" to be unable to adjust his status to cause the defendant to be inadmissible without relief for any "Waivers", and eventually as a result the defendant will be subjected to being deported from the United States as a consequence only for this above Conviction. Please see Kwan, 407 F. 3d at 1014 ( It is undisputed that the possibility of deportation alone is an "Adverse Consequence" of the defendants Conviction is insufficient to satisfy "Article III's" case or Controversy requirement. See Park V. California, 202 F. 3d 1146, 1148 ( 2000).

As a consequence of this matter, and because the defendant faces deportation, therefore, the defendant suffers actual immigration consequences for his Convictions. Please see also Hubenig, 2010 U.S. Dist. Lexis 80179. Whereas, it is the defendants conviction that triggered this immigration removal Proceedings based only on this charge, and for which caused the defendant to be inadmissible, and deportable without any relief in the immigration Courts for being denied of "Cancellation of removal" under the immigration statutes of `Felony` grounds.

It is to that effect that the `Immigration & custom enforcement` (`ICE`) of DHS has filed an "NTA", consisting of the immigration charging documents for confirmation of the defendant being deportable for the above Conviction.

*Exhibit 1*

Additionally, the Defendants motion for 3.850 Postconviction relief has also established that he understands, and acknowledge the Pleading requirements in compliance with Cano V. State, 112 So. 3d. 646, 648 (Fla 4th DCA 2013), where the Court held in Cano, that when a defendant seeks to challenge his plea based on an inadequate warning by counsel of the immigration consequences of a plea, the defendant "must establish the following:

(1) that the defendant was present in the country lawfully at the time of the plea,

(2) That the plea at issue is the sole reason or basis for the defendants deportation,

(3) That the law, as it existed at the time of the plea, subjected the defendant to virtually automatic deportation,

(4) That the presumptively mandatory consequences of deportation is clear from the face of the immigration statute,

(5) That counsel failed to accurately advise the defendant about the deportation consequences of the plea, and

(6) That, if the defendant had been accurately advised, he or she would have not entered the plea."

In the instant case, the defendant unwaveringly asserts that he never received the appropriate warnings from the trial counsel advising him that he would be deported as a result of his plea. A defendant who pleads guilty, or no contest involuntarily is entitled to vacate that plea, and may go back to start over from the beginning to stand in the same shoes he wore prior to the plea colloquy.

The defendant was not accurately informed of the consequences of his plea, thus rendering his plea involuntary. Consequently, the defendant is seeking this post conviction relief for the current charge to be vacated.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

Exhib, 15B

In addition, The defendant is seeking This Post conviction relief in reference to the charge in this case that he had pleaded to on May 25, 2001. The defendant is not precluded from obtaining a withdrawal of his plea as to The cases contemplated in a plea agreement. Please see Whitaker V. State, 881 So. 2d. 80 (Fla 5th DCA 2004); Cornett V. State, 922 So 2d 297 (Fla 2d DCA 2006) (Explaining That an involuntary plea will be withdrawn as to all cases and counts contemplated in a plea agreement).

Therefore, The defendant is choosing to file this motion For Post conviction relief, citing all The "case numbers and charges" for This "Motion for 3.850 Post conviction Relief to Vacate, set aside and/or dismiss, plea, Judgement and sentence."

Finally, The defendant is completely aware to understand That if he succeds in withdrawing his plea warrant to Rule 3.850, The case will be returned to a Pretrial Posture, either Party may Pursue a new Plea negotiations, or refuse them and Proceed to trial.

Additionally, The state may proceed on all charges listed in The information, including those That were "Nolle Prosse" as a result of The negotiated Plea agreement. Please see Carter V. State, 67 So. 3d 242 (Fla 2d DCA 2010). Which may or may not be favorable to be in the defendants best interest and if The defendant is convicted after trial, The new sentences may exceed The Sentenced Previously imposed. Goins, 289 So. 2d. at 918; Please see also Purifoy V. State, 10 So. 3d 197 (Fla 2d DCA 2009) ("Filing a motion to withdraw a Plea may not be in a defendants best interest."). But Nevertheless, the defendant is still willing to be determined to accept any of these undesired Possibilities in seeking with the Full awareness of having all this information in mind to go forward no matter what in this set course of action for a "Post conviction relief to Vacate, set aside, correct and/or dismiss, Plea, Judgement and Sentence" in The above styled cause.

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

Exhibit 1

Wherefore, Based on the foregoing statements, and arguments, and the facts Provided Therein, This Honorable Court Should Find as a matter of Law, Therefore, That the Grounds of The defendants "Motion for 3.850 Post Conviction Relief to Vacate, set aside, correct, and / or Dismiss, Plea, Judgement and Sentence" in The above is Legally Sufficient.

However, The defendant Would Like for this Honorable Court to enter an order to vacate and Set aside his Plea to re-open This case and waive The defendants appeal to not be Present for The Purposes of resolving This case in The above Styled cause, to Place This matter on calendar call to mitigate for The Purposes to Lower and receive a sentence. So, The defendant, respectfully, and Prayerfully requests That this Honorable Court issue an order Granting This "Motion for 3.850 Post Conviction Relief to Vacate, set aside And / Or Modify, Plea, Judgement and Sentence", and any other relief this Honorable Court deems Just and Proper.

NOTE: (Mr Reyna is in Custody, and Pro Se in This Case, and due to The Fact That The 'Palm Beach County Jail' Policy is not to allow any Legal Correspondance to be Sent from family members; Mr Reyna could not attach additional documents as exhibits to back up his assertions, as They are at his Home Office, and if his wife were to attempt to Send Them in, They will be rejected, and returned. Mr Reyna is Writing This motion by hand, without The benefit of a Computer; Therefore, Mr Reyna is having To make a Judgement call - Due to the fact that the Last Correspondence with his attorney on another case took 17 days to arrive -, Mr Reyna does not want to take The chance to not meet the 60 days deadline Given by This Court to File his amended motion.).

# Oath

Under Penalties of Perjury, and administrative san-
ctions from The Department of Corrections, including forfe-
iture of Gain time if This motion is found to be frivilous
or made in Bad Faith. I certify That I understand The
Contents of the foregoing motion. That The Facts Contained
in the motion are true and correct, and I have a reasonable
belief That the motion was timely filed. I certify that
This motion does not duplicate previous motions That have
been disposed of by the Court. I Further Certify That I
understand English and have read The foregoing motion.

/s/ _____

Name: _____Jose Luis Reyra_____

DC#: _____W16529_____

Date: _____6-25-21_____

## Certificate of Mailing

I certify That I Placed This document in The hands
of `PBSO`               for mailing to Clerks of Courts, 205 N Dixie Hwy,
WPB, Florida, 33401 on                    .

/s/ _____

Name: _____Jose Luis Reyra_____

Address: P.O Box 24716, WPB, FL 33416

DC#: _____W16529._____

Page 28 of 28

NOT A CERTIFIED COPY



Exhibit "A"

Exhibit-A

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/I-589.** Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent) (Sign in ink)*

Date: _____

_____
*(Signature and Title of Immigration Officer) (Sign in ink)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on **11-19-20**, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] In person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____SPANISH_____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

REFUSED TO SIGN

FRANCO DE MIRANDA
SDDO- KRONE

_____
*(Signature of Respondent if Personally Served)*

_____
*(Signature and Title of Officer) (Sign in ink)*

DHS Form I-862 (2/20)

Exhibit-A

## Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (2/20)

Exhibit-A

U.S. Department of Homeland Security                    Continuation Page for Form I-862

| Alien's Name REYNA, JOSE LUIS | File Number 041 074 228 Event No: WPD1912000103 | Date 11/19/2020 |
|---|---|---|

THE SERVICE ALLEGES THAT YOU:
-------------------------------
Judicial Circuit of Florida in and for Palm Beach County of the offense of Count 1-
Possession of Cocaine, in violation of Florida Statute 893.13(6)(a), for which you were
sentenced to five days of imprisonment, followed by eighteen months on probation. Case
number 00CF13843.


ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED
STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
-------------------------------------------------------------------------
---------------------------------------------------------
Section 237(a)(2)(B)(i) of the Immigration and Nationality Act, as amended, in that, at any
time after admission, you have been convicted of a violation of (or a conspiracy or attempt
to violate) any law or regulation of a State, the United States, or a foreign country
relating to a controlled substance (as defined in Section 102 of the Controlled Substances
Act, 21 U.S.C. 802), other than a single offense involving possession for one's own use of
30 grams or less of marijuana.

NOT A CERTIFIED COPY

| Signature | Samuel Torres S 8153 TORRES Digitally signed by Samuel Torres Date: 2020.11.19 13:06:22-05'00' | Title Acting SDDO |
|---|---|---|

Form I-831 Continuation Page (Rev. 08/01/07)

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK, 6/29/2021 9:40:00 AM

Exhibit-A

**U.S. DEPARTMENT OF HOMELAND SECURITY**          Warrant for Arrest of Alien

File No. _041 074 228_

Date: _08/08/2019_

**To:**  **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _REYNA, JOSE_
is removable from the United States. This determination is based upon:

  ☐ the execution of a charging document to initiate removal proceedings against the subject;

  ☐ the pendency of ongoing removal proceedings against the subject;

  ☐ the failure to establish admissibility subsequent to deferred inspection;

  ☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

  ☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

_Damian Weston SDDO (acting)_
(Printed Name and Title of Authorized Immigration Officer)

| Certificate of Service |
|---|
| I hereby certify that the Warrant for Arrest of Alien was served by me at _Miami, FL_ |
| (Location) |
| on _REYNA, JOSE_ on _11-19-20_ , and the contents of this |
| (Name of Alien)     (Date of Service) |
| notice were read to him or her in the _Spanish_ language. |
| (Language) |
| FRANCO DE MIRANDA |
| SDDO-KROME                       N/A |
| Name and Signature of Officer        Name or Number of Interpreter (if applicable) |

NOT ACCEPTED UNTIL FILED.COM

Exhibit P

EXHIBIT-A

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 10/17/1969

Event No: WPD1912000103

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 363450929

FINS: 1268964654

In the Matter of:

File No: 041 074 228

Respondent: JOSE LUIS REYNA AKA: RAZURI, JOSE

414 26TH STREET WEST PALM BEACH,FLORIDA, 33407

currently residing at:

(Number, street, city, state and ZIP code)

(Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States.

2. You are a native of Peru and a citizen of Peru.

3. You were admitted to the United States at or near New York, New York on or about April 3, 1987 as a lawful permanent resident.

4. You were, on May 25, 2001, convicted in the Circuit Court of the Fifteenth   See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

See Continuation Page Made a Part Hereof

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:   [ ] 8CFR 208.30   [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

18201 S.W. 12TH ST BLDG 1 STE C Miami FL 33194. EOIR SPC Miami, FL
(Complete Address of Immigration Court, including Room Number, if any)

on December 18, 2020 at _____ 8:30 AM _____ to show why you should not be removed from the United States based on the
　　(Date)　　　　　　　　(Time)

charge(s) set forth above.

Samuel Torres  Digitally signed by Samuel Torres
Date: 2020.11.19 13:06:43 -05'00'

S 8153 TORRES - Acting SDDO
(Signature and Title of Issuing Officer) (Sign in ink)

Date: November 19, 2020

Stuart, Florida
(City and State)

DHS Form I-862 (3/20)



Exhibit "B"

NOT A CERTIFIED COPY

Exhibit-B

# State of Florida
# Department of Corrections
# Interoffice Memorandum

**Memo To:**  **REYNA, JOSE**      **W16529**   **B1-113L**

**From:**      **T. CROOK, ACSS**

**Date:**      **02/03/2020**

**Re:**        **DETAINER PLACEMENT**

---

BE ADVISED THAT A DETAINER HAS BEEN <u>PLACED</u> BY:

IMMIGRATION
ALIEN A#041-074-228

IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT
CLASSIFICATION BY INMATE REQUEST.

NOT A CERTIFIED COPY

Exhibit "C"

NOT A CERTIFIED COPY

*Exhibit P*

Exhibit-C

**PLEA IN THE CIRCUIT COURT**
**THE FOLLOWING IS TO REFLECT ALL TERMS OF THE NEGOTIATED SETTLEMENT**

Name: Jose Luis Reyna        H/m   10-17-69

Plea: Guilty X  Guilty/Best Interest ___  Nolo Contendere ___

~~Case No.~~        ~~Charge~~        Count    Lesser    Degree

| 00CF 13843 AO1 | Poss. Cocaine | 1 | NO | 3 of |
|---|---|---|---|---|

State to Nolle Prosse the following at sentencing: _____

**PSI:** Waived/Not Required X   Required/Requested ___

**ADJUDICATION:**    Adjudicate [  ]      Withhold [X]   Court's Discretion   [  ]

If the Defendant is convicted of possession, sale, trafficking or conspiracy to possess, sell or traffic in any controlled substance, the Court directs the Department of Motor Vehicles and Highway Safety to revoke the Defendant's driver's license for two (2) years. If the Defendant is convicted of grand theft of a motor vehicle; theft of motor vehicle parts; or, any felony in the commission of which a motor vehicle was used, the Court directs the Department of Motor Vehicles and Highway Safety to revoke the Defendant's driver's license as mandated by law.  The Clerk is directed to make the proper notifications.

**SENTENCE:**

$_____ Fine  $_____ Court Costs  $_____ Drug Trust Fund

$_____ Cost of Prosecution  $_____ Public Defender Fees/Costs

Incarceration: _____ Days _____ Months _____ Years

with credit for time served; which is _____ days.

**PROBATION:** 18  Months / Years - Drug Offender if checked [  ]

**ALL CONDITIONS OF PROBATION MUST BE SUCCESSFULLY COMPLETED NO LESS THAN 30 DAYS BEFORE PROBATION IS SCHEDULED TO TERMINATE UNLESS STATED BELOW.**
**STANDARD CONDITIONS OF PROBATION HAVE BEEN EXPLAINED BY DEFENSE COUNSEL.**

**SPECIAL CONDITIONS OF PROBATION:**

A) Restitution as per the accompanying order. [  ] (check if ordered)

B) Fine: $_____  Court Costs: $ 261⁰⁰  Drug Trust Fund: $ 50⁰⁰

C) Cost of Prosecution $ 50⁰⁰  Public Defender Fees/Costs $_____

   Substance abuse evaluation and successful completion of recommended treatment [ ✔ ] (check if ordered) (enroll within 30 days) If in custody, release only to _____

D) Random Drug Testing at Defendant's expense [ ✔ ] (check if ordered)

E) _____ hours of community service at a rate of no less than _____ hours per month

F) Incarceration: _____ Days _____ Months _____ Year

   with credit for time served; which is _____ days.

**OTHER COMMENTS OR CONDITIONS:**

COS $20⁰⁰

SENTENCING IS DEFERRED UNTIL _____ IN COURT ROOM _____

THE DEFENDANT UNDERSTANDS IF S/HE FAILS TO APPEAR OR IS ARRESTED ON NEW CHARGES, A CAPIAS WILL BE ISSUED AND THE COURT WILL IMPOSE ANY LAWFUL SENTENCE.

FILED

MAY 25 2001

Assistant State Attorney                    Attorney for the Defendant

5-25-01                    DOROTHY H. WILKEN

Date of Plea        CIRCUIT & COUNTY COURTS
                    (CRIM DIV)

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the foregoing is a true copy of the record in my office with redactions, if any as required by law.
THIS 5th DAY OF December, 20 18
SHARON R. BOCK
CLERK & COMPTROLLER
By _____
DEPUTY CLERK

A041-074-228

**95**

EXHIBIT-C

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR PALM BEACH COUNTY

CASE NO. OOCF 13843    A#2    DIV. S

STATE OF FLORIDA

[ ] COMMUNITY CONTROL VIOLATOR

v. Jose Reyna
Jose Luis Reyna

[ ] PROBATION VIOLATOR

DEFENDANT

H/m    10-17-69

Jun-14-2001 02:24pm 01-252119
ORB 12644 Pg 183
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

I hereby certify that the foregoing is a true copy of the record in my office with redactions, if any as required by law.
THIS 28 DAY OF December, 20 18
SHARON R. BOCK
CLERK & COMPTROLLER
DEPUTY CLERK

## JUDGMENT

The above Defendant, being personally before this Court represented by Alan S. Fishman, Esq. (attorney)

| [ ] | Having been tried and found guilty of the following crime(s): | [X] | Having entered a plea of guilty to the following crime(s) | [ ] | Having entered a plea of nolo contendere to the following crime(s): |

| COUNT | CRIME | OFFENSE STATUTE NUMBER(S) | DEGREE | CASE NUMBER | OBTS NUMBER |
|-------|-------|---------------------------|--------|-------------|-------------|
| 1 | Poss. Cocaine | 893.13(6)(a) | 3°f | | |

[ ] and no cause having been shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s).

[ ] and having been convicted or found guilty of, or having entered a plea of nolo contendere or guilty, regardless of adjudication, to attempts or offenses relating to sexual battery (ch. 794), lewd and lascivious conduct (ch. 800), or murder (s. 782.04), aggravated battery (s. 784.045), carjacking (s. 812.133), or home invasion robbery (s. 812.135), or any other offense specified in section 943.325, the defendant shall be required to submit blood specimens.

[X] and good cause being shown:  IT IS ORDERED THAT ADJUDICATION OF GUILT BE WITHHELD.

SENTENCE STAYED

[ ] The Court hereby stays and withholds imposition of sentence as to count(s) and places the Defendant on  [ ] Probation and/or [ ] Community Control under the supervision of the Dept. of Corrections (conditions of probation set forth in separate order).

SENTENCE DEFERRED

[ ] The Court hereby defers imposition of sentence until _____

The Defendant in Open Court was advised of his right to appeal from the Judgment by filing notice of appeal with the Clerk of Court within thirty days following the date sentence is imposed or probation is ordered pursuant to this adjudication.  The defendant was also advised of his right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigency.

DONE AND ORDERED in Open Court at West Palm Beach, Palm Beach County, Florida, this 25 day of May 2001 199____

(rev. 1/97)

**FILED**

MAY 2 5 2001

DOROTHY H. WILKEN, CLERK

CIRCUIT COURT JUDGE

Exhibit "D"

NOT A CERTIFIED COPY



# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**Circuit Criminal Division**
PO Box 2906
West Palm Beach, FL 33402
P: (561) 355-2519 | F: (561) 355-3802

03/10/2021

50-2000-CF-013843-AXXX-MB

JOSE L REYNA DC#0252767
MAIN DETENTION CENTER
PO BOX 24716
WEST PALM BEACH FL 33416

Dear JOSE L REYNA,

We are in receipt of your request for copies. According to Florida Rules 3.140 and 3.670 our office is required to provide one copy of the indictment and/or information and one copy of the judgment free of charge. All other copy requests must be accompanied by a payment of all applicable fees or you may complete the attached Application for Criminal Indigent Status.

Once we have reviewed your application, you will be notified by mail of your status and copy request(s). Please return your completed application and your copy request(s) to:

Circuit Criminal Department
205 N. Dixie Highway, Room 3.2400
West Palm Beach, FL 33401
Attn: Copy Desk

If you have any questions, please call (561) 355-2994 to speak to our Customer Service Professionals or log onto our web site at www.mypalmbeachclerk.com.

Sincerely,

Smith, Ruby
Deputy Clerk



FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK. 03/10/2021 11:18:02 AM

FILED: PALM BEACH COUNTY, FL JOSEPH ABRUZZO, CLERK. 6/29/2021 9:49:00 AM

*(Exh. B, 4)*

March 10, 2021

RE:   JOSE L REYNA

To:   JOSE L REYNA
      MAIN DETENTION CENTER
      S8B, 0252767
      PO BOX 24716
      WEST PALM BEACH, FL 33416

Based on your request to the Clerk of the Circuit Court and Comptroller of Palm Beach County, we are notifying you of the following:

☐   The requested copies cannot be provided because: _____

☐   Court file number _____ has been destroyed pursuant to Florida Rule of Judicial Administration 2.430.

☐   The microfiche record cannot be located or is illegible due to a program error.

☐   The information you requested is prior to 1976, at which time municipalities maintained separate court systems.  Please direct your request to the arresting agency.

☐   The case you are requesting is not a Palm Beach County case.  Please direct your request to the county where the charges were filed.

☒   The transcripts requested cannot be provided as they have not been filed with the Clerk's office.  Please contact the Office of Court Administration, Court Reporting, at 561-355-6526 or mail your request to  205 N. Dixie Hwy, Room 5.1400, West Palm Beach, FL 33401.

☐   We are providing you with the microfiche record/print screens of the case.  The original case file has been destroyed pursuant to Florida Rule of Judicial Administration 2.430.

☐   Court file number _____ is still pending and is scheduled for  court on _____.  Please resubmit your request after this date.  Original request attached.

If you have any questions, please call our Customer Service Professionals at (561) 355-2994, Monday to Friday between the hours of 8am and 4pm.  You may also log on to our website at www.mypalmbeachclerk.com.

Sincerely,

RUBY SMTH
Deputy Clerk

**Circuit Criminal Division**
205 N. Dixie Highway, Rm. 3.2400
West Palm Beach, FL 33401

P.O. Box 2906
West Palm Beach, FL 33402

Phone: 561-355-2994

www.mypalmbeachclerk.com



**JOSEPH ABRUZZO**

CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY

**CIRCUIT COURT
CRIMINAL DIVISION**

P.O. Box 2906
West Palm Beach, FL 33402-2906

Jose L Reyna
Main detention center
PO BOX 24716
West Palm Beach, FL 33416

NOT A...

Jose Luis Reyna
SPB, 025276?
P.O Box 24716
W.P.B, FL 33407.

NOT A CERTIFIED COPY

Clerks of Courts
205 North Dixie Hwy
West Palm Beach, FL 334



# Exhibit Y

Inmate Request no: 5214298

## 'Sworn Declaration Under Penalty of Perjury'
In accordance with Federal Statute 28 U.S.C 1746.

Jose Luis Reyna ( Hereinafter "Declarant") makes the following statements based on Declarant own First hand Knowledge, information, and belief, unless otherwise stated. I Jose Luis Reyna, hereby Depose and Declare:

That Attachment #1 represents a True Copy of Inmate Request # 5214298 Details written on Paper Word For Word by the Declarant, from the Inmate Request Application in the Dorm Kiosk System.
A written copy was required as efforts to obtain a Printed Copy from PBSO were Unsuccessful. See attachment #2 and #3.

I, Jose Luis Reyna, Declare in accordance with Federal Statute 28 U.S.C § 1746 Under Penalty of Perjury by this Sworn Declaration That the information and Facts Provided herein are, Within the Best of my Knowledge and belief, true in accordance With the Constitution and Laws of the United States.

Date: 5/1/2021          Signature: _____

DOB: 10-17-1969      Name: Jose Luis Reyna

Inmate No: 0252767.

Page 2 of 4

## Exhibit JJ — Attachment #1

Verbatim Copy of Inmate Request # 5214298
Written From online Kiosk System

Requestor: Jose Luis Reyna, 0252767
Inmate Request number: 5214298
Date Time: 4/23/21  12:56:22

---

Processor Title: Clerical Specialist
Name of Processor: Britany Sashington
ID: 9624
Official Response: 4/23/2021  13:43:38

'You Currently have a Federal Administrative hold of 48 Hours. That means That once you have Completed and Satisfied all of Your Local charges, You will Then Be Booked on That hold and ICE will have 48 Hrs From Time You are Booked For Them, to come and Pick You UP by The Time The 48Hrs is UP The PBSO can Then Release You out of Custody.'

End of request.

Exhibit J                              Attachment #2              Page 3 of 4



**PALM BEACH COUNTY**

**RIC L. BRADSHAW, SHERIFF**

## Inmate Records – Inmate Request Response Letter

**Date:** 4/30/2021

**Jacket #:** 0252707

**Tracking #:** N/A

☒ Request completed (Please see response or attached documents if applicable)

☐ Please clarify your request

☐ Request cannot be completed by Inmate Records (Please see response)

☐ Other: (Please see response)

---

**Response:**

We need clarification needed for this request.

Completed by: JC                 ID#    24730

mlm 1/18



Exhibit B — Attachment #3.    Page 4 of 4.

PALM BEACH COUNTY
**SHERIFF'S OFFICE**
RIC L. BRADSHAW, SHERIFF
**DEPARTMENT OF CORRECTIONS**

# INMATE REQUEST

☑ MAIN DETENTION CENTER        ☐ WEST DETENTION CENTER

*Only one request allowed per form.    *Solamente se permite una solicitud por formulario.    *Li entèdi pou fè plis pase yon demann sou chak fòmilè.

☐ **Commanding Officer**
Oficial de Mando / Ofisye siperyè
☐ **Public Defender**
Defensor público/ Avoka defans piblik
☐ **Notary Service**
Servicio de Notario / Sèvis notè
☑ **Classification**
Clasificación/ Klasifikasyon
☐ **Property**
Propiedad / Pwopriyete
☐ **Canteen**
Cantina / Kantin
☐ **Inmate Records / Court Information**
Registro de Reclusos/Información de Corte/ Dosye prizonye/enfòmasyon sou jijman
☐ **Visitation**
Visitas / Vizit
☐ **Other**_____
Otro / Lòt

☐ **Program**
Programas / Pwogram
☐ **Reading Library**
Biblioteca para lectura / Bibliyotèk pou lekti
☐ **Educational Program**
Programas Educacionales / Pwogram edikasyonèl
☐ **AA/NA Meetings**
Reuniones de AA/NA / Reyinyon AA/NA
☐ **Another Way Drug Education Dorm**
Dormitorio para la Educación sobre drogas "Another Way" / Dòmitwa Another Way pou edikasyon sou dwòg
☐ **Re-Entry**
Reingreso / Retou
☐ **Alternative Custody / IHA**
Detención Alterna/Arresto Domiciliario / Gad altènatif / kouvrefe adomisil
☐ **Work Release**
Salida para Trabajar / Sòti pou ka travay

☐ **Chaplain**
Capellán / Chaplen
☐ **Bible Study**
Estudio Bíblico / Li labib
☐ **Spanish Church Service**
Servicio en Español / Legliz panyòl
☐ **Catholic Church Service**
Servicio Católico / Legliz katolik
☐ **Jewish Service**
Servicio Judio / Sèvis jyif
☐ **Jehovah's Witness**
Testigo de Jehová / Temwen jewova
☐ **Muslim Prayer**
Oración Musulman / Priyè mizilman
☐ **Non-Denominational Church**
Servicio No-Denominación / Legliz san denominasyon
☐ **Request for Bible**
Pedido de Biblia / Demann pou labib

**Name (Print):** _Jose Luis Reyna_
Nombre (Letra de molde / Non (ekri ak gwo lèt)
**Date of Birth:** _10/7_
Fecha de Nacimiento / Dat nesans

**Date:** _4/29/21_ **Jacket #:** _0252767_    **Pouch #:** _3807_    **Housing Unit:** _S8B_
Fecha / Dat    Número de "Jacket" / Nimewo "Jakèt"    Numero de "Pouch" / Nimewo "Pouch"    Unidad de Vivienda / Inite lojman

**State the reason for submitting this request:**
Explique la razón porque presenta esta solicitud: / Èksplike rezon pou demann sa a:

_Please Print Online Inmate request # 5214298._
_THX._

_D/S McGriff_                     _20338_          _D/S McGriff_          _4/29/21_
**Request received by (Print)**          **ID #**          **Signature**          **Date**

**Official Response:**
Respuesta Oficial: / Repons ofisyèl:

| Official's Name (Print) | ID # | Official's Signature | Date |

PBSO CF #0019 REV. 05/12

Exhibit Y

Legal mail.

MDC
Jose Luis Reyna
580,022
P.O. Box 24416
West Palm Beach, FL 33416

Law Offices of Sandra echevarria, P.A.
nm. Anabel
18421 SW 120Th Street
Suite 221
Miami, Florida 33186-4225

Legal mail.

Legal mail.

Page 1 of 3

## Exhibit Z

### Inmate Request 5301953

"Sworn Declaration Under Penalty of Perjury"
In accordance with Federal Statute 28 U.S.C 1746.

Jose Luis Reyna, (hereinafter 'Declarant') makes The following Statements based on declarant own First hand Knowledge, information, and belief, unless otherwise stated.

I Jose Luis Reyna, hereby depose and Declare:

"That The attached documents are a true copy Of The Papers I received from The PBSO in regards To inmate request #5301953 On May, 11, 2021."

I, Jose Luis Reyna, Declare in accordance with Federal Statute 28 U.S.C # 1746 Under Penalty of Perjury by This Sworn declaration That The information and Facts Provided herein are, within The best of my Knowledge and belief, True in accordance with The Constitution and The Laws of The United States.

X _____        Date: 5/11/21

Jose Luis Reyna                    # 0252767

EXHIBIT 2

Page 2 of 3



## Palm Beach County Sheriff's Office
## Ric L. Bradshaw, Sheriff
## Department of Corrections

### Inmate Request - Inmate Records

Name: JOSE REYNA      DOB: _____      Request #: 5301953
Account#: 0252767                                Port: South_8B_T9684
Pouch #: 3807         Housing Unit: M/S/S08/B

State the reason for submitting this request:
05/10/2021 09:50:29
i know i have an ICE hold, can you please send me the paperwork you have on the subject? A copy of the warrant? THX

Title of Processor: CS
Name of Processor: Darling
ID #: 24311
Official Response:
05/10/2021 11:13:50
Your kiosk inmate request is being forwarded to the Central Records Department for review/completion.



EXHIBIT 2

Page 3 of 3



**PALM BEACH COUNTY**
**SHERIFF'S OFFICE**
**RIC L. BRADSHAW, SHERIFF**

## Inmate Request Response Letter

**May 11, 2021**

**Jacket:** 0252767

**Regarding Request:** O077358-051121

[] Your request is complete. Documents Enclosed/Attached.

We are unable to process your request due to one or more of the following reasons:

[] This request requires a fee of $3.00.

[] Please clarify your request.

[] Unable to read the information provided. Please print legibly.

[x] Other: **Per Inmate Records**- Paper documentation is not available for the Federal Detainer Ice Hold; which was placed in 2018. There is no warrant attached to the Ice Hold.

Thank you,

**Central Records Specialist:** Devia Carrington

NLEO → Exhibit 2

# PALM BEACH CNTY SHERIFF'S OFFICE
## WARRANTS ENTRY - DETAINER

| | |
|---|---|
| Date: | 06/02/2021 |
| Time: | 3:30 PM |
| Page: | 1 of 1 |

User ID: Brittany M. Sashington

Record Type: DETAINER  Person: REYNA, JOSE LUIS

| | Last: | Suffix: | First: | Middle: | Full Name: | D.O.B.: | SSN: |
|---|---|---|---|---|---|---|---|
| Name: | REYNA | | JOSE | LUIS | REYNA, JOSE LUIS | 10/17/1969 | |
| AKA 1: | | | | | | | |
| AKA 2: | | | | | | | |

Jacket #: 0252767  Address:  US Citizen/Other: ☐
ID #: 20201217037  City:  Employer Name:
Race: W  State/Zip: FL  Employer Address:
Gender: M  Phone Number: (561) 832-5231  Employer City:
Height/LBS: 511  195  FBI#/SID#:  State/Zip:
Hair Color: BLK  State Id Type:  Employer Phone:
Eye Color: BRO  State Id/State:  Entered Date/Time: 12/17/2020  1:21 PM
Complexion: MED  MDOC #:  Entered By / Badge: ANGELA A BE  4282

Detainer Number: A041074226  Court: FEDERAL  Detainer Removed: ☐
Detainer Agency: DHS  OCA Number:  Removed Agency:
Original Agency: 21-ICE-ERO  Docket Number:  Removed Date:
Detainer Date: 12/17/2020  Bond Type: NO BOND  Removed Time:
Detainer Time: 13:21  Original Bond: $0.00  Removed By:
Detainer Type: FED ADMIN (48 HR) BOA  Date Paid:  Removed By Id:
Requested By: BEMBRY/BREWINGTON  Time Paid:  Rel To Agency:
Requested By Id: 4282/5292  Amount Paid: $0.00  Released Date:
Out Date:  Receipt Number:  Release To Name:
Out Time:  Bond Taken By:  Released To Id:
Program Eligible:  Taken By Badge:

## CHARGES INFORMATION

Charge Code: Charge Description:  Date:  Time:  Crime Type:  Bond:  Court:  Sentence:

| Charge Code | Charge Description | Date | Time | Crime Type | Bond | Court | Sentence |
|---|---|---|---|---|---|---|---|
| 0010 | FED ADMIN HOLD 48 HRS 8CF 287.7 | 12/17/2020 | 1:23 PM | | $0.00 | | |

## NOTES

| Note Type | Created Date | Created Time | Created By | Note |
|---|---|---|---|---|
| | 12/17/2020 | 1:22 PM | ANGELA A BEMBR | CAME IN ON A COURT ORDER WITH A DETAINER FOR ICE BOA I-200, I-247 & I-4-203 |

EXhIbIT-2



PALM BEACH COUNTY
RIC L. BRADSHAW, SHERIFF

### <u>Inmate Request Response Letter</u>

**June 03, 2021**

**Jacket:** 0252767

**Regarding Request:** O084679-060221

[x] Your request is complete. Documents Enclosed/Attached.

<u>We are unable to process your request due to one or more of the following reasons:</u>

[] This request requires a fee of $3.00.

[] Please clarify your request.

[] Unable to read the information provided. Please print legibly.

[] Other:

Thank you,

**Central Records Specialist:** Devia Carrington

Exhibit 2



**Palm Beach County Sheriff's Office**
**Ric L. Bradshaw, Sheriff**
**Department of Corrections**

**Inmate Request – Inmate Records**

<u>Name:</u> JOSE REYNA
<u>Account#:</u> 0252767
<u>Pouch #:</u> 3807

<u>DOB:</u>_____

<u>Housing Unit:</u> M/S/S08/B

<u>Request #:</u> 5417001
<u>Port:</u> South_8B_T9684

<u>State the reason for submitting this request:</u>
05/31/2021 10:21:04
can i olease get a screen printout of my ice detainer?

<u>Title of Processor:</u> Clerical Specialist
<u>Name of Processor:</u> e
<u>ID #:</u> 8257
<u>Official Response:</u>
06/02/2021 13:51:46
Your request is being forwarded to Central Records to be fulfilled.

Exhibit 2

☐ A SHIFT (Midnight Shift)
☐ B SHIFT (Day Shift)
☐ C SHIFT (Evening Shift)

# PALM BEACH COUNTY SHERIFF'S OFFICE
## DEPARTMENT OF CORRECTIONS
### INMATE GRIEVANCE PROCEDURE

DIV/DEPT _____

LOG # _____

☐ **MAIN DETENTION CENTER**          ☐ **WEST DETENTION CENTER**

| Writing outside of the space provided to you may be cause for the grievance to be returned unprocessed |
| SUBMIT **ONE** CONCERN/ISSUE **ONLY** PER GRIEVANCE OR IT WILL BE RETURNED UNPROCESSED |

Name: _____ Jacket # _____ Housing Unit _____ Date: _____

Use <u>only</u> the space below to explain in detail your concern/issue.
Nature of Grievance: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Have you attempted an informal resolution to this problem?   ☐ Yes   ☐ No

If yes, with whom and when? _____

Date received: _____     D/S Name (Print): _____

☐ Inmate received a copy of this grievance _____  Inmate's acknowledgement _____
                                        D/S Signature          I.D. #          I/M Initial

Date received: _____     Grievance Coordinator: _____

I find your grievance to be ☐ valid, ☐ partially valid, or ☐ not valid.  Response Date: _____

Response: _____

_____

_____

_____

_____

_____

| Investigation Officer's Name (Print) | I.D. # | Investigation Officer's Signature | Date |

Distribution:
Original (White) Grievance Coordinator
Copy (Yellow) Inmate

PBSO CF #0039 REV. 10/17

Exhibit - V

Pag 1 of 1

**The Palm Beach Post** | WEDNESDAY, MAY 12, 2021 | **1B**

+ BUSINESS

# LOCAL

# Deputy charged with battery

## Surveillance camera video of altercation at Belle Glade jail contradicts officer's incident report

**Hannah Winston**
Palm Beach Post
USA TODAY NETWORK

BELLE GLADE — Palm Beach County Sheriff's Office corrections deputy Jacob Younger wrote in an incident report that a man being held at the West Detention Center moved toward him in an "aggressive manner," so he ordered him to the ground in late April.

When Tavarous Jones didn't comply, Younger wrote that he brought the 29-year-old man down to the ground himself.

Contrary to the report, surveillance-camera video of the incident showed Younger repeatedly striking Jones, throwing him to the ground and then continuing to hit him until another deputy intervened and handcuffed Jones, according to an arrest report released this week.

Younger, 31, faces one count of battery in the alleged attack and is on administrative leave, along with the two

other deputies who were present. Younger was released on his own recognizance after his arrest and Jones remains in the jail on unrelated charges.

As of Tuesday afternoon, the sheriff's office had not publicly released the video of the incident.

Sabarish Neelakanta, an attorney who has handled civil rights cases within detention centers and has met with Jones' family to discuss its legal options, said videos of reported police misconduct are more prevalent now than ever.

He pointed to the recent conviction of former police officer Derek Chauvin in the death of George Floyd in 2020. The

Minneapolis Police Department initially called Floyd's death a "medical incident" and not a use of force by officers. Video recorded by a bystander showed a different story.

"What happens in jails and prisons is different," Neelakanta told The Palm Beach Post. "What happens inside often goes unaccounted for."

**Video shows different story than jail deputy's written statement**

On April 22, just before 11 p.m., Jones said he was expressing frustration to jail

See DEPUTY, Page 10B